# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTONIO CABALLERO,<br><br>Plaintiff,<br><br>v.<br><br>FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, a/k/a FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA; and THE NORTE DE VALLE CARTEL,<br><br>Defendants. | Case No. 1:20-mc-00040-LJV |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF PETRÓLEOS DE VENEZUELA, S.A. AND ITS SUBSIDIARIES TO QUASH WRITS OF EXECUTION AND VACATE TURNOVER JUDGMENT

**WHITE & CASE**
701 Thirteenth Street, N.W.
Washington, D.C., 20005
(202) 626-3600

*Counsel for Petróleos de Venezuela, S.A., Aceites y Solventes Venezolanos Vassa S.A., PDV Marina S.A., Petroanzoategui S.A. (a/k/a Petro San Felix S.A.), Venfleet Asphalt, Ltd., Venfleet, Ltd., and Venfleet Products, Ltd.*

June 25, 2021

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 3

STATUTORY FRAMEWORK................................................................................. 8

ARGUMENT ......................................................................................................... 14

I.    THIS COURT LACKED SUBJECT-MATTER JURISDICTION TO ISSUE THE
      WRITS OF EXECUTION AND ENTER THE TURNOVER JUDGMENT .............. 14

II.   THE COURT LACKED PERSONAL JURISDICTION TO ISSUE THE WRITS OF
      EXECUTION OR ENTER THE TURNOVER JUDGMENT .................................. 18

III.  THE TURNOVER JUDGMENT IS VOID BASED ON INEFFECTIVE SERVICE . 21

IV.   THE TERRORISM RISK INSURANCE ACT DOES NOT APPLY TO PDVSA
      AND ITS SUBSIDIARIES ........................................................................... 25

V.    THE UNDERLYING DEFAULT JUDGMENT AGAINST THE FARC IS VOID
      FOR LACK OF JURISDICTION ................................................................... 39

CONCLUSION...................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989)...........................................................................................8, 14, 17

*Balintulo v. Daimler AG*,
  727 F.3d 174 (2d Cir. 2013)........................................................................................45

*Bennett v. Franklin Res., Inc.*,
  360 F. Supp. 3d 972 (N.D. Cal. 2018) .........................................................................16

*Bigio v. Coca-Cola Co.*,
  675 F.3d 163 (2d Cir. 2012)...................................................................................36, 37

*Biton v. Palestinian Interim Self-Government Authority*,
  310 F. Supp. 2d 172 (D.D.C. 2004) .............................................................................43

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017).............................................................................................15, 26

*Bouret-Echevarria v. Caribbean Aviation Maint. Corp.*,
  784 F.3d 37 (1st Cir. 2015).........................................................................................24

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006)....................................................................................................29

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
  No. 12-48803-CA-02, 2014 Fla. Cir. LEXIS 51243...................................................44

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
  No. 154864/2020, 2020 N.Y. Misc. LEXIS 10368 (N.Y. Sup. Ct. Dec. 4, 2020) .................36

*Cameron v. City of N.Y.*,
  598 F.3d 50 (2d Cir. 2010)...........................................................................................34

*Chalabi v. Hashemite Kingdom of Jordan*,
  543 F.3d 725 (D.C. Cir. 2008) ....................................................................................37

*Cohen v. Empire Blue Cross & Blue Shield*,
  176 F.3d 35 (2d Cir. 1999)...........................................................................................26

*Concord Reinsurance Co. v. Caja Nacional de Ahorro y Seguro*,
  94 Civ. 2218, 1994 U.S. Dist. LEXIS 7532 (S.D.N.Y. June 6, 1994)....................19

*Covington Indus., Inc. v. Resintex A. G.*,
  629 F.2d 730 (2d Cir. 1980)..........................................................................................39

*Daly v. Llanes*,
   30 F. Supp.2d 407 (S.D.N.Y. 1998)........................................................................23

*Epperson v. Entm't Express, Inc.*,
   242 F.3d 100 (2d Cir. 2001).........................................................................14, 21

*Estate of Heiser*,
   885 F. Supp. 2d 429 (D.D.C. 2012)...................................................................16

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
   90 Civ. 7360 (JSM), 1992 U.S. Dist. LEXIS 15235 (S.D.N.Y. Oct. 6, 1992) ......................24

*First Fidelity Bank, N.A. v. Government of Antigua & Barbuda Permanent Mission*,
   877 F.2d 189 (2d Cir. 1989)..........................................................................24

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*,
   462 U.S. 611 (1983).......................................................................................26

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)................................................................................19, 40

*Harrison v. Republic of Sudan*,
   No. 13-cv-3127, 2017 U.S. Dist. LEXIS 25675 (S.D.N.Y. Feb. 10, 2017)...........................31

*Hausler v. JP Morgan Chase Bank, N.A.*,
   770 F.3d 207 (2d Cir. 2014)..........................................................................37

*Hausler v. JPMorgan Chase Bank, N.A.*,
   845 F. Supp.2d 553 (S.D.N.Y. 2012).............................................................38, 39

*In re Terrorist Attacks on Sept. 11, 2001 (Asat Tr. Reg.)*,
   714 F.3d 659 (2d Cir. 2013)..........................................................................19

*Janvey v. Libyan Inv. Auth.*,
   840 F.3d 248 (5th Cir. 2016) ......................................................................26

*Jerez v. Republic of Cuba*,
   775 F.3d 419 (D.C. Cir. 2014) .....................................................................39

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018)............................................................................44, 45

*Kim v. Democratic People's Republic of Korea*,
   774 F.3d 1044 (D.C. Cir. 2014) ...................................................................32

*Kiobel v. Royal Dutch Petrol. Co.*,
   569 U.S. 108 (2012)......................................................................................45

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013) .................................................36, 37

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994)..........................................................................................................14

*Letelier v. Republic of Chile*,
    748 F.2d 790 (2d Cir. 1984)............................................................................................37

*Levin v. Bank of N.Y. Mellon*,
    09 CV 5900, 2013 U.S. Dist. LEXIS 137399 (S.D.N.Y. Sept. 19, 2013) .............................38

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) .............................................................................43

*Magness v. Russian Fed'n*,
    247 F.3d 609 (5th Cir. 2001) ..........................................................................................21

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)............................................................................................18

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013)............................................................................................33

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*,
    556 U.S. 366 (2009).........................................................................................................13

*MMA Consultants 1, Inc. v. Republic of Peru*,
    719 F. App'x 47 (2d Cir. 2017) ......................................................................................31

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*,
    863 F.3d 96 (2d Cir. 2017)........................................................................................18, 21

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012)........................................................................................................30

*Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*,
    No. 00 Civ. 3235, 2003 U.S. Dist. LEXIS 7986 (S.D.N.Y. May 14, 2003)...........................32

*Peacock v. Thomas*,
    516 U.S. 349 (1996)........................................................................................................14

*Pescatore v. Pineda*,
    No. 08-2245, 2019 U.S. Dist. LEXIS 84048 (D.D.C. May 20, 2019)....................................36

*Philippines v. Pimentel*,
    553 U.S. 851 (2008)........................................................................................................39

*Plante v. Dake,*
    621 F. App'x 67 (2d Cir. 2015) ........................................................................18

*Republic of Arg. v. NML Capital, Ltd.,*
    573 U.S. 134 (2014)........................................................................................11

*Republic of Sudan v. Harrison,*
    139 S. Ct. 1048 (2019)...............................................................................19, 24

*Robers v. United States,*
    572 U.S. 639 (2014)........................................................................................25

*Rubin v. Islamic Republic of Iran,*
    138 S. Ct. 816 (2018)................................................................................ passim

*Samantar, v. Yousuf,*
    560 U.S. 305 (2010)........................................................................................25

*Sartor v. Toussaint,*
    70 F. App'x 11 (2d Cir. 2002) ........................................................................24

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993)........................................................................................14

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v.*
    *Navimpex Centrala Navala,*
    989 F.2d 572 (2d Cir. 1993).............................................................................19

*Sokolow v. PLO,*
    60 F. Supp. 3d 509 (S.D.N.Y. 2014)................................................................32

*Stansell v. Revolutionary Armed Forces al Colombia,*
    771 F.3d 713 (11th Cir. 2014) ........................................................................35

*Sullivan v. Barclays PLC,*
    No. 13-cv-2811 (PKC), 2017 U.S. Dist. LEXIS 25756 (S.D.N.Y. Feb. 21, 2017)..........41, 42

*Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria,*
    647 F.2d 300 (2d Cir. 1981).............................................................................19

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
    162 F.3d 724 (2d Cir. 1998).............................................................................24

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,*
    484 U.S. 365 (1988)........................................................................................25

*United States v. Garcia,*
    413 F.3d 201 (2d Cir. 2005)............................................................................33

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002)...................................................................................33

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
    946 F.3d 120 (2d Cir. 2019)................................................................................44

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
    486 U.S. 694 (1988)...........................................................................................23

*Walden v. Fiore*,
    571 U.S. 277 (2014)...........................................................................................20

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)..................................................................20, 40, 41

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006)................................................................16

*Wood v. Maguire Auto., LLC*,
    508 F. App'x 65 (2d Cir. 2013) ..........................................................................18

## STATUTES AND RULES

6 U.S.C. § 444(6).......................................................................................................29

7 U.S.C. § 1732(6).....................................................................................................29

10 U.S.C. § 178(a)......................................................................................................30

11 U.S.C. § 101(40)....................................................................................................30

12 U.S.C. § 1451(i).....................................................................................................30

15 U.S.C. § 78(a)(9)....................................................................................................30

18 U.S.C. § 2333...........................................................................................4, 5, 42, 43

28 U.S.C. § 451...........................................................................................................30

28 U.S.C. § 517...........................................................................................................39

28 U.S.C. § 530...........................................................................................................29

28 U.S.C. § 1330.........................................................................................................19

28 U.S.C. § 1350.........................................................................................................44

28 U.S.C. § 1602.........................................................................................................16

28 U.S.C. § 1603 .................................................................................................................9, 25

28 U.S.C. § 1604 ........................................................................................................8, 9, 14, 17

28 U.S.C. § 1605 ................................................................................................................ passim

28 U.S.C. § 1605A ............................................................................................................. passim

28 U.S.C. § 1606 ..............................................................................................................10, 11

28 U.S.C. § 1607 ........................................................................................................9, 10, 11

28 U.S.C. § 1608 ................................................................................................................ passim

28 U.S.C. § 1609 ...................................................................................................8, 9, 10, 15

28 U.S.C. § 1610 ................................................................................................................ passim

28 U.S.C. § 1611 ..............................................................................................................11, 13

Fed. R. Civ. P. 4 .................................................................................................................21, 22

Fed. R. Civ. P. 60(b) ....................................................................................................18, 24, 39

Fed. R. Civ. P. 69 .....................................................................................................................22

## PRELIMINARY STATEMENT

Plaintiff Antonio Caballero is the victim of heinous acts of terrorism perpetrated against his family by the defunct Colombian narco-terrorist organizations Fuerzas Armadas Revolucionarias de Colombia (the "FARC") and Norte del Valle Cartel (the "NDVC").  But neither PDVSA nor its Subsidiaries are responsible for those acts or for satisfying Plaintiff's default judgment against the FARC.  Yet Plaintiff nonetheless obtained *ex parte* writs of execution against garnishees M&T Bank and Citibank, N.A., and a default turnover judgment against M&T Bank, on the purported basis that they allegedly hold blocked assets of PDVSA and its Subsidiaries available for attachment and execution under the Terrorism Risk Insurance Act of 2002 ("TRIA"). For the reasons stated below, the writs and turnover judgment, respectively, should be quashed and vacated.

*First*, a judgment creditor may not collect his judgment from a party that is not liable for that judgment.  But because Plaintiff is attempting to hold PDVSA and its Subsidiaries liable for the default judgment against the FARC, he is bound by U.S. Supreme Court and Second Circuit precedent that requires him to establish an independent basis for subject matter and personal jurisdiction over PDVSA and its Subsidiaries.  Plaintiff has made no such jurisdictional showing here.

PDVSA is an undisputed "agency or instrumentality of a foreign state" — the Bolivarian Republic of Venezuela — and the exclusive source of subject matter and personal jurisdiction over PDVSA and its property is the Foreign Sovereign Immunities Act of 1976 ("FSIA").  28 U.S.C. §§ 1330, 1602, *et seq*.  The FSIA provides a comprehensive framework for suing a foreign state and its agencies or instrumentalities, and for attaching and executing against the property of a foreign state and its agencies and instrumentalities where a plaintiff has successfully overcome

sovereign immunity.  TRIA is merely one provision within the FSIA's statutory framework, codified as a note to the FSIA's attachment provision, 28 U.S.C. § 1610, and does not provide an independent basis for subject matter or personal jurisdiction.  Yet Plaintiff would have TRIA swallow the entirety of the FSIA's comprehensive jurisdictional framework, which clearly was not what Congress intended.

*Second*, this Court lacks any basis for exercising personal jurisdiction over PDVSA or its Subsidiaries under the minimum contacts requirements derived from the Due Process Clause. Indeed, Plaintiff has never attempted to make such a showing.

*Third*, Plaintiff failed to serve either PDVSA or its Subsidiaries in compliance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters or the Inter-American Convention on Letters Rogatory.  Thus, the writs and ensuing turnover judgment are void for lack of personal jurisdiction.

*Fourth*, TRIA does not apply because: (i) the legal term of art "agency or instrumentality" under TRIA refers only to an "agency or instrumentality" of a designated state sponsor of terrorism and not that of a non-state actor; (ii) Plaintiff failed to prove that PDVSA or its Subsidiaries are "agencies or instrumentalities" of the FARC under TRIA; (iii) Plaintiff failed to prove that PDVSA or its Subsidiaries own the blocked assets at issue, as they must under TRIA; and (iv) PDVSA's property interests, which the United States protectively blocked under the Venezuela sanctions program, are not available to satisfy judgments of a "terrorist party" under TRIA.

*Fifth*, Plaintiff's underlying default judgment is void as to the FARC for lack of jurisdiction and, as a result, the Court lacks jurisdiction over these enforcement proceedings.

For all of these reasons, PDVSA and its Subsidiaries respectfully request that the Court vacate its decisions ordering the writs of execution, quash the writs, vacate the turnover judgment,

and dismiss this action in its entirety with prejudice.

## BACKGROUND

In this action, Plaintiff seeks to enforce a default judgment entered by the U.S. District Court for the Southern District of Florida on May 20, 2020, in Case No. 1:18-cv-25337-KMM against the FARC and NDVC.  The Florida federal default judgment has its roots in another default judgment that Plaintiff obtained from a Florida state court against the same defendants and the Ejercito De Liberacion Nacional a/k/a ELN a/k/a National Liberation Army ("ELN," and together with the FARC and NDVC, the "Defendants").  Because the Florida default judgments are interrelated and relevant to these enforcement proceedings, both are detailed below.  Importantly, neither Florida action involved PDVSA or its Subsidiaries.

### A.     The Florida State Default Judgment

On December 17, 2012, Plaintiff commenced his first civil action in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, based on the murder of his father.  *Caballero v. Fuerzas Armadas Revolucionarias de Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia, et al.*, Case No. 12-048803-CA.  The operative complaint was a Second Amended Complaint ("SAC") filed on March 22, 2013.  *See* Exhibit 1.[1]

Plaintiff sought damages for injuries he sustained as a result of Defendants' kidnapping, torture, and killing of his father in Colombia in the late 1990s.  *See id.* ¶¶ 1, 80.  As of the filing of the SAC in March 2013, Plaintiff was a citizen of Colombia and a resident alien of the United States residing in Florida.  *Id.* ¶ 2.  Plaintiff's father was a citizen and resident of Colombia at all times alleged in the SAC.  *Id.* ¶ 59.  The SAC purported to allege, among other things, various claims under the Alien Tort Statute, including hostage taking, torture, and extrajudicial killing, and

---

[1] All citations to "Exhibits" refer to the exhibits to the Declaration of Claire DeLelle dated June 25, 2021, filed herewith.

claims under federal and Florida civil R.I.C.O. statutes.  *Id.* at ¶¶ 90-277.  Neither the FARC nor

the other Defendants appeared or otherwise responded to the SAC, and a default was entered

against all three Defendants on December 12, 2013.  *See* Exhibit 3 (Order of Default).  Following

a non-jury trial on damages in November 2014, the Florida state court entered a final default

judgment, holding the FARC, ELN, and the NDVC liable in the amount of more than $45 million,

plus trebling.  *See* Exhibit 4.

     **B.**     **The Florida Federal Default Judgment**

     Approximately four years later, Plaintiff initiated the Florida federal action against the

same Defendants on the same allegations as the state court action with one exception — the

Complaint alleges that, sometime after filing the Florida state court action, Plaintiff became a

naturalized U.S. citizen.  *See* Exhibit 5 (Federal Complaint) at ¶ 3.  The complaint alleged a sole

cause of action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333.  *See id.* ¶¶ 12-14.  The

clerk entered a default against NDVC and the FARC, respectively, on March 8, 2019, and April

4, 2019, and the court entered a default judgment against them on May 20, 2020.  *See* Clerk's

Default, No. 1:18-cv-25337 (S.D. Fla.), ECF No. 23; Clerk's Default, No. 1:18-cv-25337 (S.D.

Fla.), ECF No. 32; Exhibit 6 (Order Granting Motion for Default Judgment) and Exhibit 7 (Federal

Final Judgment).[2]   Plaintiff voluntarily dismissed Defendant ELN.   *See* Notice of Voluntary

Dismissal of Defendant ELN, No. 1:18-cv-25337 (S.D. Fla.), ECF No. 57.

---

[2] Although the FARC did not appear in the federal action, in January 2019, two non-party federal inmates purporting to be "entitled to the protections of the FARC's recent historic peace agreement with the Colombian government" filed Motions to Dismiss.  *See* Letter Motions to Dismiss Complaint, No. 1:18-cv-25337 (S.D. Fla.), ECF Nos. 12, 14.   Among other things, these individuals argued that the action lacked a basis for subject matter jurisdiction because Plaintiff was not a U.S. national at the time of the relevant terrorist attacks and the ATA claim was time-barred. *See id.* at 1-2.  The court struck both Motions to Dismiss without considering them because the non-party inmates had not first moved to intervene.  *See* Paperless Order, No. 1:18-cv-25337 (S.D. Fla.), ECF No. 38.

In entering its default judgment, the court found that Plaintiff "state[d] a claim for damages under § 2333 [of the ATA]."  Exhibit 6 at 7.  The court, however, declined to make an independent determination on damages and instead held that the Florida state court's damages ruling was binding on the federal court.  *See id.* at 8-9 ("[I]ssue preclusion bars Defendants from re-litigating the issue of damages" because "the precise issue here was presented in the State Court Action" and the "state court explicitly ruled on the issue of damages.").  Accordingly, the court awarded Plaintiff $45 million in actual, compensatory non-economic damages and $1,729,667.00 in actual compensatory economic damages (*id.* at 14; *see also* Exhibit 7) — the exact amounts determined by the Florida state court. *See* Exhibit 4 at 90-91.  The court further held that these damages were trebled pursuant to 18 U.S.C. § 2333 and that Plaintiff was entitled to post-judgment interest at the rate of 0.15% per annum on the above-described trebled economic and non-economic damages. *See* Exhibit 6 at 14.

### C.     This Enforcement Action

Plaintiff registered his Florida Federal Default Judgment with this Court on September 10, 2020.  *See* ECF No. 1.  He then sought leave to file under seal his *ex parte* Motion for Issuance of Court Ordered Post-Judgment Writ of Execution Pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002 on the basis that "[i]t is standard practice in ATA cases that motions for issuance of post-judgment writs be filed *ex-parte* and sealed until after attachment" so as to prevent other judgment creditors from learning of the targeted assets.  ECF No. 9 at 3 (citing *Stansell v. Revolutionary Armed Forces al Colombia*, 771 F.3d 713, 729 (11th Cir. 2014)); *see also* ECF No. 10 at 1-2, 18.  Specifically, Plaintiff requested: (1) a determination that PDVSA and its Subsidiaries are "agents [*sic*] or instrumentalities of the FARC"; (2) a determination that the assets of PDVSA and its Subsidiaries "are blocked assets and are executable under TRIA towards satisfaction of"

his Federal Default Judgment against the FARC; (3) writs of execution "to attach any assets within the Court's jurisdiction in the putative names of, held for the benefit of, or that were blocked due to their association with" PDVSA or its Subsidiaries; and (4) an order sealing Plaintiff's *ex parte* filings and any subsequent writs. ECF No. 10 at 18. In support, Plaintiff filed, among other things, two sworn declarations of John Robert McBrien with exhibits. *See id.* at 2; ECF No. 10-3 (McBrien Declaration); ECF No. 10-4 ("Supplemental McBrien Declaration").

Thereafter, Plaintiff filed notices of supplemental authority, urging this Court to take action on his Motion for Post-Judgment Writ. *See* ECF Nos. 19, 19-1 (stating that Plaintiff had obtained *ex parte* writ in the District of South Carolina against PDVSA property); ECF No. 11 at 2 (urging this Court to "expeditiously grant" his *ex parte* Motion "so as to avoid further inequity" in light of writs obtained by "two sets of competing plaintiffs" in the Southern District of New York). In response, the Court issued an Order to Show Cause "why the Court should reach the question of whether the subsidiaries are agencies or instrumentalities of the FARC or whether the subsidiaries' assets are subject to attachment" in light of the fact that Caballero's *ex parte* Motion and attached proposed writ (ECF No. 10-6) sought "to attach funds held at M&T Bank 'in the putative name of, or for the benefit of' only PDVSA and not any of the subsidiaries." ECF No. 12 at 1 (quoting ECF Nos. 10 at 18, 10-6). Plaintiff promptly withdrew his requests related to the Subsidiaries. ECF No. 13.

That same day, the Court entered its Decision & Order on Plaintiff's *ex parte* Motion, designating PDVSA as an "agency or instrumentality of FARC" and issuing a "writ of execution to attach the assets held by M&T Bank Corporation . . . in the putative name of, or for the benefit of, Petroleos de Venezuela, S.A." (the "M&T Writ"). ECF No. 15 at 11. The Court additionally found that due process requires that "before its assets are executed on, PDVSA is . . . entitled to

notice and an opportunity to be heard to rebut the allegations that it is an agency or instrumentality of FARC." *Id.* at 5 n.3.

On December 21, 2020, Caballero served the M&T Writ on M&T Bank. *See* ECF No. 18-1. And on December 23, 2020, Caballero purported to serve the M&T Writ on PDVSA by mailing the "Writ of Execution, Notice to Debtor" to an address in Caracas, Venezuela. ECF No. 23-4.

On January 11, 2021, Caballero filed under seal his *ex parte* Motion seeking a writ of execution against funds held by Citibank "in the putative names of, or for the benefit of, or that were blocked due to an association with" the Subsidiaries, Banco Central de Venezuela, and Venezuela's Ministerio del Poder Popular de Economia y Finanzas. ECF No. 22 at 5.

On January 13, 2021, Caballero moved for turnover of the funds held by the M&T Writ, in addition to turnover of funds held by other garnishees with respect to other individuals. *See* ECF No. 23. In support, Caballero filed four affidavits of service (ECF Nos. 23-1, 23-2, 23-3, 23-4), two letters from M&T Bank (ECF Nos. 23-5, 23-6), a declaration by counsel to Caballero (ECF No. 23-8), and a proposed memorandum opinion (ECF No. 23-9).

On January 29, 2021, the Court entered its Decision & Order designating the Subsidiaries, Banco Central de Venezuela, and Venezuela's Ministerio del Poder Popular de Economia y Finanzas as "agencies or instrumentalities of FARC" and issuing a writ of execution against the assets "held by Citibank, N.A. . . . in the putative name of, or for the benefit of" any of the so-designated entities. ECF No. 33 at 10-12. As to the Subsidiaries, the Court held that "[i]f PDVSA is an agency or instrumentality of FARC—which this Court has already determined it is—it follows that its majority-owned subsidiaries are as well." *Id.* at 5. Plaintiff has never served—nor attempted to serve—the Citibank writs or the Court's Decision & Order as to the Subsidiaries on

the Subsidiaries.  On that same day, the Court found PDVSA in default and entered a turnover judgment, ordering M&T Bank to turn over to Caballero "$7,253,050.01 in blocked funds held in the putative name of, or for the benefit of, PDVSA."  ECF No. 35 at 3, 4.

On February 2, 2021, purported counsel for PDVSA and its Subsidiaries, Messrs. Flynn and Jiménez, filed a Limited Motion to Intervene on behalf of PDVSA and its Subsidiaries.  *See* ECF No. 37.  That same day, the Court granted the limited motion to intervene and stayed the turnover judgment.  *See* ECF No. 39.

On March 26, 2021, PDVSA and its Subsidiaries filed a Motion to Substitute undersigned counsel, appointed by the Ad Hoc Board of PDVSA, for Messrs. Flynn and Jiménez.  *See* ECF No. 58. The Court decided that motion on May 11, 2021, finding that the Interim Government was the only legitimate government of Venezuela and that, as such, "[t]he Ad Hoc Board . . . is the only lawful governing body of PDVSA that can retain counsel in this case."  ECF No. 78 at 15. This Motion and Memorandum of Law are filed pursuant to the Court's May 11 Decision & Order. *See* ECF Nos. 78, 80.

## STATUTORY FRAMEWORK

The FSIA and its comprehensive framework play a critical role in resolving this action. First enacted in 1976, the FSIA "grants foreign states and their agencies and instrumentalities immunity from suit in the United States (called jurisdictional immunity) and grants their property immunity from attachment and execution in satisfaction of judgments against them."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 820 (2018); 28 U.S.C. §§ 1604, 1609; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (holding that the FSIA provides the "sole basis" for obtaining jurisdiction over foreign states and their agencies and instrumentalities in U.S. courts).  Those grants of immunity are subject to certain enumerated

exceptions set forth in the FSIA.  *See Rubin*, 138 S. Ct. at 820; 28 U.S.C §§ 1604, 1609.

The FSIA begins by establishing that a "foreign state" includes a "political subdivision of a foreign state" or an "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  The FSIA defines an "agency or instrumentality" as any entity—

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

When an entity qualifies as a foreign state, the FSIA provides that a foreign state "shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  Section 1605 enumerates "general exceptions to the jurisdictional immunity of a foreign state," including exceptions based on waiver, commercial activity, expropriation, rights in certain property, non-commercial torts, arbitral agreements or awards, maritime liens, and foreclosures on preferred mortgages.

Sections 1605A and 1605B contain standalone exceptions to immunity for certain terrorism-related actions:  § 1605A, enacted in 2008 to replace former § 1605(a)(7) (enacted in 1996), provides jurisdiction over foreign states designated by the United States as state sponsors of terrorism for actions based on personal injury or death caused by certain specified acts of terrorism.  Section 1605B, enacted in 2016, provides an exception to immunity for actions against foreign states not designated as state sponsors of terrorism, but accused of acts of international terrorism that occurred in the United States.

Section 1607 provides an exception to immunity for certain counterclaims where a foreign

state brings an action.  Section 1606 then provides the rules on the extent of liability of a foreign

state where an exception to immunity applies under §§ 1605 or 1607.

Next, § 1608(a) and (b) set forth the rules under which service must be made upon foreign

states and their agencies or instrumentalities, the time to respond upon effective service

(§ 1608(d)), and the procedures the court must follow before and after entering any default

judgment (§ 1608(e)).  As applicable here, § 1608(b) provides:

> Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:
>
> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—
>
>> (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or
>>
>> (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or
>>
>> (C) as directed by order of the court consistent with the law of the place where service is to be made.

Section 1609 establishes that a foreign state's "property in the United States shall be immune from

attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter."

Section 1610 sets forth exceptions to attachment and execution immunity for certain property, but

only in respect of judgments against the foreign state or its agencies or instrumentalities for which

they lacked immunity under §§ 1605 and 1605A (and former § 1605(a)(7)).

Specifically, subsections 1610(a)(1) through (7) provide exceptions to the immunity of a foreign state's property that correspond to the immunity exceptions upon which the judgment against the foreign state was entered, *i.e.*, § 1605(a)(1) through (6) and § 1605A (or repealed § 1605(a)(7)). *See also Republic of Arg. v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014) (stating that exceptions to execution immunity under §§ 1610-11 "are narrower" than the exceptions to jurisdictional immunity provided by §§ 1605-07). In other words, there is no exception to attachment or execution immunity absent a corresponding judgment against the foreign state or its agencies or instrumentalities. Further, there is no exception to attachment and execution immunity in respect of any judgment for which the foreign state was deemed not immune under § 1605B. Section 1610(b) similarly provides exceptions to the attachment and execution immunity of certain property of agencies or instrumentalities where those exceptions correspond to certain types of judgments for which the agency or instrumentality lacked immunity, namely judgments based upon §§ 1605(a)(2), (3), (5), 1605(b), 1605A, or 1605(a)(7).

Section 1610(c) further emphasizes that the attachment and execution exceptions under § 1610(a) and (b) apply in respect of judgments against the foreign state or its agencies or instrumentalities. It does so by providing that no attachment or execution shall be permitted under § 1610(a) or (b) until the court has ordered such attachment or execution after having determined that a reasonable period of time has elapsed "following the entry of judgment" and the giving of any notice required in respect of a default judgment against the foreign state under § 1608(e). Section 1610(d) authorizes pre-judgment attachments under narrowly tailored circumstances, but makes clear that the purpose of the attachment is to "secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction." In other

words, there is no in rem or quasi in rem jurisdiction available under the FSIA over foreign states, their agencies or instrumentalities, or their property.  Section 1610(e) provides for arrest of vessels and execution, but only for actions brought to foreclose a preferred mortgage under § 1605(d).

Section 1610(f) identifies additional property that is available to plaintiffs holding judgments under §§ 1605(a)(7) and 1605A (the former and current terrorism exceptions) against a "foreign state (including any agency or instrumentality of such state)."  Specifically, § 1610(f)(1)(A) provides for attachment and execution of property with respect to which financial transactions are prohibited or regulated under various U.S. economic sanctions laws administered by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC").  In other words, plaintiffs holding §§ 1605(a)(7) or 1605A judgments against designated state sponsors of terrorism and their agencies and instrumentalities may seek to attach and execute against their blocked assets.  Section 1610(f)(2) provides that the Secretaries of the Treasury and State Departments should assist plaintiffs holding §§ 1605(a)(7) or 1605A judgments in executing those judgments.

Section 1610(f)(3) gives the President the discretion to waive the availability under § 1610(f)(1) of blocked assets of a foreign state, including its agencies or instrumentalities, to satisfy a § 1605(a)(7) or § 1605A judgment.  Section 1610(g) makes the property of agencies or instrumentalities of a foreign state available for attachment or execution in respect of a judgment under §§ 1605(a)(7) or 1605A against the foreign state without regard to the separate juridical status of the foreign state's agencies or instrumentalities.  *See Rubin*, 138 S. Ct. at 823 (holding that § 1610(g) abrogates *Bancec* regarding the separateness of agencies or instrumentalities).  Section 1610(g) is not an exception to attachment and execution immunity, but a provision identifying property available for attachment and immunity in the event of a § 1605A judgment against the foreign state.  *Id.* at 820 (holding that § 1610(g) "does not in itself divest property of

immunity").  Finally, § 1611 restores the immunity of certain specified property, notwithstanding any provision of § 1610.

As related to § 1610(f)(1), in 2002 Congress enacted § 201 of the Terrorism Risk Insurance Act.  Section 201(a) of TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), codified as 28 U.S.C. § 1610 note.  Section 201(d)(4) defines "terrorist party" to mean "a terrorist, a terrorist organization . . . or a foreign state designated as a state sponsor of terrorism."

Section 201 of TRIA was enacted to build upon the availability of blocked assets of designated state sponsors of terrorism and their agencies and instrumentalities under § 1610(f)(1), but also to specifically eliminate the effect of any Presidential waiver issued prior to the date of TRIA's enactment pursuant to § 1610(f)(3) of the FSIA.  H.R. Rep. No. 107-779 at 27 (2002) (conference report); *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009) ("Congress placed the 'notwithstanding' clause in § 201(a) for totally different reasons, namely to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment.").  As such, § 201 of TRIA was codified as a note to § 1610 of the FSIA and titled "Satisfaction of Judgments from Blocked Assets of Terrorists, Terrorist Organizations, and State Sponsors of Terrorism."

Against this statutory framework, Plaintiff seeks to execute against assets of PDVSA — an "agency or instrumentality of a foreign state" under the FSIA — and its Subsidiaries, in

satisfaction of Plaintiff's Federal Default Judgment against the FARC.

## ARGUMENT

### I.    THIS COURT LACKED SUBJECT-MATTER JURISDICTION TO ISSUE THE WRITS OF EXECUTION AND ENTER THE TURNOVER JUDGMENT

Plaintiff does not hold a judgment against PDVSA or its Subsidiaries for the kidnapping and murder of his father; he holds a default judgment against the FARC and the NDVC.  Yet in this action, Plaintiff seeks to hold PDVSA and its Subsidiaries liable for payment of that judgment as though they were the FARC.  The U.S. Supreme Court, and the Second Circuit applying Supreme Court law, have held that a federal judgment creditor seeking to impose liability for a money judgment on a person not otherwise liable for the judgment, must establish an independent basis for the court's subject matter jurisdiction over that third party.  *See Peacock v. Thomas*, 516 U.S. 349, 357 (1996) ("We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."); *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001) (concluding that efforts to collect judgments by shifting liability to a new party create an independent controversy that does not fall within court's ancillary jurisdiction).  Accordingly, in order to enforce his FARC default judgment against PDVSA and its Subsidiaries, Plaintiff must establish an independent basis for jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (holding that party seeking to enforce settlement agreement of concluded action was required to establish an independent basis for jurisdiction).

Here, the FSIA provides "the sole basis for obtaining jurisdiction" in U.S. courts over PDVSA.  *See Amerada Hess Shipping Corp.*, 488 U.S. at 434.  As such, PDVSA is presumptively immune from jurisdiction unless Plaintiff can establish that an exception to PDVSA's sovereign immunity under the FSIA applies.  28 U.S.C. § 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355

(1993) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488-89 (1983)); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) (stating the FSIA "starts from a premise of immunity and then creates exceptions to the general principle") (internal quotations omitted).  No such exception applies in this case.  Indeed, Plaintiff made no effort whatsoever to discharge his burden to prove that subject matter jurisdiction existed under the FSIA.

Instead, Plaintiff simply asserted that he had satisfied TRIA's requirements and was entitled to attach and execute against PDVSA's blocked assets to satisfy his default judgment against the FARC.  Plaintiff is wrong.  TRIA does not provide an exception to the jurisdictional immunity of foreign states and their agencies and instrumentalities.  Indeed, the context, text, and purpose of § 201(a) of TRIA confirms that it is only an exception to attachment and execution immunity where, like the provisions in § 1610(a), (b), and (f), a plaintiff has overcome the jurisdictional immunity of the foreign state or agency or instrumentality and obtained a judgment and seeks to enforce that judgment through attachment, arrest, or execution as contemplated under § 1609.

Specifically, where § 201(a) applies to a foreign state as a "terrorist party," it does so only where that terrorist party "is not immune under section 1605(a)(7) or § 1605A," *i.e.*, the so-called terrorism exception to foreign sovereign immunity.  Although Plaintiff alleged that PDVSA was an agency or instrumentality of the FARC, PDVSA does not cease to become an "agency or instrumentality of a foreign state" for jurisdictional immunity purposes in the context of TRIA and Plaintiff had the burden of establishing that an exception to PDVSA's sovereign immunity existed.

In almost all cases involving TRIA, the judgment creditors have obtained a judgment (typically a default judgment) against a designated state sponsor of terrorism (currently, Iran,

Cuba, Syria and North Korea) under §§ 1605(a)(7) or 1605A before invoking TRIA to satisfy their judgments against blocked assets of an agency or instrumentality of the designated foreign state. *See, e.g.*, *Estate of Heiser*, 885 F. Supp. 2d 429, 449-50 (D.D.C. 2012) (awarding turnover of blocked assets of agency of Iran under TRIA where plaintiffs had obtained a default judgment against Iran pursuant to § 1605A); *Bennett v. Franklin Res., Inc.*, 360 F. Supp. 3d 972, 982-83 (N.D. Cal. 2018) (same); *Weininger v. Castro*, 462 F. Supp. 2d 457, 502-03 (S.D.N.Y. 2006) (same, where judgment was against Cuba pursuant to § 1605(a)(7)).  Only in those cases, where the foreign state lacked immunity under § 1605A or § 1605(a)(7), does TRIA make the blocked property of the designated foreign state's agency or instrumentality available for execution.

Indeed, the structure of the FSIA reveals that property of a foreign state or its agency or instrumentality is not subject to attachment or execution *unless* a judgment exists against the foreign state or agency or instrumentality under one of the exceptions stated in §§ 1605 to 1607. This is evident from the text of §§ 1610(a), (b), and (f) of the FSIA and § 201(a) of TRIA, codified as a note to § 1610, each of which provides for an exception to attachment and execution immunity that is explicitly tied to judgments entered against the foreign state or its agency or instrumentality pursuant to one of the exceptions to sovereign immunity contained in §§ 1605 through 1607.

The Findings and declaration of purpose of the FSIA set forth in § 1602 explain that Congress vested the U.S. courts with authority to decide foreign sovereign immunity in conformity with the principles set forth in the FSIA and that Congress did so to conform with the principles of international law, under which "states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for satisfaction of judgments rendered *against them* in connection with their commercial activities."  28 U.S.C. § 1602 (emphasis added).  Thus, the FSIA does not contain any provision

authorizing an attachment or execution against an agency or instrumentality's property absent a judgment against the foreign state or an agency or instrumentality of a foreign state. *See Rubin*, 138 S. Ct. at 825 (interpreting § 1610(g) and declining "to read into the [FSIA] a blanket abrogation of attachment and execution immunity for §1605A judgment holders absent a clearer indication of Congress' intent").

In fact, TRIA § 201(a) operates no differently from any other FSIA exception to attachment and execution immunity because it authorizes attachment and execution against an agency or instrumentality's blocked assets where a judgment exists against the foreign state under § 1605(a)(7) or § 1605A.

Simply put, TRIA is not a back door to avoid jurisdictional immunity under the FSIA. *See* 28 U.S.C. §§ 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607[.]"); *Amerada Hess Shipping Corp.*, 488 U.S. at 443 ("the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country[.]"). To proceed against an agency or instrumentality of a foreign state under TRIA, a plaintiff must first obtain a judgment under § 1605(a)(7) or § 1605A against the foreign state sponsor of terrorism of which the agency or instrumentality is a part. Plaintiff here possesses no such judgment, nor could he, because Venezuela is not a designated state sponsor of terrorism.

The only cases involving a judgment creditor's invocation of TRIA to try to satisfy a judgment against a private party using assets of a foreign state's agency or instrumentality are this case and other enforcement actions by Plaintiff here, among other competing plaintiffs, involving default judgments against the FARC. But in these cases, where plaintiffs assert that PDVSA is an agency or instrumentality of the FARC, courts lack any independent basis for subject matter

jurisdiction over an action against PDVSA.  In short, Plaintiff must identify an exception to PDVSA's jurisdictional immunity under §§ 1605 or 1607 of the FSIA, but he cannot do so here.

Finally, with respect to Plaintiff's enforcement action against assets of the Subsidiaries, Plaintiff cannot establish any independent basis for federal jurisdiction — Plaintiff's pleadings are devoid of any Article III claim or controversy against the Subsidiaries other than the conclusory assertion that the Subsidiaries are "agents" *[sic]* of the FARC because they are majority owned by PDVSA.  *See* ECF No. 22 at 6, 14-15, 18; ECF No. 33 at 4-6; *see also Plante v. Dake*, 621 F. App'x 67, 69 (2d Cir. 2015) (summary order) (affirming dismissal for lack of jurisdiction because complaint failed to allege Article III standing); *Wood v. Maguire Auto., LLC*, 508 F. App'x 65, 65-66 (2d Cir. 2013) (summary order) (affirming dismissal because "conclusory" allegations failed to establish jurisdiction) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.").

Because the Court lacked subject matter jurisdiction over an action against PDVSA and its Subsidiaries, the writs in respect of M&T Bank and Citibank and the turnover judgment as to the account of M&T Bank are void as a matter of law under Rule 60(b)(4) of the Federal Rules of Civil Procedure.  *See generally Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*, 863 F.3d 96, 111 (2d Cir. 2017) (holding that a judgment is void under Rule 60(b)(4) if the court that entered the judgment lacked subject matter or personal jurisdiction over the debtor) (citing *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 138 (2d Cir. 2011)).

## II.   THE COURT LACKED PERSONAL JURISDICTION TO ISSUE THE WRITS OF EXECUTION OR ENTER THE TURNOVER JUDGMENT

The FSIA also provides the exclusive basis for personal jurisdiction over a foreign state and its agencies and instrumentalities.  Specifically, personal jurisdiction exists over a foreign state

and its agencies and instrumentalities, only where (1) service has been effected under § 1608, and (2) an exception to foreign sovereign immunity has been established.  *See* 28 U.S.C. § 1330(b); *see also Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1053-54 (2019); *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981) (explaining that under the FSIA, "the statutory aspect of personal jurisdiction [is] simple: subject matter jurisdiction plus service of process equals personal jurisdiction").

In addition, due process requires Plaintiff to show that PDVSA and each of its Subsidiaries possess "'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *see also Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) ("[T]he FSIA cannot create personal jurisdiction where the Constitution forbids it.  Consequently, in addition to each finding of personal jurisdiction made pursuant to the FSIA, we make a due process scrutiny of the court's power to exercise its authority over the defendant."); *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001 (Asat Tr. Reg.)*, 714 F.3d 659, 673 (2d Cir. 2013) (holding that "due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances"); *Concord Reinsurance Co. v. Caja Nacional de Ahorro y Seguro*, 94 Civ. 2218, 1994 U.S. Dist. LEXIS 7532, at *3 (S.D.N.Y. June 6, 1994) (dismissing for lack of personal jurisdiction suit against agency or instrumentality of foreign state where plaintiff had otherwise complied with the requirements of the FSIA).

Courts determine whether the minimum contacts alleged are sufficient to satisfy due

process by analyzing "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 284 (2014) (citations and quotation marks omitted). For that relationship to support an "exercise [of] jurisdiction consistent with due process," a "substantial connection" must exist between "defendant's suit-related conduct" and the forum. *Id.* And "[t]he relationship between the defendant and the forum 'must arise out of the contacts that the defendant *himself* creates with the forum.' " *Waldman v. PLO*, 835 F.3d 317, 335 (quoting *Walden*, 571 U.S. at 284) (emphasis in original) (citations omitted)).

Constitutional principles of due process and fair notice thus preclude this Court from enforcing the Federal Default Judgment against PDVSA and its Subsidiaries, because Plaintiff has failed to allege *any* contacts between PDVSA or its Subsidiaries with *any* U.S. state, much less constitutionally sufficient minimum contacts. As discussed more fully below, Plaintiff's only factual allegations allegedly connected to PDVSA relate to the purported conduct of individuals allegedly associated with the government of Venezuela under the Chavez and Maduro regimes between 2004 and 2008, occurring entirely in Colombia and Venezuela. *See* ECF No. 10. at 12-13. And as to the Subsidiaries, Plaintiff alleges *no conduct whatsoever*, merely stating that "PdVSA owns, directly or indirectly, 50 percent or more" of each Subsidiary. *See id.* at 14; ECF No. 22 at 14-18. How this "conduct" is "suit-related" when Plaintiff's ATA claims arise out of events that occurred in Colombia in 1999 is entirely unclear. *Walden,* 571 U.S. at 284; *see* Exhibit 1 at 6-7. And it is even less clear what "substantial connection" this alleged "conduct" has with New York. *Walden*, 571 U.S. at 284.

Because Plaintiff has not — and cannot — carry his burden of showing constitutionally sufficient minimum contacts to support personal jurisdiction over PDVSA and its Subsidiaries, this Court lacks jurisdiction and the writs of execution and the turnover judgment are therefore

void.  *See Mobil Cerro Negro, Ltd.*, 863 F.3d at 111.

## III.    THE TURNOVER JUDGMENT IS VOID BASED ON INEFFECTIVE SERVICE

As stated above, Plaintiff was required to bring an independent action against PDVSA and its Subsidiaries in order to attempt to hold them liable for his default judgment against the FARC. *See Epperson*, 242 F.3d at 104.  Had Plaintiff done so, he would have been required to serve PDVSA under Rule 4(j)(1) of the Federal Rules of Civil Procedure, which points to § 1608(b) of the FSIA, and to serve the Subsidiaries, each of which is a Venezuelan corporation, under Rule 4(h)(2) and (f)(1).  Properly followed, these Rules required Plaintiff to serve PDVSA and its Subsidiaries in accordance with the Hague Service Convention and the Inter-American Service Convention — treaties to which Venezuela and the United States are parties.  *See* Hague Service Convention, 20 U.S.T. 361; Inter-American Service Convention, S. Treaty Doc. No. 27, 98th Cong., 2d Sess. (1984), and the Additional Protocol to the Inter-American Service Convention, S. Treaty Doc. No.98–27, 58 Fed. Reg. 31,132 (1988).

With respect to service on PDVSA, the requirements of § 1608(b)(1) through (3) "are hierarchical, such that a plaintiff must attempt the methods of service in the order they are laid out in the statute." *Magness v. Russian Fed'n*, 247 F.3d 609, 613 (5th Cir. 2001). Because there is no "special arrangement for service between" Plaintiff and PDVSA (§ 1608(b)(1)) and PDVSA does not have "an officer, a managing or general agent, or . . . any other agent authorized by appointment or by law to receive service of process in the United States" (first clause of § 1608(b)(2)), Plaintiff was required to serve PDVSA under the Hague Service Convention and the Inter-American Service Convention under the second clause of § 1608(b)(2).

Similarly, with respect to service on the Subsidiaries, every method of service authorized by Rule 4(f) required Plaintiff to effect service under the Hague Service Convention or the Inter-

American Service Convention.  *See* Fed. R. Civ. P. 4(f)(1) (requiring service "by any internationally agreed means"); 4(f)(2) (providing additional means of service only "if there is no internationally agreed means"); 4(f)(3) (providing for alternative service by means "not prohibited by international agreement").  Plaintiff did not do so.

In acceding to the Hague Service Convention, Venezuela objected to service of process or other judicial documents by mail.  *See* Hague Service Convention, art. 10 ("*Provided the State of destination does not object*, the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad[.]" (emphasis added)); Decl. 3 of Venezuela to the Hague Service Convention (objecting "to the transmission of documents through postal channels").  Venezuela also conditioned its accession on the requirement that all service documents be in Spanish.  *See* Decl. 1 of Venezuela to the Hague Service Convention (requiring "that notices and documents and other items annexed to the notices will be accepted only when they are properly translated into the Spanish language").  Likewise, the Inter-American Service Convention contemplates service of process exclusively by letters rogatory and requires full translations of the service package.  *See* Inter-American Service Convention, arts. 2 & 5.

Plaintiff did not comply with any of these service requirements.  Instead, he purported to serve PDVSA as though it was the judgment debtor (not an alleged agency or instrumentality of the judgment debtor) pursuant to CPLR § 5232(c) by mailing the writ of execution to PDVSA in Caracas.  *See* ECF No. 23 at 2 ("In compliance with CPLR §5232(c), per his Affidavits of Service by Mail, on December 23, 2020 the special process server mailed the Writ of Execution and Notice to Debtor set forth in §5222(e) to the Judgment Debtors/Defendants and PDVSA."); ECF No. 23-4.  But the service provisions of the CPLR do not apply in the face of a federal law, *i.e.*, the FSIA and the Hague Service Convention.  *See* Fed. R. Civ. P. 69(1)(a) (providing that a money judgment is

22

enforced by following the execution "procedure of the state where the court is located, but a federal statute governs to the extent it applies"); *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) ("[T]he [Hague Service] Convention pre-empts inconsistent methods of service prescribed by state law in all cases to which it applies.").

Plaintiff's purported service on PDVSA thus cannot stand.  First, although Plaintiff invoked the service requirements of § 5232, the starting place should have been § 5225.  Section 5232 applies to a levy on the property of the judgment debtor not capable of delivery or a debt owed to the judgment debtor by a garnishee.  But to invoke § 5232, Plaintiff was required to initiate a special turnover proceeding against the garnishees under § 5225(b), which applied because the property was not in the possession of the putative judgment debtor.  Under § 5225(b), "[n]otice of the proceeding shall also be served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested."  To the extent that Plaintiff appears to be equating PDVSA and its Subsidiaries with the judgment debtor, at a minimum, he should have followed § 5225(b).

Second, and in any event, the service requirements in the Hague Service Convention and the Inter-American Service Convention preempt §§ 5225(b) and 5232 because service by mail in Venezuela is not permitted under these Conventions which, as ratified treaties, are the supreme law of the United States.  *See* U.S. Const. art. VI, cl. 2; *Daly v. Llanes*, 30 F. Supp.2d 407, 415-16 (S.D.N.Y. 1998) (holding that personal delivery of summons and complaint to agency or instrumentality in Caracas violated §1608(b)(2), because such service did not comply with either the Hague or Inter-American Service Conventions, which "would have required the use of letters rogatory and the service of a Spanish language translation").

Accordingly, because Plaintiff failed to serve notice of the turnover proceedings under the

Hague Service Convention or the Inter-American Service Convention, the turnover judgment must be vacated.  *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 731 (2d Cir. 1998) (reversing default judgment in light of D.C. Circuit holding that judgment was void and unenforceable for lack of personal jurisdiction due to defective service); *First City, Texas-Houston, N.A. v. Rafidain Bank*, 90 Civ. 7360 (JSM), 1992 U.S. Dist. LEXIS 15235, at *4-5 (S.D.N.Y. Oct. 6, 1992) (vacating default judgment because plaintiff failed to comply with any of the provisions of § 1608(b)); *see also Republic of Sudan*, 139 S. Ct. at 1062 (holding that default judgment was void for lack of personal jurisdiction due to defective service under § 1608(a)); *Sartor v. Toussaint*, 70 F. App'x 11, 13 (2d Cir. 2002) ("When a judgment entered against the defaulting party is void, the court has no discretion and is compelled to grant the [Rule 60(b)(4)] motion for the reason that a void judgment cannot be enforced.").

The writs should similarly be quashed and the decisions and orders granting them should be vacated because they involved an adjudication of the rights and liabilities of PDVSA and its Subsidiaries absent any proper service on those entities.

The Court also may quash the writs and vacate the turnover judgment for "any other reason that justifies relief" under Rule 60(b)(6) of the Federal Rules of Civil Procedure.  Such relief is more than warranted here given the serious due process and sovereign immunity considerations, as well as the underlying political circumstances and foreign policy concerns at issue in this case. *See, e.g.*, *Bouret-Echevarria v. Caribbean Aviation Maint. Corp.*, 784 F.3d 37, 42, 44-45 (1st Cir. 2015) (reversing denial of Rule 60(b)(6) motion because due process violation in default judgment was an "exceptional circumstance" under 60(b)(6)'s "broad authority"); *see also First Fidelity Bank, N.A. v. Government of Antigua & Barbuda Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) (setting aside judgment under Rule 60(b)(6), stating: "Courts go to great lengths to avoid

24

default judgments against foreign sovereigns or to permit those judgments to be set aside.").

## IV.   THE TERRORISM RISK INSURANCE ACT DOES NOT APPLY TO PDVSA AND ITS SUBSIDIARIES

### A.   TRIA Applies to "Agencies or Instrumentalities" of State Sponsors of Terrorism Only

Just as Plaintiff has misinterpreted the jurisdictional limitations of TRIA, he has also misinterpreted its substantive provisions.  Most importantly, Plaintiff has conflated the term "agency or instrumentality" with the common law term "agent."  *See, e.g.*, ECF No. 10 at 4-5, 6-7, 9, 11-14, 18; ECF No. 10-5 ("Agents or Instrumentalities List"); ECF No. 22 at 1-2, 5-7, 9, 12, 14-22; ECF No. 23 at 2, 3-4.  However, the phrase "agency or instrumentality" is a legal term of art specifically defined in § 1603(b) of the FSIA and, as used in TRIA § 201(a) (which is codified as a note to the FSIA), the term should be given the meaning ascribed to it under § 1603(b).  *See generally Robers v. United States*, 572 U.S. 639 (2014) ("Generally, identical words used in different parts of the same statute are . . . presumed to have the same meaning."); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme — because the same terminology is used elsewhere in a context that makes its meaning clear.").  Indeed, § 1603 provides that the definitions contained in this section apply, "[f]or purposes of this chapter."  TRIA is codified as part of "this chapter" — Chapter 97 governing Jurisdictional Immunities of Foreign States.

Additionally, the Supreme Court's prior analysis of the phrase "agency or instrumentality" supports this reading.  The Court expressly rejected the notion that "agency or instrumentality" can be "given the meaning of 'any thing or person through which action is accomplished.'" *Samantar, v. Yousuf*, 560 U.S. 305, 315 (2010) (quoting *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 83 (2d Cir. 2008)).  Yet, Plaintiff has reduced this specific legal term of art to

mean only "agent" — a phrase that he uses frequently and arbitrarily as a substitute for the actual statutory phrase. *Contra Cohen v. Empire Blue Cross & Blue Shield*, 176 F.3d 35, 41-42 (2d Cir. 1999) (holding that an "agent" is not an "agency" for purposed of Title 28); *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 259 (5th Cir. 2016) ("We note that the term '*agent*' should not to be confused with 'agency' in the phrase '*agency* or instrumentality'"). Had Congress intended that TRIA make blocked assets of any "agent" of a terrorist organization available for execution, it could have said so simply, but it did not.

To the extent there is any ambiguity about whether "agency or instrumentality" in TRIA means the "agency or instrumentality of a foreign state" adjudged liable for a terrorism-related judgment, the legislative history resolves the matter. *See generally Helmerich*, 137 S. Ct. at 1321 (examining the FSIA's language, history, and structure to determine the standard applicable to establishing subject-matter jurisdiction). The legislative history shows that Congress was frustrated by and wanted to overcome the application of *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba* ("*Bancec*"), 462 U.S. 611 (1983), to the agencies and instrumentalities of state sponsors of terrorism such as Iran and Iraq. *Bancec* establishes that, "as a default, . . . agencies and instrumentalities of a foreign state [are] to be considered separate legal entities that cannot be held liable for acts of the foreign state." *Rubin*, 138 S. Ct. at 822 (2018) (citing *Bancec*, 462 U.S. at 628) (quotation marks and alteration omitted). TRIA was enacted to permit victims of terrorism who had successfully sued state sponsors of terrorism to have their judgments "satisfied against the assets that have been seized from primarily two countries that have been involved — Iran and Iraq." 148 Cong. Rec. 10312 (2002) (statement of Sen. Allen); *see also id.* at 23121 (statement of Sen. Harkin).

At the time of TRIA's passage, such victims had obtained numerous judgments against

Iran, Iraq, and the other designated state sponsors of terrorism.  *See* 148 Cong. Rec. 10311 (2002) (statement of Sen. Allen).   But these victims of terrorism had been unable to satisfy those judgments from the more than $3.7 billion in blocked or frozen assets belonging to those state sponsors of terrorism and their agencies or instrumentalities.  *See id.*   "Thus, for purposes of enforcing a judgment against a terrorist state," Congress enacted TRIA to make clear that the law "does not recognize any juridical distinction between a terrorist state and its agencies or instrumentalities." 148 Cong. Rec. 23122 (2002) (statement of Sen. Harkin).

The term "agency or instrumentality" was added to the text of draft § 201(a) at the same time as its companion language — "for which a terrorist party is not immune under section 1605A or 1605(a)(7)" — signifying that Congress intended for plaintiffs with judgments against state sponsors of terrorism to be able to satisfy their judgments against blocked property of that state's agencies or instrumentalities.  *Compare* H.R. 3210 § 15(f), 107th Cong. (Nov. 19, 2001) (omitting reference to "agencies or instrumentalities"), *with* H.R. 3210 § 15(e), 107th Cong. (Nov. 29, 2001) (including quoted text).  The "agency or instrumentality" language was drawn from a bill passed by the House during the 106th Congress, the "Justice for Victims of Terrorism Act," which would have amended 28 U.S.C. § 1610(f) by adding subparagraphs (1)(C) and (4), which provided for the satisfaction of judgments "pending under section 1605(a)(7)" and that, for purposes of § 1610(f), "all assets of any agency or instrumentality of a foreign state shall be treated as assets of that foreign state."  H.R. 3485 §§ 1(c)(1)-(2), 106th Cong. (July 24, 2000); *see* 147 Cong. Rec. 23326 (2001) (statement of Rep. Cannon).  There is no evidence that Congress intended the phrase "agency or instrumentality" to apply to terrorists or terrorist organizations or to encompass mere "agents" of such persons.

As originally drafted, the "Terrorism Risk Protection Act" omitted any reference to

judgments against terrorist parties.  *See* H.R. 3210, 107th Cong. (Nov. 1, 2001).  When it was reported out of committee to the House, it included a provision that simply read: "All assets of terrorists or terrorist organizations seized or frozen by the United States in accordance with law shall be liable for satisfaction of judgments rendered for acts of terrorism, in proportions determined by the courts."  H.R. Rep. No. 107-300, pt. 1, at 9 (Nov. 19, 2001).  The text was then amended in the House to include the reference to § 1605(a)(7), the predecessor to § 1605A, and to provide for the satisfaction of judgments from "the frozen assets of th[e] terrorist party, or any agency or instrumentality of that terrorist party."  147 Cong. Rec. 23347 (2001); *see* H.R. 3210, 107th Cong, § 15(e)(1) (Nov. 29, 2001).

The final enacted text of TRIA was drafted by Senator Harkin and added to the bill as an amendment.  *See* 148 Cong. Rec. 10352 (2002).  That text was adopted wholesale from Senator Harkin's bill, which he explained "only applie[d] to 'terrorist states.'" 148 Cong. Rec. 4629 (2002) (statement of Sen. Harkin); *see* S. 2134, 107th Cong. (Apr. 16, 2002) ("To allow American victims of state sponsored terrorism to receive compensation from blocked assets of those states.").  In his floor speech urging final passage of TRIA, Senator Harkin further explained that TRIA "expressly addresses" and thereby resolves the then-existing

> dispute over the availability of "agency and instrumentality" assets to satisfy judgments against a terrorist state itself.  Let there be no doubt on this point.  [TRIA] operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of its agencies or instrumentalities, available for attachment and/or execution of a judgment issued against that terrorist state.

148 Cong. Rec. 23122 (2002).

Thus, TRIA does not permit a plaintiff who holds a terrorism-related judgment against a non-state terrorist organization, such as the FARC, to attach and execute the assets of an "agency or instrumentality" of such a non-state terrorist organization, because there is no such thing as an

"agency or instrumentality" of a non-state terrorist organization.

Even were the legislative history not conclusive on this point, reading "agency or instrumentality" to be synonymous with the common law concept of "agent" would be a radical departure from the meaning ascribed to the phrase throughout the U.S. Code that always denotes a relationship between a government and a separate or inferior governmental body. *See, e.g.*, 28 U.S.C. § 530D(a)(1)(C)(i)-(ii) (requiring a report on settlements by or against "the United States (including any agency or instrumentality thereof)"); *id.* § 624(2) (directing every "department, agency, or instrumentality" of "the Government" to comply with requests from the Federal Judicial Center); *id.* § 1930 note (discussing the "Administrative Office of the United States Courts, or any other agency or instrumentality of the United States"); *cf. Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006) (Scalia, J.) ("Our more natural reading is confirmed by the use of the word 'contract' elsewhere in the United States Code.").

Looking even more broadly, in the 2003 version of the U.S. Code, reflecting the text as it stood at the time of TRIA's enactment, the term appeared in 558 different sections (a number that has since increased to 618). *See* Exhibit 8 (search results for "agency or instrumentality" from the 2003 version of the U.S. Code as published on the Office of the Law Revision Counsel's website). The abundance of evidence from the U.S. Code demonstrates that Congress understands the term "agency or instrumentality" to refer to the federal government or of a state, local, tribal, or foreign government. For example:

- 6 U.S.C. § 444(6) provides that "'non-Federal Government customers' means any customer of a Seller that is not an *agency or instrumentality* of the [U.S.] Government";

- 7 U.S.C. § 1732(6) provides that "'nongovernmental organization' . . . does not include an organization that is primarily an *agency or instrumentality* of the government of the foreign country";

- 10 U.S.C. § 178(a) provides that "[t]here is authorized to be established a nonprofit corporation . . . which shall not for any purpose be an *agency or instrumentality* of the United States Government";

- 11 U.S.C. § 101(40) provides that "'municipality' means political subdivision or public *agency or instrumentality* of a State";

- 12 U.S.C. § 1451(i) provides that "'conventional mortgage' means a mortgage other than a mortgage [guaranteed] by the United States or any of its *agencies or instrumentalities*";

- 15 U.S.C. § 78c(a)(9) provides that "'person' means a natural person, company, government, or political subdivision, *agency, or instrumentality* of a government."

(2003) (emphasis added).

Thus, Plaintiff's reading is entirely inconsistent with the natural reading of "agency or instrumentality" in its specific context of the FSIA, in the context of title 28, and in the context of the whole of the *corpus juris*. There is no evidence that Congress intended to enact such a radical change. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 455 (2012) ("Congress remains free, as always, to give [a] word a broader or different meaning. But before we will assume it has done so, there must be *some* indication Congress intended such a result." (emphasis in original)); *see also* 28 U.S.C. § 451 ("As used in this title: . . . The term 'agency' includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used *in a more limited sense*." (emphasis added)). To the contrary, it is clear Congress intended to use "agency or instrumentality" as a defined term of art. And neither Plaintiff nor the courts are empowered to revise the statute.

PDVSA and its Subsidiaries acknowledge that the Second Circuit in *Kirschenbaum v. 650 Fifth Avenue* held that § 1603(b)'s definition of "agency or instrumentality" does not apply to the same phrase used later in the same statutory framework. 830 F.3d 107, 134-35 (2d Cir. 2016), *abrogated by Rubin,* 138 S. Ct. 816 (2018). Nonetheless, PDVSA and its Subsidiaries submit that

30

*Kirschenbaum* was wrongly decided and they preserve all available arguments for further appellate review.  PDVSA also notes that the Second Circuit issued its decision without analyzing any legislative history — which history confirms the error.  Finally, the U.S. Supreme Court's decision in *Rubin* reversed *Kirschenbaum*'s erroneous interpretation of § 1610(g) of the FSIA, thus calling the remainder of the decision into question.

### B. Plaintiff Failed to Prove That PDVSA and Its Subsidiaries are "Agencies or Instrumentalities" of the FARC

An "entity's agency or instrumentality status" under TRIA is determined at the time the enforcement action was commenced against an entity's property.  *See Harrison v. Republic of Sudan*, No. 13-cv-3127, 2017 U.S. Dist. LEXIS 25675, at *15-17 (S.D.N.Y.  Feb. 10, 2017) (internal quotation marks omitted) (denying summary judgment for petitioners where it was undisputed that Sudanese entity was not an "agency or instrumentality" of Sudan under either the FSIA or TRIA when enforcement action was commenced).  Here, Plaintiff commenced this action on October 9, 2020, when he sought a writ against an account at M&T Bank.  *See* ECF No. 10.  Yet *all* of Plaintiff's allegations regarding PDVSA in respect of the FARC concern purported conduct that predated October 9, 2020.  *See* ECF No. 10 at 12 (describing an alleged 2008 proposal by Hugo Chavez to sell Venezuelan oil to the FARC); *id* (describing alleged money laundering based on 2015 Treasury press release); *id.* at 12-13 (describing an alleged 2004 proposal for China to provide arms to the FARC).  Moreover, by October 9, 2020, the Ad Hoc Board appointed by Interim President Juan Guaidó was in charge of PDVSA's affairs.  *See* ECF No. 78 at 5 (noting that the Interim Government appointed the Ad Hoc Board to govern PDVSA on February 8, 2019).

Even without this fundamental temporal defect, Plaintiff has failed to show by a preponderance of the evidence that he is entitled to execute on the blocked assets of PDVSA and its Subsidiaries.  *See MMA Consultants 1, Inc. v. Republic of Peru*, 719 F. App'x 47, 51 (2d Cir.

2017) (holding "plaintiff must . . . establish by a preponderance of the evidence that an exception under the FSIA permits jurisdiction over the foreign sovereign." (quotation marks omitted)); *Sokolow v. PLO*, 60 F. Supp. 3d 509, 515 (S.D.N.Y. 2014) (holding ATA liability must be shown by preponderance of the evidence). And Plaintiff has not adduced any evidence admissible under the Federal Rules of Evidence showing that PDVSA or any of the Subsidiaries is an "agency or instrumentality" of the FARC. *See Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) (applying Federal Rules of Evidence to default judgment proceedings against foreign state under § 1608(e)).

Plaintiff's purported evidence principally comprise the two declarations and accompanying exhibits of Mr. McBrien dated, respectively, July 14, 2020 (ECF No. 10-3, the "McBrien Declaration"), and September 8, 2020 (ECF No. 10-4, the "Supplemental McBrien Declaration"). The McBrien declarations and exhibits are inadmissible under the Federal Rules of Evidence and insufficient to show that PDVSA and the Subsidiaries are agencies or instrumentalities of the FARC.

McBrien's purported "opinion" that "PDVSA is an agent or instrumentality of the FARC" (Supp. McBrien Decl. ¶ 12) is inadmissible as either an expert or lay opinion, though Plaintiff did not proffer McBrien as an expert. *See generally* ECF Nos, 10, 22, 23. In any event, McBrien would not qualify as an expert, because he lacks relevant "knowledge, skill, experience, training, or education" to opine on whether PDVSA or the Subsidiaries are agencies or instrumentalities of the FARC. Fed. R. Evid. 702; *see also Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*, No. 00 Civ. 3235, 2003 U.S. Dist. LEXIS 7986, at *6 (S.D.N.Y. May 14, 2003) (excluding expert testimony where plaintiff "proffered nothing to indicate that [the expert] has any expertise in the . . . matters that are at issue in this case"). McBrien purports to draw on his experience at OFAC between

1987 and 2011.  *See* ECF No. 10 at 10; McBrien Decl. ¶¶ 1-6.  While this prior professional experience may qualify McBrien to opine on historical inner workings at OFAC, it is irrelevant to the question of whether PDVSA and its Subsidiaries are agencies or instrumentalities of the FARC.  *See* Fed. R. Evid. 402.

McBrien's testimony is inadmissible as lay testimony, because he lacks "personal knowledge" of whether PDVSA or any of the Subsidiaries is an agency or instrumentality of the FARC.  S*ee* Fed. R. Evid. 602 & 701(a); *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) ("A witness may not testify to a matter until evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter." (quotation marks omitted)); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) ("[A] lay opinion must be rationally based on the perception of the witness." (quotation marks omitted)).

And whether lay or expert, the McBrien declarations constitute inadmissible hearsay within hearsay (in the form of summaries of OFAC press releases, indictments, congressional reports and testimony, news articles, books, and executive branch materials) and pat legal conclusions concerning a wide variety of individuals and entities that McBrien purportedly opines are "agents or instrumentalities of the FARC."  *See, e.g.*, McBrien Decl. ¶¶ 11-15 (summarizing and quoting extensively from a July 25, 2019 OFAC press release); *id.* ¶ 16 ("It is my opinion that the individuals and entities referenced in paragraphs 11, 12, 13, 14, and 15 herein are agents and instrumentalities of the FARC.").  The McBrien declarations are not admissible under any hearsay exception.  *See* Fed. R. Evid. 802 & 805; *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." (quotation marks omitted)).  And McBrien's opinion that PDVSA is an agency or instrumentality of the

FARC constitutes an inadmissible legal conclusion.  *See Cameron v. City of N.Y.*, 598 F.3d 50, 62 (2d Cir. 2010) ("[W]itnesses may not present testimony in the form of legal conclusions." (quotation marks omitted)).  That McBrien, like Plaintiff, erroneously conflates the term "agent" with "agency" in rendering his "opinion" only underscores the unreliability of his testimony. Supp. McBrien Decl. ¶¶ 11, 12.

Further, of the 73 paragraphs of the McBrien declarations, only four address purported ties between PDVSA and the FARC.  *See* Supp. McBrien Decl. ¶¶ 9-12.  Besides being inadmissible under the Federal Rules, these paragraphs are insufficient as they merely describe purported events that allegedly occurred between 2005 and 2008, and undermine any finding that PDVSA is an agency or instrumentality of the FARC.

In particular, Plaintiff relied on McBrien to contend that, in 2008, Hugo Chavez "offered" to fund the FARC, purportedly with the "cooperation" of an unnamed "manager of PDVSA."  ECF No. 10 at 12 (quoting Supp. McBrien Decl. ¶ 9 (quoting The International Institute for Strategic Studies, *The FARC Files* 148 (2011), ECF No. 10-4 at 306 ("The FARC Files"))).  But McBrien's own sources indicate that, at most, this alleged "offer" was merely an offer.  *See* The FARC Files at 148 (observing that no agreement was reached).

Plaintiff also relies on McBrien to allege that PDVSA was involved in "money laundering" for the FARC.  *See* ECF No. 10 at 12 (quoting Supp. McBrien Decl. ¶ 11 (quoting Adapting US. Counternarcotics Efforts in Colombia: Hearing Before the Senate Caucus on International Narcotics Control 6 (Sept. 12, 2017) (testimony of Douglas Farah), ECF No. 10-4 at 313 ("Farah Testimony") (citing "FinCEN Names Banca Privada d'Andorra a foreign financial institution of primary money laundering concern," U.S. Department of the Treasury, March 10, 2015))). Besides being inadmissible hearsay, the Farah testimony does not address PDVSA's conduct; it

addresses the purported conduct of two PDVSA affiliates not present before this Court and located in Nicaragua and El Salvador.  *See* Farah Testimony at 5-6.

Again relying on McBrien, Plaintiff further alleges that "PDVSA has . . . helped the FARC purchase arms."  ECF No. 10 at 12 (quoting Supp. McBrien Decl. ¶ 12 (quoting The FARC Files at 96, ECF No. 10-4 at 301).  But McBrien acknowledges that the "proposed" arms deal was merely proposed.  Supp. McBrien Decl. ¶ 12; *see* The FARC Files at 96 (stating that the alleged arms deal "fell through").  Moreover, McBrien conspicuously omits that, according to the FARC Files on which he relies, it is "not known" whether the purported Venezuelan government official allegedly involved in the proposed arms deal was acting on his own "personal initiative" or whether "the Venezuelan government was committed to a deal."  *See* The FARC Files at 97, ECF No. 10-4 at 302 (stating "the exact status" of the alleged Venezuelan official "remained unclear (in some FARC correspondence he is referred to as a 'businessman'), and it is equally plausible, given the relatively small amount of money at stake, that he was acting on his own initiative").

Remarkably, with respect to the Subsidiaries, Plaintiff failed to adduce any factual evidence supporting a finding that they are each an agency or instrumentality of the FARC.  Instead, Plaintiff relied in error on OFAC's so-called "Fifty Percent Rule," which requires U.S. banks and other U.S. persons to block the property and interests in property of entities that are owned 50% or more by a blocked party.  *See* ECF No. 22 at 6, 14-15, 18; Supp. McBrien Decl. ¶ 13 (opining that the Subsidiaries are owned 50 percent or more by PDVSA).  But OFAC's asset-blocking rules are separate and distinct from an "agency or instrumentality" determination under TRIA.  *See Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 731 n.13 (11th Cir. 2014) ("[I]t is not proper for the district court to rely solely on OFAC designation as creating an irrebuttable presumption of agency or instrumentality status.  The agency or instrumentality

determination is separate from the blocked asset determination."); *Pescatore v. Pineda*, No. 08-2245, 2019 U.S. Dist. LEXIS 84048, at *7 (D.D.C. May 20, 2019) (same); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 154864/2020, 2020 N.Y. Misc. LEXIS 10368, at *3 (N.Y. Sup. Ct. Dec. 4, 2020) (holding that OFAC designation of defendants "does not show that [defendant] is an agent or instrumentality of FARC, as neither the OFAC documents nor the United States Department of the Treasury press release mentions FARC.").

In the absence of the adversarial process, this Court was unfortunately misled into accepting Plaintiff's flawed theory of liability as against the Subsidiaries and issued writs of execution on that basis. *See* ECF No. 33 at 4-6.  The Court did not make any factual findings that the Subsidiaries each acted as an agency or instrumentality of the FARC.  The Court also did not make any factual findings that the corporate separateness of the Subsidiaries should be collapsed such that they should all be treated as alter egos of PDVSA.  Absent such findings, the writs were issued on grounds that defy basic principles of corporate separateness.  *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 195-96 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013) ("[A] claim sufficient to 'overcome the presumption of separateness afforded to related corporations,' is not established by the bare allegation that one corporation dominated and controlled another." (quotation omitted)); *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) ("A corporate parent's ownership interest in a subsidiary, standing alone, is insufficient to demonstrate the existence of an agency relationship.").

Indeed, Plaintiff would have this Court impute the alleged illegal actions of individual Venezuelan officials under the Chavez and illegitimate Maduro regimes to the Venezuelan government, and then in turn to PDVSA, and then in turn to the Subsidiaries.  But Plaintiff has not provided any underlying factual support for such endless veil piercing, and such veil piercing is

plainly foreclosed as a matter of law.  *See Kiobel*, 621 F.3d at 195-96; *Bigio*, 675 F.3d at 175; *Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir. 1984) (holding "creditor seeking execution against an apparently separate entity" had failed to "prove the property to be attached is subject to execution" under *Bancec* (quotation marks omitted)).

Because Plaintiff failed to prove the alleged "agency or instrumentality" status of PDVSA and its Subsidiaries, the writs of execution should be quashed and the turnover judgment vacated.

### C.     Plaintiff Has Not Established That PDVSA And The Subsidiaries Own The "Blocked Assets"

As a threshold matter, even if TRIA applied to PDVSA and the Subsidiaries, TRIA would allow for enforcement against the blocked assets only if PDVSA and the Subsidiaries actually own the Blocked Assets.  TRIA § 201 (requiring blocked assets to be "of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)"); *see Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 212 (2d Cir. 2014) (stating that terrorist party must have property interest in blocked asset before attachment under TRIA would be proper).  Here, Plaintiff has failed to establish that the Blocked Assets are in fact owned by PDVSA and the Subsidiaries as required under TRIA.  Thus, the Court may quash the writs and vacate the turnover judgment without having to reach the jurisdictional defects addressed above.  *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728 (D.C. Cir. 2008) (dismissing case on limitations grounds without deciding subject matter jurisdiction because "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits" (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007))).

Specifically, the record suggests that the Blocked Assets are held in the name of "CID Private Equity Europe Trust," not PDVSA.  *See* ECF No. 23-6.  And there is no record evidence that the Subsidiaries own the Blocked Assets held at Citibank.  *See* ECF No. 22 at 5 (asserting that

Citibank, N.A. holds "blocked assets in the putative names of, or for the benefit of, or that were blocked due to an association with" the PDVSA Subsidiaries) (emphasis added); *see also id.* at 23-27 (asserting only that the assets are "blocked," but not that the assets are owned by the PDVSA Subsidiaries).  Because Plaintiff failed to prove that the Blocked Assets at M&T Bank or Citibank are in fact assets "of" PDVSA and its Subsidiaries, those assets are not available for execution under TRIA.

Moreover, even if the Blocked Assets were owned by PDVSA and its Subsidiaries, the assets still are not "available for execution" under TRIA because they are not "blocked pursuant to the particular regulation or administrative action directed at the particular terrorist-party judgment debtor" — here, the FARC.  *Hausler v. JPMorgan Chase Bank, N.A.,*, 845 F. Supp.2d 553, 567 (S.D.N.Y. 2012) ("TRIA does not permit a party with a judgment against Iran to execute against funds blocked pursuant to the [Cuban Assets Control Regulations], which are, of course, targeted at Cuba."), *rev'd on other grounds*, 770 F.3d 207 (2d Cir. 2014); *accord Levin v. Bank of N.Y. Mellon*, 09 CV 5900, 2013 U.S. Dist. LEXIS 137399, at *99 (S.D.N.Y. Sept. 19, 2013).  On January 28, 2019, OFAC blocked PDVSA's assets pursuant to Executive Order 13850 "for operating in the oil sector of the Venezuelan economy."  OFAC Press Release (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594; *see also* Venezuela Sanctions Regs. (31 C.F.R. part 591).  This blocking measure was protective in nature and intended to "ensure that the assets of Venezuela are preserved for the country's people, rather than misused and diverted by former President Nicolas Maduro."  OFAC, Frequently Asked Question No. 660, https://home.treasury.gov/policy-issues/financial-sanctions/faqs/660 ("OFAC FAQ 660").  The FARC, meanwhile, is designated as a significant foreign narcotics trafficker, a Foreign Terrorist Organization and a Specially Designated Global Terrorist.  *See* OFAC List of Specially Designated

Nationals and Blocked Persons, https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-list-data-formats-data-schemas; *see also* Foreign Terrorist Organization Sanctions Regulations (31 C.F.R. part 597), Global Terrorism Sanctions Regulations (31 C.F.R. part 594), and Foreign Narcotics Kingpin Sanctions Regulations (31 C.F.R. part 598). This lack of overlap between the relevant OFAC programs precludes execution on PDVSA's assets under TRIA. *See Hausler*, 845 F. Supp. 2d at 567.

This lack of overlap also counsels against effectuating "the judicial seizure of the property of a friendly state" — here the Interim Government of Venezuela — that "may be regarded as an affront to its dignity and may affect [the United States'] relations with it." *Philippines v. Pimentel*, 553 U.S. 851, 866 (2008). This is particularly so where, as here, the United States has blocked PDVSA's assets not punitively, but to support the Interim Government "taking concrete and meaningful actions to combat corruption, restore democracy, and respect human rights." OFAC FAQ 660. These comity concerns themselves provide another ground upon which this Court may vacate the turnover judgment and quash the writs. At a minimum, the Court should invite the views of the United States on this matter. *See* 28 U.S.C. § 517.

## V.   THE UNDERLYING DEFAULT JUDGMENT AGAINST THE FARC IS VOID FOR LACK OF JURISDICTION

The Florida federal court made no findings whatsoever regarding whether the court had personal jurisdiction over the FARC. Indeed, it did not and, as such, the Federal Default Judgment is void under Rule 60(b)(4). *See Covington Indus., Inc. v. Resintex A. G.*, 629 F.2d 730, 732 (2d Cir. 1980) (affirming vacatur of default judgment entered by a Georgia federal court for lack of personal jurisdiction because "[a] judgment entered against parties not subject to the personal jurisdiction of the rendering court is a nullity"); *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) (declaring void default judgments issued by a Florida state court and a Florida federal

court for lack of subject matter jurisdiction).

As detailed above, the Florida federal action involved the claims of a naturalized U.S. citizen alleging injury as a result of a foreign terrorist organization's conduct taken in Colombia against Plaintiff's father, a citizen of Colombia, more than a decade earlier when Plaintiff was also only a national of Colombia. The federal complaint contained no allegations that would suffice to establish general personal jurisdiction over the FARC in a U.S. court and no relevant suit-related conduct by the FARC in the United States much less Florida. *See Waldman*, 835 F.3d at 331 ("A court may assert general personal jurisdiction over a foreign defendant to hear any and all claims against that defendant only when the defendant's affiliations with the State in which suit is brought are so constant and pervasive as to render [it] essentially at home in the forum State.") (cleaned up); *Goodyear Dunlop Tires Operations S.A. v. Brown*, 564 U.S. 915, 919 (2011) (specific jurisdiction requires an "affiliation between the forum and the underlying controversy")

In the Florida federal action, Plaintiff alleged that "Defendants . . . transacted business in [Florida] . . . by their criminal activity and operations trafficking millions of dollars of illicit drugs into Florida and the United States for distribution throughout the United States." Exhibit 5 at ¶ 10. Taken as true, these allegations do not establish that the FARC was "at home" in Florida, or otherwise in the United States. As the Second Circuit held in *Waldman*, simply operating or "doing business" in the United States does not render a foreign entity at home in the United States. 835 F.3d at 331, 333. Moreover, the federal complaint, as well as the findings of fact by the Florida state court in its Default Judgment (which is repeatedly cited in the federal Complaint), demonstrate that the FARC was a Colombian terrorist organization that is "at home," if anywhere, in Colombia. *See* Exhibit 5 at ¶ 5(a) ("Defendants are criminal narco-terrorist organizations from the jungles and mountains of Colombia."); Exhibit 4 at ¶¶ 1, 27 (describing the FARC's narco-

trafficking activity in Colombia and its "active participa[tion] in the ongoing war against the Colombian government"). Thus, despite any activity that ultimately resulted in conduct in or touching the United States, it is clear that the "far larger quantum" of the FARC's activities took place in Colombia. *Waldman*, 835 F.3d at 333 (holding general jurisdiction lacking where, despite the defendants' presence in the United States, "there is no doubt that the 'far larger quantum' of the [their] activities took place in Palestine"); *see also id.* at 334 (finding defendants were "at home" in Palestine as that is where they were "headquartered and from where they are directed").

The Florida federal court also lacked specific personal jurisdiction over the FARC because Plaintiff's ATA claim was based exclusively on conduct occurring entirely outside the United States. Indeed, it is undisputed that Plaintiff's father was a Colombian citizen and that his kidnapping, torture, and eventual murder all took place in Colombia. *See* Exhibit 4 at ¶¶ 5, 17, 18, 24. Likewise, there is no question that Plaintiff was a Colombian citizen and a resident of Colombia at the time of his father's death and that Plaintiff's business and property that were damaged by reason of the Defendants' actions in Colombia were located in Colombia. *See* Exhibit 1 at ¶ 2; Exhibit 5 at ¶¶ 5(b)-5(f).

In the federal complaint, Plaintiff attempted to plead specific jurisdiction by alleging that the FARC's "kidnapping and eventual assassination of Ambassador Caballero was a necessary component part of the Defendants' overall criminal activity and scheme to traffic illicit drugs into South Florida and the United States." *See* Exhibit 5 at ¶ 10. This is plainly insufficient. Specific jurisdiction requires that the forum "be the 'focal point' or 'nucleus' of plaintiff's underlying claim." *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 U.S. Dist. LEXIS 25756, at *132 (S.D.N.Y. Feb. 21, 2017); *see also id.* ("This includes consideration of the claim's elements and where the underlying conduct occurred."). The "focal point" or "nucleus" of Plaintiff's ATA claim

— the conduct that forms the claim's elements — is the kidnapping and assassination of Ambassador Caballero, which occurred entirely in Colombia.  Indeed, Plaintiff does not claim to have been injured by any of the FARC's broader "criminal activity" or trafficking of drugs into the United States.  *C.f. Sullivan*, 2017 U.S. Dist. LEXIS 25756, at *134-148 (finding specific jurisdiction not established over various European banks because, although the banks allegedly conducted banking activities in the United States, the particular activities that formed the basis of the plaintiffs' claim occurred outside the United States).

Moreover, Plaintiff lacked standing to even assert an ATA claim — his sole claim in the federal action — because, by his own allegations, he was not a U.S. citizen until years *after* the terrorist acts against his father.  *See* Exhibit 1 at ¶¶ 2, 12 (containing Plaintiff's admission that he was not a U.S. national, more than a decade after the terrorist acts, when he filed the state court action, seeking damages as an alien under the Alien Tort Statute).  Section 2333(a) of the ATA, titled "Action and Jurisdiction," requires that an ATA plaintiff be a "national of the United States" at the time he or she is injured in order to invoke the jurisdiction of an "appropriate district court of the United States."  This nationality requirement is clear from the plain language of the statute:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States[.]

18 U.S.C. § 2333(a).

Nothing in the statute suggests that § 2333(a) provides a cause of action to foreign nationals injured by acts of international terrorism who years later become naturalized U.S. citizens.  Had Congress intended to provide a cause of action for U.S. nationals who have ever been injured by international terrorism, it would have done so.  Moreover, § 2333(a) expressly covers only injuries that a U.S. national "sustains"; the use of the present tense denotes that the individual must be a U.S. national when he sustains the injury.

The Congressional Record further makes clear that § 2333(a) was intended "to provide a new civil cause of action in Federal law for international terrorism that provides extraterritorial jurisdiction over *terrorist acts abroad against United States nationals*." 137 Cong. Rec. 8143 (1991) (consideration of S. 740) (emphasis added); *see also id.* (statement of Sen. Grassley) ("This legislation would, for the first time, provide for Federal civil remedies for American victims of international terrorism."); 138 Cong. Rec. 33635 (1992) (statement of Sen. Grassley) (the purpose of the ATA is "to create a new civil action for American victims of terrorism").

Although the Florida federal court found that the ATA covered individuals who became naturalized U.S. citizens after the act of international terrorism for which they sustained injury, that finding is not afforded preclusive effect in the default context. *See Bob Jones Univ.*, 416 U.S. at 740 n.11. Moreover, the Florida federal court's reasoning — namely, that "Congress intended for the ATA to have a broad scope" (*see* Exhibit 6 at 5) — and the cases upon which that court relied do not support that court's conclusion that Plaintiff could have ATA standing for injuries he sustained before becoming a U.S. national. *See id.* at 5; s*ee id.* (citing, *e.g.*, *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 575 (E.D.N.Y. 2005) ("Plaintiffs . . . are United States citizens, or their estates, survivors, and heirs, who have been victims of terrorist attacks in Israel"); *Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172, 175 (D.D.C. 2004) ("Plaintiff . . . is an American citizen[,] [and] sues in her individual capacity under the ATA")). The court also cited cases where courts "permitted survivors of U.S. nationals who were killed by acts of international terrorism to state a claim under the ATA even if the survivors are not U.S. nationals." Exhibit 6 at 5 (citing *Weinstock v. Islamic Republic of Iran*, No. 17-23272-Civ-Scola, 2019 WL 1993778, at *4 (S.D. Fla. May 6, 2019)). But the ATA expressly provides standing to the "estate, survivors, or heirs" of U.S. nationals injured in terrorist attacks. 18 U.S.C. § 2333(a).

Thus, none of these cases supports the Florida federal court's decision to extend the ATA beyond its plain terms and allow Plaintiff to sue for damages he sustained as a foreign national.

The Federal Default Judgment is also void as to its damages award because the Florida federal court improperly gave preclusive effect to the damages findings of the Florida state court default judgment, which is itself void for lack of jurisdiction.   The Florida state court lacked personal jurisdiction over the FARC for the same reasons as the Florida federal court, set forth above.   While the Florida state court made findings as to jurisdiction under Florida's long-arm statute, it failed to consider the constitutional due process requirements that Plaintiff failed to satisfy, also discussed above.   As such, the Florida state default judgment is void and the Florida federal court should not have relied upon it for the damages award sought to be enforced here. *See, e.g.*, *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 135-36 (2d Cir. 2019) (vacating turnover order for lack of jurisdiction and finding that district court improperly gave full faith and credit to jurisdictional findings made by a Florida state court in a default judgment).

The Florida state court also incorrectly asserted subject matter jurisdiction under the Alien Tort Statute.  *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803-CA-02, 2014 Fla. Cir. LEXIS 51243, at* 44-49.  The state court reasoned that, because state courts generally have concurrent jurisdiction over "a federal cause of action," it has concurrent jurisdiction over ATS claims.  *Id.* at 44.  But "the ATS is 'strictly jurisdictional' and does not by its own terms provide or delineate the definition of a cause of action for violations of international law."  *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018) (citation omitted); *see also* 28 U.S.C. § 1350 ("[U.S.] district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States").

Further, even if the state court could exercise jurisdiction under the ATS, ATS jurisdiction

does not extend to suits against foreign entities such as the FARC.  *See Jesner*, 138 S. Ct. at 1403 ("[A]bsent further action from Congress it would be inappropriate for courts to extend ATS liability to foreign corporations.").  Nor does it extend to claims, like Plaintiff's, that are based on conduct occurring entirely outside the United States.  *See Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 117 (2012) ("The principles underlying the presumption against extraterritoriality thus constrain courts exercising their power under the ATS."); *Balintulo v. Daimler AG*, 727 F.3d 174, 189-190, 192 (2d Cir. 2013) (holding presumption against extraterritoriality not rebutted for ATS claims based on conduct occurring in South Africa even though the defendants maintained business operations in the United States).  Thus, the Florida state court's exercise of jurisdiction under the ATS is fundamentally incorrect and the Florida federal default judgment is void to the extent it gave preclusive effect to the void judgment of the Florida state court.

## CONCLUSION

For the foregoing reasons, PDVSA and its Subsidiaries respectfully request that this Court (1) vacate the Court's Decisions & Orders dated December 18, 2020 (ECF No. 15) and January 29, 2021 (ECF No. 33), (2) quash the writs of execution issued pursuant to these orders, (3) vacate its turnover judgment dated January 29, 2021 (ECF No. 35), and (4) dismiss this action with prejudice.

Dated:  June 25, 2021                                  Respectfully submitted,

**WHITE & CASE**

By:*/s/ Claire A. DeLelle*
Nicole Erb
Claire A. DeLelle
701 Thirteenth Street N.W.
Washington, D.C. 20005
(202) 626-6485
nerb@whitecase.com
claire.delelle@whitecase.com