UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK
CASE NO: 1:20-mc-00040-LJV

ANTONIO CABALLERO,

      Plaintiff,

vs.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, a/k/a FARC-EP a/k/a
REVOLUTIONARY ARMED FORCES OF
COLOMBIA; and THE NORTE DE VALLE
CARTEL,

      Defendants.

_____/

**PLAINTIFF ANTONIO CABALLERO'S MEMORANDUM OF LAW IN OPPOSITION
TO PETROLEOS DE VENEZUELA S.A.'S AND SUBSIDIARIES' MOTION TO QUASH
WRITS OF EXECUTION AND VACATE TURNOVER JUDGMENT [D.E. 85]**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................ 1

**RESPONSE TO THE PDVSA PARTIES' PRELIMINARY STATEMENT** ........................ 4

**RELEVANT STATUTORY FRAMEWORK** ............................................................... 6

   **A.**  The FSIA is Applicable to *In Personam*, Not *In Rem* Actions ....................................... 6

   **B.**  The FSIA's Provisions Regarding a Foreign State's Property Are Applicable to Enforcement of *In Personam* Actions, not *In Rem* Actions ................................................. 8

   **C.**  TRIA Unequivocally Overrides the FSIA – Including Exempting Blocked Assets from any Immunity Provided by the FSIA ................................................................... 9

**PROCEDURAL AND FACTUAL BACKGROUND** ...................................................... 12

**LEGAL STANDARDS** ..................................................................................... 22

   **A.**  PDVSA's Burden under Rule 60(b) ........................................................................ 22

   **B.**  PDVSA Has the Burden of Proof Because it Had Actual Notice ................................ 23

**ARGUMENT** ................................................................................................. 24

   **A.**  This Court had Subject Matter Jurisdiction to Issue the Writs of Execution and Turnover Judgment. ........................................................................................ 24

   **B.**  The Court Did Not Need Personal Jurisdiction over the PDVSA Parties ................... 27

   **C.**  PDVSA Received Actual Notice of these Proceedings Before the Entry of the Turnover Judgment. ......................................................................................... 28

   **D.**  TRIA'S Applicability is Beyond Arguable .............................................................. 31

     **1.**  The PDVSA' Parties Legal Arguments Fail ......................................................... 32

     **2.**  The PDVSA' Parties Factual Arguments Fail ...................................................... 35

     **3.**  M&T Bank is Holding Assets in the name of, or for the benefit of PDVSA ........... 39

   **E.**  Caballero's ATA Final Judgment is Correct, Final, and Not Assailable ................... 41

**CONCLUSION** ............................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*"R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115 (2d Cir. 2008) ................................ 24

*Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016) ................................................ 26

*Bennett v. Islamic Republic of Iran,* 927 F. Supp. 2d 833 (N.D. Cal. 2013) ................. 24

*Bertelt v. United States (In re Bertelt)*, 206 B.R. 579 (Bankr. M.D. Fla. 1996) ........................ 11

*Burda Media, Inc. v. Viertel*, 417 F.3d 292 (2d Cir. 2005) ...................................... 24

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 770 F.3d 993 (2d Cir. 2014) ..................... 40

*Cent. Vt. PSC v. Herbert*, 341 F.3d 186 (2d Cir. 2003) ......................................... 23, 24

*Chicot City Drainage Dist. v. Baxter State Bank*, 308 U.S. 371 (1940) ................................ 42, 43

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993) ............................................... 10

*Connyers v. Rossides*, 558 F. 3d 137 (2d Cir. 2009) ............................................. 11

*Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730 (2d Cir. 1980) ............................. 42

*Crescendo Mar. Co. v. Bank of Communs. Co.*, Case No. 15-cv-4481, 2016 U.S. Dist. LEXIS 21824 (S.D.N.Y. Feb. 22, 2016) ................................................................. 7

*Crowley Caribbean Transport, Inc. v. United States,* 865 F. 2d 1281 (D.D.C. 1989) ................ 11

*CSX Transp., Inc. v Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) ............................. 30

*Gater Assets, Ltd. v. Gazsnabtranzit,* Case No. 16-cv-04118, 2018 U.S. Dist. LEXIS 171350 (S.D.N.Y Sept. 30, 2018) ................................................................. 22, 23

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) ............................... 7

*Harrison v. Republic of Sudan*, No 13-cv-3127, 2017 U.S. Dist. LEXIS 25675 (S.D.N.Y. Feb. 10, 2017) ................................................................. 36

*Hausler v. JP Morgan Chase Bank*, 740 F. Supp. 2d 525 (S.D.N.Y. 2010) ................................ 28

*Hausler v. JPMorgan Chase Bank, N.A.,* 845 F. Supp. 2d 553 (S.D.N.Y. 2012) ................. 40, 41

*Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019) ..................................... 35

*Hill v. Republic of Iraq*, Case No. 99-cv-03346, 2003 U.S. Dist. LEXIS 3725 (D.D.C. Mar. 11, 2003) ................................................................. 10

*Hoffman v. Pulido*, 928 F.3d 1147 (9th Cir. 2019) ............................................. 42

*Hyundai Merch. Marine Co. v. Grand China Shipping (H.K.) Co.*, 878 F. Supp. 2d 1252 (S.D. Ala. 2012) ................................................................. 31

In *Calderon-Cardona v. Bank of N.Y Mellon*, 770 F.3d 993 (2d Cir. 2014) ........................ 36

*In re 650 Fifth Ave. & Related Props.,* Case No. 08 cv 10934, 2014 U.S. Dist. LEXIS (S.D.N.Y. Mar. 28, 2014) ................................................................. 29

*In re Betwell Oil & Gas Co.,* 204 B.R. 817 (Bankr. S.D. Fla. 1997) .............................. 11

*In re Montero*, Case No. 17-cv-1105, 2019 U.S. Dist. LEXIS 4948 (E.D.N.Y. Jan. 9, 2019) ..... 31

*Ins. Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694 (1982) ........................... 42

*International Shoe v. State of Washington*, 326 U.S. 310 (1945) ................................... 7

*Jenkins v. Smead Mfg. Co.,* Case No. 09-cv-0261, 2009 U.S. Dist. LEXIS 101545 (S.D. Cal. Oct. 28, 2009) ................................................................. 43

*Jerez v. Republic of Cuba*, 775 F.3d 419 (D.C. Cir. 2014) ....................................... 43

*Kiobel v. Royal Dutch Petrol Co.*, 569 U.S. 108 (2012) ......................................... 43

*Kirschenbam v. 650 Fifth Ave & Related Props.*, 934 F.3d 191 (2d Cir. 2019) ....................... 35

*Kirschenbaum v. 650 Fifth Avenue and Related Properties*, 830 F.3d 107 (2d Cir. 2016) .. 18, 32, 34

*Levin v. Bank of N.Y. Mellon*, Case No. 09-cv-5900, 2019 U.S. Dist. LEXIS 22788 (S.D.N.Y. Feb 12, 2019) ...................................................................................................................... 35

*Miccosukee Tribe of Indians of Florida v. United States Army Corps of Engr's,* 619 F. 3d 1289 (11th Cir. 2010) ...................................................................................................................... 10

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009) ................................................................................................................ 11, 12

*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) ................ 29

*Nemaizer v. Baker,* 793 F.2d 58 (2d Cir. 1986) ......................................................................... 42

*Partida v. United States DOJ (In Re Partida),* 862 F. 3d 909 (9th Cir. 2017) ........................... 11

*Peterson v. Islamic Republic of Iran,* 627 F.3d 1117 (9th Cir. 2010) ........................................ 30

*Rondout Valley Cent. Sch. Dist. v. Coneco Corp*., 321 F. Supp. 2d 469 (N.D.N.Y. 2004).......... 36

*Rouse v. Conner*, Case No. 12-2121, 2012 U.S. Dist. LEXIS 86446 (N.D. Cal. June 21, 2012). 43

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) .................................................. passim

*Sayles v. PAC Eng'rs & Constructors, Ltd.*, Case No. 08-cv-676S, 2009 U.S. Dist. LEXIS 124819 (W.D.N.Y. Jan. 16, 2009) .......................................................................................... 43

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ..................................................................................... 7

*Smith v. FRB*, 280 F. Supp. 2d 314 (S.D.N.Y. 2003) .......................................................... 10, 27

*Stansell v. Revolutionary Armed Forces of Colombia (FARC),* No. 09-cv-2308-RAL-MAP, 2013 U.S. Dist. LEXIS 189867 (M.D. Fla. Feb. 17, 2015) ..................................................... 39

*Stansell v. Bello*, 802 F. App'x 445 (11th Cir. 2020) ................................................................. 29

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158 (2d Cir. 2004).......... 23

*United States v. Assa Co.*, 934 F.3d 185 (2d Cir. 2019) ....................................................... 7, 8, 25

*United Student Aid Funds, Inc. Espinosa*, 559 U.S. 260 (2010)................................................. 42

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988) ....................................... 31

*Weigner v. New York*, 852 F.2d 646 (2d Cir. 1988)................................................................... 19

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) .................................... passim

*Windward Bora LLC v. Baez*, Case No. 19-cv-1755, 2021 U.S. Dist. LEXIS 36829 (E.D.N.Y., Feb. 24, 2021) ........................................................................................................................ 19

## Statutes

28 U.S.C. § 1608..................................................................................................................... 9

28 U.S.C. § 1610................................................................................................................ 9, 34

28 U.S.C. § 1610 note ............................................................................................................ 10

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. 28 U.S.C. §§ 1330, 1602, et seq............. 4

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2337 (28 U.S.C. 1610 note) .................................................................................................................... 3, 4

## Other Authorities

DOJ, Documents Related to the March 26, 2020 Press Conference, *Criminal Charges Against the Former Maduro Regime* (Mar. 26, 2020) ............................................................................ 3

H.R. Conf. Rep. 107-779 ........................................................................................................ 33

H.R. Conf. Rep. No. 107-779 ................................................................................................. 12

## Rules

Fed R. Civ. P. 4...................................................................................................................... 29

Fed. R. App. P. 4(a)(4)(A)(vi) .................................................................................. 1

Fed. R. Civ. P. 59 ...................................................................................................... 1

Fed. R. Civ. P. 60(b) ............................................................................................ 1, 22

Fed. R. Civ. P. 69 .................................................................................................... 29

N.Y. C.P.L.R. § 5225 ............................................................................................... 30

Plaintiff Antonio Caballero ("Caballero"), by and through undersigned counsel, hereby opposes Petroleos de Venezuela, S.A.'s ("PDVSA") and its Subsidiaries' (as defined at D.E. 85 at 1)[1] Motion to Quash Writs of Execution and Vacate Turnover Judgment (the "Motion") [D.E. 85].

## PRELIMINARY STATEMENT

This Court's January 29, 2021, Turnover Judgment is ***final***.  Despite appearing in this case on February 2, 2021, the day before M&T Bank was due to comply with this Court's Turnover Judgment [D.E. 35], PDVSA never appealed the Turnover Judgment or timely moved for rehearing or to alter or amend the judgment pursuant to Rule 59, Federal Rules of Civil Procedure. Instead, PDVSA has taken on Rule 60(b)'s heightened burdens applicable to relieving a party from the terms of a final judgment.[2]  As explained herein, PDVSA has not met its burden.  It is time for this Court's final Turnover Judgment to be enforced.

In its December 18, 2020, Decision & Order, this Court found that "Caballero has presented credible evidence that PDVSA is an agency or instrumentality of the FARC.  Other courts have found the same. *See* Docket Item 11." [D.E. 15 at 5].[3]  Based on its review of the evidence, this Court ruled that " . . . Caballero has established both that FARC is a terrorist party and that PDVSA is an agency or instrumentality of FARC." [D.E. 15 at 5]. The Court did the same in its January

---

[1]  Collectively, PDVSA and its Subsidiaries will be referred to as the "PDVSA Parties."

[2]  A turnover judgment is a final, appealable judgment in collection proceedings. *See, e.g. Stansell v. Revolutionary Armed Forces of Columbia [sic]*, 771 F.3d 713, 737 (11th Cir. 2014). PDVSA did not file its Rule 60 motion within twenty-eight days after the Turnover Judgment was entered. As such, its filing did not toll its obligation to file its notice of appeal within thirty days. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

[3] At this point, ***seven*** different courts on ***thirteen*** occasions have declared PDVSA and/or a PDVSA subsidiary to be an agency or instrumentality of the FARC. *See* **Ex. 1,** Decl. of Leon N. Patricios at ¶ 7.  The PDVSA Parties will surely complain that these findings were *ex parte*, but the PDVSA Parties cannot accuse any of the Courts of abdicating their responsibility to review the submissions before them.

29, 2021, Decision & Order regarding the Subsidiaries. [D.E. 33 at n.7]. Thus, there has been ***one***

***potential*** factual issue before this Court since PDVSA's appearance on February 2, 2021 – the

status of the PDVSA Parties as agencies or instrumentalities of the FARC.

During the hearing on the Ad Hoc Board's Motion to Substitute counsel, the Court

repeatedly warned the PDVSA Parties that any dispute between the Guaidó appointed and Maduro

appointed lawyers that resulted in necessary evidence not being submitted to the Court was

conduct akin to "cutting off one's nose to spite one's face" that could only benefit Caballero. *See*

Hearing Transcript 4/28/21 at pp. 16, 23, 34. Despite the Court's specific warnings and numerous

orders[4] that the PDVSA Parties brief both legal and factual issues, the PDVSA Parties have

submitted ***no evidence – none***. The PDVSA Parties have not submitted an affidavit providing any

facts ***refuting*** the evidence before the Court or even bothered, although it would not be sufficient

to create an issue of fact, to submit an affidavit simply ***denying*** participation in the activities that

establish their agency or instrumentality status. Thus, this Court's finding that the PDVSA Parties

are agencies or instrumentalities of the FARC is well-supported and in line with the finding of

every court to have considered the issue[5] – and now stands unrebutted by the PDVSA Parties'

failure to submit any evidence.

Instead of providing evidence, the PDVSA Parties make unsupported allegations. By way

of example, in the ***very first sentence*** of their Preliminary Statement, the PDVSA Parties

characterize, without any support, the FARC as "defunct." That would be news to United States

Attorney General, the United States Attorney for the Southern District of New York, and several

other United States Attorneys who participated on March 26, 2020, in the announcement[6] of a

---

[4] *See* D.E. 15 at 5; D.E. 78 at p. 18; D.E. 82.
[5] *See* **Ex. 1,** Decl. of Leon N. Patricios at ¶ 7.
[6] On March 26, 2020, the United States government announced at a press conference the unsealing

superseding indictment against Maduro (the "Maduro Indictment") that makes very clear that the FARC's narco-terrorist activities are very much ongoing and continue to be supported by FARC's partner Maduro and various Venezuelan government organs or organizations, including PDVSA. *See* **Ex. 2,** Superseding Indictment, Case No. 11-cr-00205-AKH (S.D.N.Y.), D.E. 11. *See also*, Otto Reich Declaration at D.E. 66-1 at ¶ 14 (adopting opinions of John Robert McBrien's March 3, 2021 Declaration filed in the United States District Court for the Southern District of Texas, attached hereto **Ex. 5**).

Left without any facts to rebut the Court's agency or instrumentality findings, the PDVSA Parties vainly raise the proverbial "kitchen sink"[7] of legal arguments (attacking every aspect of Caballero's case from inception through today) as its sole means of attempting to prevent a victim of terrorism from recovering blocked assets that the United States Congress and Executive Branch have expressly designated as available for that purpose. As explained below, each of the PDVSA Parties' attacks fail. Most fundamentally, no matter how many pages they write, or how many cases they cite, the PDVSA Parties cannot overcome these powerful words: "[n]otwithstanding any other provision of law, . . . ." TRIA, § 201(a) – words that the United States Supreme Court has acknowledged create precedence over any other law, including the immunities provided in the

---

of the Maduro Indictment. *See* DOJ, Documents Related to the March 26, 2020 Press Conference, *Criminal Charges Against the Former Maduro Regime* (Mar. 26, 2020), available at: *https://www.justice.gov/opa/documents-related-march-26-2020-press-conference*. This was no ordinary press conference. Remarks were provided by U.S. Attorney General William P. Barr, U.S. Attorney Geoffrey S. Berman of the Southern District of New York, U.S. Attorney Ariana Fajardo of the Southern District of Florida, and Assistant Attorney General Brian A. Benczkowski of the Justice Department's Criminal Division.

[7] In *Bank Markazi v. Peterson,* 136 S. Ct. 1310 (2016), the Supreme Court recounted the district court's observation that the party opposing turnover, like PDVSA here, had "filled the proverbial kitchen sink with arguments." *Id.* at 1321; n.14 (raising (i) lack of subject matter jurisdiction; (ii) lack of personal jurisdiction; (iii) no ownership over the assets in question; (iv) and numerous other objections to execution).

Foreign Sovereign Immunities Act ("FSIA") and apply to "***every*** ***case*** ***in which a person has*** ***obtained a judgment against a terrorist party . . . .***"  *See* TRIA Section 201(a) (emphasis added).

In the face of multiple rulings against them, the PDVSA Parties ask this Court to be the first in the nation to absolve them from their undisputed support of the FARC -- Maduro's partner in narco-terrorism -- and declare their blocked assets off limits to victims of terrorism.  The PDVSA Parties have simply not provided this Court with any legal or factual basis to take such an extreme action.

### RESPONSE TO THE PDVSA PARTIES' PRELIMINARY STATEMENT

The PDVSA Parties raise five issues in their preliminary statement.  We provide a brief response in this preliminary statement and provide further argument below.

Citing general and inapplicable law, the PDVSA Parties argue that "a judgment creditor may not collect his judgment from a party that is not liable for that judgment."  D.E. 85-1 at 9.  The PDVSA Parties ignore TRIA, its legislative history, and the cases applying it because TRIA expressly allows victims of terrorism to collect their judgments from the blocked assets of non-defendants by explicitly authorizing collection from the blocked assets of a non-defendant – the agency or instrumentality of a terrorist defendant.

The PDVSA Parties further argue that this Court needs, but does not have, subject matter jurisdiction over PDVSA pursuant to a FSIA immunity exemption or personal jurisdiction over the PDVSA Parties.  It is established law that TRIA overcomes any FSIA immunity and provides an *in rem* remedy against a limited set of assets – blocked assets – not a "money judgment" against the PDVSA Parties that could require an *in personam* judgment.  Indeed, this Court entered a Turnover Judgment against a *res* in this District – not a money judgment against PDVSA.

The PDVSA Parties' arguments are truly specious and are based on the mistaken premise

that although Congress created a remedy for terrorism victims that allows them to attach terrorists' blocked assets located in the United States, such victims cannot actually collect the blocked assets unless the victims: (i) first locate and serve the terrorists who are hiding offshore; and (ii) then establish such off-shore terrorists all have minimum contacts with the United States sufficient for *in personam* jurisdiction.  Nonsense. Congress expressly did the opposite – when under TRIA it created a direct, *in rem* remedy against blocked assets.  Moreover, PDVSA has moved to intervene – waiving any personal jurisdiction arguments.[8]

PDVSA argues that FSIA's service provisions, applicable to commencing lawsuits against sovereign nations, the Hague Service Convention, and the Inter-American Convention on Letters Rogatory mandate compliance with the complex procedures of each.  None are applicable to this ***post***-judgment *in rem* proceeding that attached blocked assets held within this District.  Caballero complied with applicable New York law service procedures as already found by this Court in its Turnover Judgment.  Moreover, in addition to Caballero's appropriate service upon PDVSA, PDVSA's counsel has admitted that they received actual notice on behalf of PDVSA from M&T Bank **before** this Court's Turnover Judgment.  To the extent PDVSA was entitled to notice of these proceedings, PDVSA received it and so did the Subsidiaries.

Reaching towards the bottom of their proverbial sink, the PDVSA Parties argue that TRIA does not apply for a variety of meritless reasons. The PDVSA Parties attack the Second Circuit's definition of "agency or instrumentality," which this Court necessarily followed.   Next, the PDVSA Parties argue that Caballero has not proven that they are agencies or instrumentalities of the FARC.  But, as noted above, they have provided no contrary evidence or even denied the

---

[8] The record reflects that the Subsidiaries have never moved to intervene, but they have appeared through counsel employed by the Ad Hoc Board. D.E. 58, 59, 69, 70, and the Court has authorized their counsel to appear.  D.E. 78.

misconduct.  Instead, the PDVSA Parties vainly attack Caballero's evidence that this Court has already accepted when entering its agency or instrumentality determinations and its Turnover Judgment.  Their attacks on the evidence already accepted by this Court should be summarily rejected.

Lastly, the PDVSA Parties, strain to overreach in their attacks, without any standing to do so, of Caballero's ATA Final Judgment,[9] which has been enforced in multiple proceedings around the country.  Notably, the PDVSA Parties have not appeared before Chief Judge Moore, who issued the ATA Final Judgment to attack how he handled the case.  Again, without any standing to do so, the PDVSA Parties ask this Court to sit as an appellate court and reconsider Chief Judge Moore's long final ATA Final Judgment.

RELEVANT STATUTORY FRAMEWORK

The PDVSA Parties provided their view of the relevant statutory framework.  For the Court's benefit, Caballero does the same.  Because PDVSA is a company owned by the nation of Venezuela, PDVSA relies heavily on the FSIA.  It is black letter law that the FSIA has no applicability to the Subsidiaries because downstream subsidiaries of a state-owned company are not protected by the FSIA.  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003).  Thus, any analysis of FSIA is necessarily only applicable to PDVSA but not the Subsidiaries.

**A.  The FSIA is Applicable to *In Personam*, Not *In Rem* Actions**

The starting point in a FSIA analysis, wholly ignored by PDVSA, is whether the lawsuit seeks an *in personam* judgment against the foreign state or whether the lawsuit is in the nature of an *in rem* action.[10]  The Second Circuit recently addressed this distinction in *United States v. Assa*

---

[9] The ATA Action refers to *Caballero v. FARC et al.*, Case No. 18-25337-KMM (S.D. Fla) and the ATA Judgment refers to the Final Judgment entered in that case at D.E. 63.

[10] And whether this action is characterized as *in rem* or *quasi in rem*, there is no difference because

6

*Co.*, 934 F.3d 185 (2d Cir. 2019) (holding that the FSIA is not applicable to an *in rem* forfeiture proceeding against the property of a foreign state); *see also Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 820 (2018) (FSIA "grants foreign states and their agencies and instrumentalities immunity ***from suit*** in the United States (called jurisdictional immunity) and grants their property immunity from attachment and execution ***in satisfaction of judgments against them***.") (emphasis added).

In *Assa*, the Second Circuit began its analysis with 28 U.S.C. § 1330, which the FSIA added to provide federal courts with jurisdiction over foreign states. *Assa*, 934 F.3d at 188-89.  Section 1330(a) provides district courts with original subject matter jurisdiction over "any nonjury civil action against a ***foreign state*** . . . as to any claim ***for relief in personam*** . . . ."  28 U.S.C. § 1330(a) (emphasis added).  The Second Circuit began its analysis with the phrase "foreign state" reasoning that "[t]he gateway into the FSIA's immunity regime is the phrase 'foreign state.'" *Assa*, 934 F.3d at 188.  It noted that if "the ***defendant*** is a foreign state, the lawsuit must go through the FSIA gateway. . . . However, if the ***defendant*** is not a foreign state, the gateway closes: § 1330(a) does not authorize jurisdiction, and § 1604 does not confer immunity."  *Id*. at 189 (emphasis added and citations omitted).  With regard to a forfeiture proceeding brought against an asset, the Second Circuit held that "[p]roperty belonging to a foreign state does not fit any of these categories.  As this is therefore not a suit against a foreign state, the FSIA gateway is closed.  No jurisdiction flows

---

both provide sufficient jurisdiction to adjudicate any interests in the blocked assets without satisfying the traditional minimum contacts analysis set forth in *International Shoe v. State of Washington*, 326 U.S. 310 (1945) or *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011).  *See Shaffer v. Heitner*, 433 U.S. 186, 210 n.36 (1977) (noting that a minimum contacts analysis is not applicable to post-judgment *quasi in rem* proceedings); *Crescendo Mar. Co. v. Bank of Communs. Co.*, Case No. 15-cv-4481, 2016 U.S. Dist. LEXIS 21824 (S.D.N.Y. Feb. 22, 2016) (finding that in a post-judgment collections proceeding where assets are within the jurisdiction of the court, personal jurisdiction is not required).

from § 1330(a), and no immunity flows from § 1604." *Assa,* 934 F.3d at 189.

### B. The FSIA's Provisions Regarding a Foreign State's Property Are Applicable to Enforcement of *In Personam* Actions, not *In Rem* Actions

In *Assa*, the Second Circuit acknowledged that Section 1609 addresses the immunity of a foreign state's property from attachment, arrest, and execution – subject to the exceptions set forth in the FSIA.  The Second Circuit concluded that the immunities conferred by Section 1609 are applicable to "suits meant to enforce *in personam* judgments against a foreign state" and are therefore inapplicable to an *in rem* civil forfeiture proceeding.  *Id.*   Similarly, the Supreme Court has noted that, subject to certain exceptions, FSIA grants the property of foreign states "immunity from attachment and execution ***in satisfaction of judgments against them.***"  *Rubin*, 138 S. Ct. at 820 (emphasis added).

The Second Circuit also found that the background relating to the passage of Section 1609 supported its conclusion that Section 1609's immunities were inapplicable to an *in rem* civil forfeiture action.  The Court reasoned that "[w]hen the executive branch seeks the forfeiture of a foreign state's property, the judiciary is in no position to second-guess whether the lawsuit will harm our nation's foreign policy goals."  *Assa*, 934 F.3d at 190.  The same is true of TRIA enforcement actions, which are premised on the Executive Branch's blocking of property – making such property available for the satisfaction of judgments held by victims of terrorism.  Clearly, the Executive Branch necessarily considers our country's foreign policy goals when blocking the assets of a foreign state or its wholly owned entities and knowingly makes such blocked assets subject to "forfeiture" to victims of terrorism given TRIA's broad language.

The language of Section 1610, titled "Exceptions to the immunity from attachment or execution" also supports the Second Circuit's conclusion that the FSIA's asset immunity

provisions are inapplicable to *in rem* proceedings.[11]  Sections  1610(a)  and  (b)  provide  various scenarios  upon  which  a  foreign  state's  assets  may  be  the  subject  of  a  post-judgment  writ  of attachment  or  execution.   The  provisions,  however,  are  plainly  only  applicable  to  collection  upon an *in personam* judgment against the foreign state – leaving *in rem* proceedings wholly outside the scope of the FSIA.[12]

### C.  TRIA Unequivocally Overrides the FSIA – Including Exempting Blocked Assets from any Immunity Provided by the FSIA

Although the FSIA is not applicable to this post-judgment proceeding, even if this Court were *arguendo* to find it applicable, the plain language and legislative history of TRIA, as well as the opinions of the United States Supreme Court, the Second Circuit, and many other courts, make clear that TRIA's application to "every case" and provision of a remedy "notwithstanding any other law" eviscerates PDVSA's reliance on the FSIA.  Put another way, ***the FSIA is <u>no</u> obstacle to TRIA.***

Section 201(a) of TRIA provides:

> ***Notwithstanding any other provision of law***, and except as provided in subsection (b), ***in every case*** in which a person has obtained ***a judgment against a terrorist party on a claim based upon an act of terrorism***, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) . . . , ***the blocked assets*** of that terrorist party (***including the blocked assets of any agency or instrumentality of that terrorist party)*** shall be subject to execution or attachment in aid of execution

---

[11] There is no dispute that TRIA is codified as a note to Section 1610 and provides additional exceptions to FSIA immunity.  D.E. 85-1 at 21.  *See also Rubin*, 138 S. Ct. at 824 (referencing TRIA as one of "two other provisions *within* §1610 . . . .") (emphasis added).  Just because TRIA is located within the FSIA does not mean that it is only applicable to state actors. It is well established that codification of a law as a note has no impact on its interpretation or enforcement. *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010).

[12] Section 1610(c)'s reference to Section 1608(e) makes this clear.  Section 1610(c) provides that the post-judgment remedies provided in subsections (a) and (b) can be used to collect a judgment served as "required under section 1608(e) of this chapter."  Section 1608 and in particular Section 1608(e) relate to *in personam* judgments entered against the foreign state – not post judgment *in rem* collection proceedings brought under TRIA.  *See, e.g.,* 28 U.S.C. § 1608(e) (referencing a judgment "against a foreign state").

in order to satisfy ***such judgment*** to the extent of any compensatory damages for which ***such terrorist party*** has been adjudged liable.

Section 201(a), TRIA (emphasis added).

TRIA begins with the powerful statement that its provisions apply notwithstanding any other provision of law.  The United States Supreme Court (on two occasions), the Second Circuit, and numerous district courts have consistently held that, given such language, the provisions of TRIA take "precedence over any other provision of law." *Rubin*, 138 S. Ct. at 826 (citing *Bank Markazi*, 578 U.S. at n.2); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010) (noting that TRIA's "[n]otwithstanding any other provision of law" makes "plain that the force of the section extends everywhere."); *Smith v. FRB*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003) ("The phrase 'notwithstanding any other provision of law' simply means that Section 201(a) controls if there is another provision of law that conflicts with it."); *Hill v. Republic of Iraq*, Case No.  99-cv-03346, 2003 U.S. Dist. LEXIS 3725 at *10 (D.D.C. Mar. 11, 2003) ("As this Court has frequently recognized, 'the phrase 'notwithstanding any other provision of law,' or a variation thereof, means exactly that: it is unambiguous and effectively supersedes all previous laws.").  In other contexts, such phrase has been interpreted consistent with how courts have applied TRIA – the statute overrides any law to the contrary.  *See, e.g., Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) ("the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section ***override conflicting provisions of any other section***. Likewise, the Courts of Appeals generally have interpreted similar 'notwithstanding' language . . . to ***supersede all other laws***, stating that '[a] ***clearer statement is difficult to imagine***.'") (emphasis added).[13]

---

[13] *See also Miccosukee Tribe of Indians of Florida v. United States Army Corps of Engr's,* 619 F. 3d 1289, 1297 (11th Cir. 2010); *In re Betwell Oil & Gas Co.,* 204 B.R. 817, 818 n.3 (Bankr. S.D.

TRIA is codified as a note to Section 1610 – a statute that provides exceptions to the immunity from attachment and execution afforded to the property of a foreign state by Section 1609. *See Rubin*, 138 S. Ct. at 824 (referencing TRIA as one of "two other provisions **within** §1610" allowing for the attachment and execution of property of a foreign state) (emphasis added). Thus, there can be no dispute that, to the extent the FSIA is applicable to PDVSA's blocked assets (and it is not), TRIA would override any immunity provided by the FSIA.

Faced with plain language and abundant, on point precedent, the PDVSA Parties retreat to misrepresenting *dicta*. *See* D.E. 85-1 at p. 21 (citing *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009)). PDVSA attempts to use dicta from *Elahi* to suggest that TRIA's "notwithstanding any other provision of law" clause has a very narrow purpose. As described below (and is often the case) relying upon dicta, instead of a court's actual complete analysis, leads to legal error.

In *Elahi*, a victim of Iranian terrorism waived "all rights" to attach Iranian blocked assets pursuant to the terms of the Trafficking and Violence Protection Act of 2000 ("VPA"), as amended by Section 201(c)(4) of TRIA, when he received partial compensation under the VPA. *Elahi*, 556 U.S. at 369. In an attempt to avoid the application of VPA's waiver provisions, the plaintiff made a strained argument that TRIA Section 201(a)'s "[n]otwithstanding any other provision of law" language permitted him to attach the blocked assets notwithstanding his waiver of "all rights" to do so. *Id.* at 385. In support, the plaintiff cited to the legislative history of TRIA. *Id.* at 386. The

---

Fla. 1997); *Bertelt v. United States (In re Bertelt)*, 206 B.R. 579, 583 (Bankr. M.D. Fla. 1996); *Partida v. United States DOJ (In Re Partida),* 862 F. 3d 909, 912-913 (9th Cir. 2017)*; Connyers v. Rossides,* 558 F. 3d 137, 145 (2d Cir. 2009); *Crowley Caribbean Transport, Inc. v. United States,* 865 F. 2d 1281, 1283 (D.D.C. 1989).

Supreme Court disagreed finding that the relinquishment of "all rights" included the relinquishment of any right given by TRIA Section 201(a) to attach blocked assets, especially because the waiver was contained in TRIA Section 201(c) – the same law that contained Section 201(a). *Id.* at 385. Responding to the plaintiff's legislative history argument, in dicta, the Supreme Court then commented that the legislative history "suggests" that the "notwithstanding" clause in Section 201(a) of TRIA was not inserted to overcome the waiver of "all rights" in Section 201(c), but "for totally different ***reasons***." *Id.* at 386 (emphasis added).  The Supreme Court then recounted ***one*** of those reasons — to "eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of TRIA's enactment." *Id.* (citing to H.R. Conf. Rep. No. 107-779 at 27).

The PDVSA Parties attempt to mislead this Court into legal error by misrepresenting the above dicta.  The Supreme Court did not state that eliminating the Presidential waiver was the ***only*** reason for TRIA's passage and the text of the legislative history referred to by the Supreme Court makes this clear.  As noted on page 27 of H.R. Conf. Rep. 107-779 (cited by the Supreme Court), TRIA was passed to both "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties . . . ***and*** eliminates the effect of any Presidential waiver . . . " H.R. Conf. Rep. 107-779 at p. 27 (emphasis added).

## PROCEDURAL AND FACTUAL BACKGROUND

### Caballero Submitted Competent Evidence (<u>Still Unrebutted</u>) Regarding PDVSA's and its Subsidiaries' Status as an Agency or Instrumentality of the FARC

On September 10, 2020, Caballero registered his ATA Final Judgment with this Court.

[D.E. 1]. In accordance with the established procedures in TRIA collections actions,[14] on September 24, 2020, Caballero filed a Motion for Leave to File Document Under Seal [D.E. 7], which the Court granted on October 9, 2020 [D.E. 8], accepting, under seal, Caballero's *ex parte* Motion for Issuance of Court Ordered Post-Judgment Writ of Execution Pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002. (hereinafter "Motion for Issuance") [D.E. 10].

Caballero has submitted three sworn declarations on the status of PDVSA and its Subsidiaries as agencies or instrumentalities of the FARC. The Court has found Caballero's evidence credible and sufficient to support is agency or instrumentality determination. "This Court finds that Caballero has presented credible evidence that PDVSA is an agency or instrumentality of the FARC. Other courts have found the same. *See* Docket Item 11." [D.E. 15 at 5]. The PDVSA Parties have submitted ***no evidence in rebuttal or even a denial.*** Given as much, there is no need to revisit the evidence submitted by Caballero and accepted by this Court. Nevertheless, Caballero provides a short summary below.

Caballero's declarations include two from John Robert McBrien [D.E. 10-2, 10-3], the former Associate Director for Global Targeting at OFAC who spent 25 years developing "every sanctions Executive Order issued in that period and in the implementation of the resulting sanctions programs" and who was "responsible for targeting investigations, execution of designations, policy development, and interagency collaboration involving OFAC's designation

---

[14] *See Stansell,* 771 F.3d at 729. "During the pendency of execution proceedings, a number of events may occur which make satisfaction using a particular asset impossible. Other judgment creditors may seek to execute against the asset. The government may take action that makes the asset unreachable, including seizure or de-listing of the alleged agency or instrumentality (which may or may not be the result of a finding that the SDNT designation was incorrectly reached), the latter of which would enable the asset owner to move the asset (or proceeds from its sale) outside the reach of any United States district court." *Id.*

programs." *See* [D.E. 10-3 at pp. 2-3.].  Caballero has also submitted the sworn declaration of the Honorable Otto Juan Reich, former United States Ambassador to Venezuela, former Assistant Secretary of State for Western Hemisphere Affairs, and former Special Envoy for Western Hemisphere Initiatives.

### McBrien's July 14, 2020 Sworn Declaration

Before entering it's agency or instrumentality determination as to PDVSA or its Turnover Judgment, the Court had before it Mr. McBrien's July 14, 2020 Sworn Declaration.  D.E. 10-3. In addition to providing a summary of his extensive background, including being responsible for "targeting investigations, execution of designations, policy development, and interagency collaboration involving OFAC's designation programs," *id.* at ¶ 6, Mr. McBrien's declaration explained that "[t]hroughout his regime, Maduro has made Venezuela a safe haven for the FARC." *Id.* at ¶ 18.  Quoting from a publication from the United States State Department, Mr. McBrien informed that "'Maduro helped manage, and ultimately, led the Cartel of the Suns, a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials, as he gained power in Venezuela in a corrupt and violent narco-terrorism conspiracy with Revolutionary Armed Forces of Colombia (FARC).'" *Id.* Mr. McBrien concluded that Maduro is an agency or instrumentality of the FARC, *id.* – a conclusion shared and amplified by the United States government's indictment of Maduro attached hereto.

### McBrien's September 8, 2020 Sworn Declaration

Before entering it's agency or instrumentality determination or its Turnover Judgment, the Court had before it Mr. McBrien's September 8, 2020 Sworn Declaration.  D.E. 10-4.   Mr. McBrien's declaration clearly explains that, at all times material hereto, PDVSA has been an agency or instrumentality of the FARC.

14

Going back to the years when Chavez ran Venezuela, Mr. McBrien explained that "Hugo Chavez offered FARC at least two vehicles for receiving income from the sale of Venezuelan oil, 'in both cases with the cooperation of the manager of PDVSA.'" *Id.* at ¶ 9.  Quoting authoritative sources, Mr. McBrien informed that "beginning in 2005, Chavez personally directed the exchange of vast sums of oil revenue for cocaine with the Colombian Fuerzas Armadas Revolucionarias de Colombia (FARC) guerrillas." *Id*. at ¶ 10.  He further explained that the primary money laundering structure for the FARC, as well as the Maduro regime and other criminal groups, is PDVSA.  *Id.* at ¶ 11. When opining that PDVSA is an agency or instrumentality of the FARC, Mr. McBrien provided additional examples of how PDVSA provided material assistance to FARC's narco-terrorism conspiracy, including PDVSA helping FARC purchase arms.

In addition to establishing that PDVSA has long been an agency or instrumentality of the FARC, Mr. McBrien brought the chronology forward to the present (and certainly through the time Caballero filed his action in the Western District of New York in September 2020). Quoting an OFAC publication, Mr. McBrien noted that "PdVSA has long been a vehicle for corruption . . . On January 28, 2019, OFAC designated PdVSA as an SDN under Executive Order 13850." *Id.* at ¶ 3.  In ***June 2020***, noting that PDVSA was the Maduro regime's "primary conduit for corruption," OFAC added numerous individuals as SDNs including Maduro's ***oil minister***.  *Id.* at ¶ 14.  Mr. McBrien noted that the Venezuelan officials blocked in June 2020 "coordinated with and/or assisted, various FARC operatives." *Id*. at ¶ 16.  Using source OFAC publications Mr. McBrien explained, the corrupt operations of PDVSA associated individuals.  *Id.* at ¶¶ 16-17.

### Mr. Reich's April 9, 2021 Sworn Declaration

On March 26, 2021, the Ad Hoc Board filed its Motion to Substitute Counsel [D.E. 58] and submitted a declaration that, in part, offered statements about Maduro's control of PDVSA

and his misuse and diversion of its assets.  [D.E. 58-2, at p. 4].  ***Of course, this is a clear admission that during all times material hereto, Maduro (who is FARC's partner in narco-terrorism) has controlled PDVSA.***   With his opposition [D.E. 66], Caballero provided the sworn declaration of the Honorable Otto Reich who has served as the U.S. Assistant Secretay of State for Western Hemisphere Affairs, and also as U.S. Ambassador to the Republic of Venezuela [D.E. 66-1].  In its reply in support of its Motion to Substitute [D.E. 68], the Ad Hoc Board quibbled with Mr. Reich's conclusions, but failed to provide any evidence in rebuttal.  And, the PDVSA Parties' Motion neither mentions nor rebuts Mr. Reich's conclusions.

Mr. Reich is unquestionably one of the preeminent experts on Latin America, and the PDVSA Parties have not disputed his expertise.  His qualifications include, but are not limited to:

- Bachelor's Degree in International Studies from the University of North Carolina;
- Master's Degree in Latin American Studies from Georgetown University;
- Three executive appointments under President Reagan:
  - Assistant Administrator of the U.S. Agency for International Development;
  - Special Advisor to U.S. Secretary of State George P. Schulz, directing the Office of Public Diplomacy for Latin America and the Caribbean;
  - United States Ambassador to the Republic of Venezuela;
- Appointment by President George H.W. Bush as Alternate U.S. Representative to the United Nations Human Rights Commission;
- Two executive appointments under President George W. Bush:
  - U.S. Assistant Secretary of State for Western Hemisphere Affairs;
  - Special Envoy for Western Hemisphere Initiatives.

Mr. Reich noted that he is familiar with the "current political climate and government in Venezuela, including the status of the current Venezuelan government and its operation of [PdVSA] a government owned and run oil company."  [D.E. 66-1 at p. 4].  Mr. Reich's first opinion, that PDVSA is currently controlled by Maduro and his regime is admitted to be true by the Ad Hoc Board and its counsel.  *See* Ad Hoc Board's Memorandum [D.E. 58-1 at p. 9];

Declaration of Claire DeLelle [D.E. 59-2 at p. 4].[15]

Mr. Reich also relates that he has reviewed several of Mr. McBrien's declarations and agrees with Mr. McBrien's conclusions and opinions. [D.E. 66-1 at pp. 4-5].  Like Mr. McBrien, Mr. Reich opines that notwithstanding the "2016 Peace Accord", the FARC **has operated without interruption _before_, _during_, and _after_ the 2016 Peace Accord** and "**_continues_** to engage in narco-trafficking, narco-terrorism, and violence in Colombia." *Id*. at p. 6. The record is unrebutted that the FARC has been in continuous operation.

Mr. Reich opines (just as the United States government alleges in the Maduro Indictment) that the Cartel of the Suns is headed by Maduro and that it is a major distributor of FARC cocaine into the United States and other nations. [D.E. 66-1 at p. 6].  Mr. Reich cites FARC's own announcement that FARC is "in full support of the commander, comrade Nicolas Maduro, so that this government may continue, so that he may continue to lead this ship." *Id.*   In terms of timeframes, Mr. Reich does not restrict his opinions to some far-off date in the past.  He is clear that, in his opinion, Maduro is currently the head of a drug cartel that is a major distributor of FARC cocaine into the United States, that Maduro is currently in control of PDVSA, and that Maduro is using, and has been using, PDVSA to support FARC's drug trade.  In sum, Mr. Reich's opinion (completely in accord with the Maduro Indictment) is that, at all times material hereto, Maduro and PDVSA have been agencies or instrumentalities of the FARC.

### This Court's Decisions and Orders and PDVSA's Receipt of Actual Notice

Even though PDVSA asks this Court to quash the writ of execution and to vacate the

---

[15] The Ad Hoc Board and its counsel concede that United States sanctions have been directed at PDVSA **due to Maduro's control over it**.  "Indeed, the United States has used its economic sanctions tools to prevent the misuse and diversion of the assets of PdVSA and its subsidiaries by Maduro . . . ."  [D.E. 59-2 at p. 4].  .

Turnover Judgment, its Memorandum [D.E. 85-1] contains no discussion of how this Court erred in entering its: (i) December 18, 2020 Decision and Order finding PDVSA to be an agency or instrumentality of the FARC (the "PDVSA A&I Order") [D.E. 15]; (ii) January 29, 2021 Turnover Judgment [D.E. 35]; or (iii) January 29, 2021 Decision and Order finding the Subsidiaries and other entities to be agencies or instrumentalities of the FARC (the "Subsidiaries A&I Order") [D.E. 33].  Simply put, the Court committed no error.

### The PDVSA A&I Order

On December 18, 2020, after considering Caballero's Motion for Issuance (docketed on October 9, 2020) [D.E. 10], the Court entered the PDVSA A&I Order [D.E. 15].  After reciting the background of the case, the Court turned to the issue of defining the term "agency or instrumentality" in TRIA.  In roughly two pages of analysis, including a review of the Second Circuit's opinion in *Kirschenbaum v. 650 Fifth Avenue and Related Properties*, 830 F.3d 107 (2d Cir. 2016), this Court concluded that FSIA's definition of "agency or instrumentality" is not applicable and applied the definition provided by the Second Circuit in *Kirshenbaum*.  *Id*. at pp. 4-5.

> In this circuit, therefore, "agency or instrumentality" for purposes of the TRIA means any person or entity who "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party."

*Id.* at p. 5 (quoting *Kirschenbaum*) (italics in original).

In its analysis, the Court also reasoned that "[b]ecause of the 'clandestine' nature of terrorist parties and their agents, and agency-or-instrumentality relationship can be found even if the agency or instrumentality 'had not previously been directly linked to' the terrorist party and even if the evidence linking the agency or instrumentality to the terrorist party is 'indirect.'" *Id*.

Applying these standards, the Court found that "Caballero has established both that FARC is a terrorist party and that PDVSA is an agency or instrumentality of FARC." *Id*. The Court also noted (n.3) that it "finds that Caballero has presented credible evidence that PDVSA is an agency or instrumentality of FARC." In making these findings, the Court did not reject Mr. McBrien's declarations as hearsay, but instead accepted Mr. McBrien's declarations, quoting extensively (see pages 6 and 7 of D.E. 15) from his declaration and supporting documentation, concluding: "Through the McBrian [sic] declaration and supporting documentation, Caballero has sufficiently demonstrated that PDVSA, through money laundering and weapons support, has 'provided material services to, on behalf of, or in support of [FARC].'" [D.E. 15 at. p. 12].

### Service of the PDVSA A&I Order and Writ of Execution

The same day the PDVSA A&I Order was issued, Caballero moved for the appointment of a special process server [D.E. 16], which the Court granted [D.E. 17]. On December 21, 2020, the Clerk issued the Writ of Execution. The Writ of Execution required the U.S. Marshal to levy upon the assets "in your district belonging to Petroleos de Venezuela, S.A. (or in the putative name of, or for the benefit of Petroleos de Venezuela, S.A.) c/o M&T Bank Corporation . . . ."

On December 23, 2020, the authorized process server served the Writ of Execution and a Notice to Debtor upon PDVSA by mailing such documents to PDVSA at the two addresses in Venezuela listed by OFAC in its SDN designation of PDVSA. *See* D.E. 23-4 at pp. 2-3;[16] 84 FR 3282 (Feb. 11, 2019). The process server also served the Defendants and M&T Bank. *See* D.E. 23-1, 23-2, and 23-3. The Writ of Execution was directed to, and served upon, M&T Bank

---

[16] "[I]t is well established that notice 'sent by ordinary mail is deemed reasonably calculated to inform interested parties' of an impending action." *Windward Bora LLC v. Baez*, Case No. 19-cv-1755, 2021 U.S. Dist. LEXIS 36829 at n.8 (E.D.N.Y., Feb. 24, 2021) (citing *Weigner v. New York*, 852 F.2d 646, 650 (2d Cir. 1988) and other cases).

because, in response to a subpoena, M&T Bank had indicated that it was holding blocked funds due to the "Sanctions Target" "PETROLEOS DE VENEZUELA, S.A." *See* D.E. 23-6 at p. 3.

Proceedings Related to the Subsidiaries

On January 11, 2021, the Clerk filed under seal Caballero's motion for determination of agency or instrumentality status as to the Subsidiaries and other entities. [D.E. 22].   In support, Caballero noted that other courts had already determined that PDVSA subsidiaries, including some of the Subsidiaries at issue in the Motion, to be agencies or instrumentalities of the FARC and attached the four court orders for the Court's review. [D.E. 22 at p. 6]. Caballero also relied upon Mr. McBrien's previously filed declarations.

On January 29, 2021, the Court granted the motion [D.E. 33].  Noting that "Caballero has proffered credible evidence that PDVSA's subsidiaries are instrumental to its money laundering operation and that PDVSA's money laundering operation is in turn instrumental to the FARC's drug trafficking," the Court issued its Subsidiaries A&I Order. After serving the Garnishee, Citibank, with the writ issued following the Court's Subsidiaries A&I Order, Caballero advised the Court of the service [D.E. 46], and the Court unsealed the related papers. [D.E. 47].

**PDVSA's Counsel Received Actual Notice from M&T Bank**

M&T Bank answered the Writ of Execution served upon it, and also provided an amended answer to the Writ of Execution.   [D.E. 23-5].  M&T Bank titled the amended answer: "RE: Petroleos de Venezuela, S.A. . . . Reference No.: N/A – Writ of Execution Answer."  *Id.*  In its answer to the Writ of Execution about PDVSA, M&T Bank acknowledged its receipt of the Writ of Execution and noted that it was holding two frozen accounts.  *Id.*  M&T Bank's form also contained an empty and unchecked box that could have indicated it "was unable to comply" because it had "No Open Accounts" [D.E. 23-5 at p.2].  M&T obviously would have checked such

box if it was not holding any blocked assets in the putative name of, or for the benefit of, PDVSA. After twenty days elapsed with no response from PDVSA or the Defendants, on January 13, 2021 Caballero filed his Motion and Memorandum in Support of Plaintiff's Motion for Entry of Turnover Judgment [D.E. 23] ("Motion for Turnover").

According to a February 2, 2021 email from Edward H. White, Vice-President of M&T Bank, *on January 12, 2021*, Mr. White provided counsel for PDVSA with M&T Bank's amended answer to the writ of execution, and *on January 13, 2021*, he provided counsel for PDVSA with Caballero's Motion for Turnover.  *See* **Ex. 3** (email chain) and **Ex. 1,** Decl. of Leon N. Patricios at ¶¶ 3-6. PDVSA's lawyers did not contact counsel for Caballero or notify the Court of their involvement.  Instead, PDVSA waited until *after* the entry of the Turnover Judgment to file an appearance.

**The Turnover Judgment**

Even though PDVSA's lawyers had more than *two weeks* of actual notice of the pending Turnover Motion, they did not timely file an appearance with the Court, and after entering an appearance, PDVSA never appealed the Turnover Judgment.[17]  On January 29, 2021, the Court entered its Turnover Judgment. The Turnover Judgment acknowledged that Caballero had provided notice to PDVSA in *two ways*: (i) by serving PDVSA through the process server (D.E. 35 at n.2 (citing to the returns of service filed by Caballero)); and (ii) by levying on PDVSA's property.  *Id*.  The Court specifically explained that it "is satisfied that Caballero, through a specially appointed process server, has complied with CPLR § 5232 and has provided adequate

---

[17] The Ad Hoc Board may try to argue about these consequences by noting that the Ad Hoc Board should not be saddled with the decisions of the Maduro appointed lawyers.  Nonsense.  There is only *one* PDVSA.  PDVSA, through counsel, made these decisions.  Moreover, the Maduro appointed counsel and the Ad Hoc Board appointed counsel are completely aligned when it comes to opposing the relief sought by Caballero.

notice of the writ of execution to PDVSA and the Defendants." *Id*. at p. 3.  The Court also held that because "PDVSA has not appeared in this action or offered evidence to rebut Caballero's credible allegations that it is an agency or instrumentality of the FARC . . . [t]he Court's prior finding that PDVSA is an agency or instrumentality of the FARC . . . therefore stands." *Id*. at n.2 and at p. 3.  The Turnover Judgment gave M&T Bank five days from the date of the Turnover Judgment to transfer the funds to counsel for Caballero – or February 3, 2021.

### PDVSA's Untimely Appearance

After the Court entered its Turnover Judgment, counsel for Caballero was in regular communication with M&T Bank and specifically Mr. White.  **Ex. 1**, Decl. of Leon N. Patricios at ¶ 4.  During a series of emails on February 2, 2021 about the turnover due February 3, 2021, Mr. White wrote that he "was notified earlier today by counsel for PDVSA that they intend to file something with the court today."  **Ex. 3** (email chain).  Later in the day, Mr. White wrote that he had previously provided counsel for PDVSA with the bank's amended answer to the writ of execution on January 12, 2021 and Caballero's motion for turnover on January 13, 2021. *Id*.

Later in the day on February 2, 2021, PDVSA did file an appearance through counsel and moved to intervene and to stay [D.E. 37].  Very shortly thereafter, on the same day, the Court granted the motion to intervene and stayed the Turnover Judgment.  [D.E. 39].

### LEGAL STANDARDS

### A.  PDVSA's Burden under Rule 60(b)

In its Memorandum, PDVSA cites to Rule 60(b)(4) and Rule 60(b)(6) of the Federal Rules of Civil Procedure.  "Relief under Rule 60(b) 'is addressed to the sound discretion of the district court.'"  *Gater Assets, Ltd. v. Gaznabtranzit,* Case No. 16-cv-04118, 2018 U.S. Dist. LEXIS 171350 at *14 (S.D.N.Y Sept. 30, 2018) (citing *State St. Bank & Tr. Co. v. Inversiones Errazuriz*

*Limitada*, 374 F.3d 158, 166 (2d Cir. 2004)).  "Courts generally require that the evidence in support of the Rule 60(b) motion be 'highly convincing, that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties.'" *Id.* (citations omitted).

With regard to subject matter jurisdiction arguments, the Second Circuit has drawn a distinction between arguments made on direct appeal and arguments made through Rule 60(b)(4). In *Cent. Vt. PSC v. Herbert*, 341 F.3d 186 (2d Cir. 2003), the Second Circuit held: "Because 'final judgments should not be lightly reopened, [Rule 60(b)] may not be used as a substitute for a timely appeal . . . Since 60(b) allows extraordinary relief, it is invoked only upon a showing of exceptional circumstances.'" *Id.* at 190 (citation omitted).  The Second Circuit further explained that in "the context of a Rule 60(b)(4) motion, a judgment may be declared void for want of jurisdiction only when the court 'plainly usurped jurisdiction,' or, put somewhat differently, when 'there is a total want of jurisdiction and no arguable basis on which it could have rested a finding that it had jurisdiction.'" *Id.*

### B.   PDVSA Has the Burden of Proof Because it Had Actual Notice

There is no dispute in the record that counsel for PDVSA received notice from M&T Bank of these proceedings more than two weeks ***before*** the Court's entry of its Turnover Judgment. Because PDVSA clearly had actual notice of these proceedings ***before*** the entry of the Court's Turnover Judgment (and did nothing), PDVSA must somehow overcome that it has standing to establish (and if so, meet the burden of proof) that: (i) this Court lacked subject matter jurisdiction to issue the writ of execution and Turnover Judgment (PDVSA has not met its burden here); (ii) this Court needed and did not have personal jurisdiction (PDVSA Parties have no standing, and would not have met their burden here); and (iii) every other point raised by the PDVSA Parties (PDVSA Parties have no standing, as these are collateral attacks, and would not have met their

burden here either).  *See "R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 126 (2d Cir. 2008)

("But in a collateral challenge to a default judgment under Rule 60(b)(4), the burden of establishing

lack of personal jurisdiction is properly placed on a defendant who had notice of the original

lawsuit."); *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 299 (2d Cir. 2005) (holding that defaulting

defendant who had actual notice of the proceeding bears the burden under Rule 60(b)(4) when

challenging service of process).

## ARGUMENT

### A.  This Court had Subject Matter Jurisdiction to Issue the Writs of Execution and Turnover Judgment.

The PDVSA Parties' first argument, that Caballero improperly seeks to hold them liable

for a judgment against the FARC and in doing so needs an independent basis for subject matter

jurisdiction, [D.E. 85-1 at p. 22] is simply wrong.  TRIA's express language allows Caballero to

collect his judgment against FARC from the blocked assets of FARC's agencies or

instrumentalities, and binding Second Circuit precedent holds both that: (i) TRIA provides this

Court with subject matter jurisdiction; and (ii) the PDVSA Parties did not have to be named in the

underlying judgment.  *Weinstein*, 609 F.3d at 50 ("Accordingly, we find it clear beyond cavil that

Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment

proceedings against property held in the hands of an instrumentality of the judgment-debtor, even

if the instrumentality is not itself named in the judgment.").[18]

The PDVSA Parties next argue that the FSIA is the sole basis for obtaining subject matter

jurisdiction over PDVSA [D.E. 85-1 at p 22].  PDVSA's central argument is that TRIA is not a

"back door" to avoid the FSIA's jurisdictional immunities and that "only in those cases, where the

---

[18] *See also Bennett v. Islamic Republic of Iran,* 927 F. Supp. 2d 833, 841-42 (N.D. Cal. 2013) (holding that TRIA does ***not*** shift liability "from a terrorist party to its instrumentality.")

foreign state lacked immunity under § 1605A or § 1605(a)(7), does TRIA make the blocked property of the designated foreign state's agency or instrumentality available for execution." [D.E. 85-1 at p. 24, 25-26]. PDVSA is partly correct. TRIA is no "back door" to FSIA immunity – it is a "front door" because TRIA's "notwithstanding any other law" provision eliminates ***any*** FSIA immunity.

Preliminarily, we note that FSIA is not even implicated in this *in rem* proceeding. The principles set forth by the Second Circuit in *Assa* that the FSIA "gateway" is not implicated in forfeiture proceedings is equally applicable here.  In *Assa*, the Second Circuit reasoned that FSIA is only applicable to lawsuits seeking *in personam* judgments against foreign nations.  *Assa*, 934 F.3d at 190; *see also supra* Relevant Statutory Framework, A.   Caballero is not seeking and has not obtained an *in personam* judgment against PDVSA.  He is seeking a turnover of a specific *res* – a blocked asset within this District. This post-judgment proceeding is far more akin to an *in rem* forfeiture proceeding than a civil action seeking an *in personam* judgment against a foreign state. As noted, the remedy sought from, and already granted by, this Court was not an *in personam* judgment for damages against PDVSA, but the turnover of a specific *res* located within the geographic jurisdiction of this Court. Thus, according to the Second Circuit's reasoning, PDVSA cannot even invoke FSIA immunity because Caballero is not seeking an *in personam* judgment.

Even if FSIA were applicable to PDVSA, and it is not, TRIA unequivocally overrides any FSIA immunity.  PDVSA fails to cite one opinion in which a court says anything different.  Put another way, it asks this Court to boldly declare that TRIA's language is not so plain after all and that the United States Supreme Court, Second Circuit, and all the other district courts in this nation are wrong.

The lynchpin to PDVSA's faulty argument is that TRIA cannot overcome the immunity of

an agency or instrumentality of a foreign state unless the foreign state is a terrorist state against whom the plaintiff has a judgment for an act of terrorism. [D.E. 85-1 at pp. 23-24].   Put another way, PDVSA argues that an agency or instrumentality of a (non-terrorist) foreign state retains its FSIA immunity even if such agency or instrumentality is committing horrible crimes on behalf of a non-state terrorist.   PDVSA fails to cite one case that supports its argument because its pure fantasy.   Moreover, PDVSA's proposition: (i) ignores TRIA's plain language that overrides all laws to the contrary ("notwithstanding any other provision of law") and does so "in every case"; and (ii) asks this Court to be the first to narrow the scope of TRIA.

PDVSA cannot dispute that TRIA defines a "terrorist party" to include ***both*** state and non-state actors.   *See* TRIA § 201(d)(4).   PDVSA cannot dispute that "notwithstanding any other provision of law," Section 201(a) of TRIA is applicable in "*every* case" in which a plaintiff has a judgment based on a qualifying act of terrorism against a non-state terrorist ***or*** a foreign state, and that the plaintiff may collect from the blocked assets of an agency or instrumentality of "***that*** terrorist party."   In this case "that terrorist party" is the FARC, and PDVSA is its agency or instrumentality.   TRIA simply does not limit the terrorist victim the way the PDVSA posits.

If PDVSA doesn't like the language of TRIA it should ask Congress and the President to change it.   Instead, he asks this Court to narrow its applicability when, as noted above, from the highest court in this nation on down, have found TRIA's language to unequivocally take precedence over ***any*** FSIA provision.    For example, when discussing the narrower remedy provided by 28 U.S.C. Section 1610(g), the U.S. Supreme Court compared such narrower provision to TRIA's precedence over all other law, reasoning as follows:

> Section 1610(g) does not take precedence over "any other provision of law" ***as the TRIA does***. *See* TRIA §201(a).   Hence, the FSIA's central-bank immunity provision, 194 L. Ed. 2d at 474, limits §1610(g), ***but not the TRIA.***
> *Bank Markazi v. Peterson,* 136 S. Ct. 1310, 1318 n.2 (2016) (emphasis

added).

The Supreme Court noted TRIA's "precedence over any other provision of law" in a second case. *Rubin*, 138 S. Ct. 826. The Second Circuit and numerous other courts have found the same. *See e.g., Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010); *Smith v. FRB*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003). In short, there is simply no precedent that even remotely supports the PDVSA Parties' argument that PDVSA is immune from TRIA because Venezuela has not been designated a terrorist nation.

As to the Subsidiaries, who are unquestionably not ever protected by the FSIA, the PDVSA Parties try to concoct a federal subject matter jurisdiction argument by alleging that Caballero failed to allege facts sufficient to create an Article III claim or controversy against the Subsidiaries [D.E. 85-1 at p. 26]. Caballero did not make mere conclusory allegations. Pursuant to TRIA, Caballero made the allegations of agency or instrumentality and provided proof sufficient of the Subsidiaries status as agencies or instrumentalities for this Court to issue the writs. The Article III argument is preposterous.

### B.  The Court Did Not Need Personal Jurisdiction over the PDVSA Parties

The PDVSA Parties argue that Caballero has failed establish that this Court had the "minimum contacts" necessary to enter the PDVSA A&I Order, the Turnover Judgment, and the Subsidiaries A&I Order. Again, the PDVSA Parties are wrong, and it is the PDVSA Parties that have **not** met their burden under Rule 60(b).

Finding that terrorism victims were holding mere "paper judgments," it is well established that Congress passed TRIA as a terrorist victim maximation statute. *See, e.g.. Weinstein*, 609 F.3d at 50. TRIA is a collections statute, not a liability statute like the ATA. Thus, TRIA provides a ***post-judgment in rem*** remedy against a very narrow class of assets – the "blocked assets" (as

defined in TRIA § 201(d)(2)) of the terrorist defendant or its agency or instrumentality.  Congress clearly did not intend to burden terrorism victims with the task of re-starting the litigation at square 1 by obliging them to prove that United States courts have minimum contacts with terrorists hiding offshore in post-judgment collection proceedings over blocked assets already located in the United States.  Instead, Congress provided a simple and straightforward *in rem* remedy (in the nature of a civil forfeiture) against already identified and blocked assets that terrorists had voluntarily placed in the United States.   Thus, the plain language and intent of TRIA establish that it does not create an *in personam* remedy that would require a personal jurisdiction showing.

Moreover, in *Weinstein*, the Second Circuit confirmed that courts have subject matter jurisdiction over TRIA collection proceedings even if the agency or instrumentality was not named in the underlying judgment. *Weinstein*, 609 F.3d at 50.  This is a clear statement of *in rem* jurisdiction against property and not against a person or entity as such person or entity was not named in the judgment. *See also Hausler v. JP Morgan Chase Bank*, 740 F. Supp. 2d 525, 539 (S.D.N.Y. 2010) (noting *in rem* jurisdiction over blocked assets within the District).

### C. PDVSA Received Actual Notice of these Proceedings Before the Entry of the Turnover Judgment.

As this Court has already found, the Court appropriately proceeded *ex parte* with regard to the issuance of the writs relating to the property of PDVSA and its Subsidiaries. [D.E. 15 at n.2, n.3; D.E. 33, n.1; D.E. 35 at n.2]. Thereafter, the PDVSA Parties received appropriate and actual notice after the service of the writs upon the garnishees.  Their appearances establish that each received ***actual notice***.   Indeed, PDVSA received actual notice of these proceedings ***prior*** to the issuance of this Court's Turnover Judgment.   Faced with both Court approved service and actual notice, the PDVSA Parties attempt to shoehorn inapplicable law into the equation.

"The Supreme Court has made clear that 'it is now well established that 'due process'

unlike some legal rules, is not a technical conception with a fixed content unrelated in time, place, and circumstance." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205 (D.C. Cir. 2001). Based on such principles, courts have not held terrorism victims to strict compliance with state garnishment procedures but have instead reviewed whether fair notice had been provided to the claimant. *See, e.g., Stansell*, 771 F.3d at 735, 741-42, 46 (rejecting every claimants' due process claim because each received actual notice and appeared in the case); *Stansell v. Bello*, 802 F. App'x 445, 449 (11th Cir. 2020) ("Whether or not each and every technical procedural requirement of Florida law was complied with is not the litmus test for a due process violation. Here, as established above, Lopez Bello received actual notice . . ., and he had the opportunity to contest its findings. Therefore, he was not denied due process under the United States Constitution."); *In re 650 Fifth Ave. & Related Props.*, Case No. 08 cv 10934, 2014 U.S. Dist. LEXIS at n.12 (S.D.N.Y. Mar. 28, 2014). Due process has therefore been satisfied with regard to the PDVSA Parties. PDVSA was properly served[19] and received actual notice prior to the entry of the Turnover Judgment and the Subsidiaries were properly served after the writ of execution was served upon the garnishee and have also received actual notice.

Returning to their kitchen sink, the PDVSA Parties cite to a host of inapplicable rules and laws. They argue that Caballero was bound to follow the service provisions in Rule 4 of the Federal Rules of Civil Procedure, FSIA, the Hague Service Convention, and Inter-American Service Convention. The PDVSA Parties are wrong yet again.

Rule 4 of the Federal Rules of Civil Procedure is applicable to pre-judgment proceedings. Rule 69 of the Federal Rules of Civil Procedure is applicable to post-judgment proceedings. Rule

---

[19] In its Turnover Judgment acknowledged that Caballero had provided notice to PDVSA in *two ways*: (i) service upon PDVSA; and (ii) levying on PDVSA's property [D.E. 35 at n.2].

69, in turn, refers to the law of the state in which the Court sits to the extent such law is not inconsistent with federal law.  This Court already reviewed Caballero's service upon PDVSA and found it appropriate before entering the Turnover Judgment. *See* D.E. 35 at p. 3 ("This Court also is satisfied that Caballero, through a specially appointed process server, has complied with CPLR § 5232 and has provided adequate notice of the writ of execution to PDVSA and the defendants."). In sum, using a Court approved special process server, Caballero served the PDVSA Parties by mail using the addresses provided by OFAC.

With regard to New York Procedure, PDVSA complains that CPLR § 5232 required Caballero to initiate a special turnover proceeding against garnishee M&T Bank pursuant to § 5225(b).  Incorrect.  Section 5225(b) allows a judgment creditor to commence a special proceeding against a third party who "is in possession or custody of money or other personal property" in which the judgment debtor has an interest.   However, the Second Circuit has held that "[a] party seeking a money judgment against a non-party garnishee may proceed by ***motion*** and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp., Inc. v Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018). The Court has personal jurisdiction over M&T Bank.  Moreover, notice was provided to PDVSA by both M&T Bank and Caballero, eliminating any prejudice argument.

PDVSA's reliance on the service provisions in the FSIA, the Hague Convention on Service, and the Inter-American Service Convention are similarly misplaced as none apply to post-judgment *in rem* proceedings.  PDVSA's FSIA arguments fail for several reasons.  One, as argued above, FSIA is simply not applicable.  Two, if FSIA were applicable, its service provisions in Section 1608 relate solely to the service of complaints and summons and are ***inapplicable*** to post judgment proceedings. *Peterson v. Islamic Republic of Iran,* 627 F.3d 1117, 1130 (9th Cir. 2010)

("***If Congress had intended for foreign states to receive notice of every post-judgment motion, it would have said so***") (emphasis added). The Hague Convention on Service is equally inapplicable. The United States Supreme Court has interpreted the Hague Service Convention's use of the term "service of process" narrowly to mean a "***formal*** delivery of documents that is legally sufficient to charge the ***defendant*** with notice of a pending action." *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988) (emphasis added). Such formal notice to a defendant occurs upon the commencement of a pre-judgment action because proper service of process often forms the foundation for establishing ***personal jurisdiction*** over a foreign defendant, not *in rem* proceedings. *See, e.g., Hyundai Merch. Marine Co. v. Grand China Shipping (H.K.) Co.*, 878 F. Supp. 2d 1252, 1256-58 (S.D. Ala. 2012) (holding that compliance with Hague Service Convention would be necessary to obtain ***personal*** jurisdiction over foreign company, but compliance with Hague Service Convention ***not necessary*** in giving "notice of maritime attachment and garnishment" to a foreign company of the attachment of an asset within the U.S.). Finally, compliance with the Inter-American Convention on Service and its Additional Protocol is not mandatory even in pre-judgment proceedings because it is not the exclusive method by which pre-judgment service may be accomplished. *See, e.g., In re Montero*, Case No. 17-cv-1105, 2019 U.S. Dist. LEXIS 4948 at *13-17 (E.D.N.Y. Jan. 9, 2019). So even if it were applicable (and it is not), it would have no import here. Indeed, ***none*** of the cases cited by the PDVSA parties on pages 29-32 of D.E. 85-1 address service in post-judgment *in rem* proceedings.

### D.  TRIA'S Applicability is Beyond Arguable

The PDVSA Parties continue their journey to the bottom of the sink by arguing that TRIA is not applicable.   To argue against TRIA's application, the PDVSA Parties invite this Court to make plain legal error.   Their bold arguments include: (i) "TRIA applies to "agencies or

instrumentalities" of state sponsors of terrorism only" [D.E. 85-1 at p. 33]; (ii) "there is no such thing as an "agency or instrumentality" of a non-state terrorist organization [D.E. 85-1 at pp. 36-37]; (iii) this Court should not follow the Second Circuit's decision in *Kirschenbaum* because it was "wrongly decided" and called into question when the Supreme Court overruled its interpretation of § 1610(g) [D.E. 85-1 at 39]; (iv) "Plaintiff failed to prove that PDVSA and its Subsidiaries are 'agencies or instrumentalities of the FARC; [D.E. 85-1 at 39-40]; and (v) Plaintiff has not established that PDVSA and the Subsidiaries own the blocked assets. [D.E. 85-1 at pp. 45-47]. Each of the PDVSA Parties' arguments fail miserably.

**1.   The PDVSA' Parties Legal Arguments Fail**

From the approximately hundreds of cases that cite TRIA, the PDVSA Parties cannot cite any case actually ruling that "TRIA applies to 'agencies or instrumentalities' of state sponsors of terrorism only" and "there is no such thing as an 'agency or instrumentality'" of a non-state terrorist organization. Has every district court in the United States that has presided over collection efforts from agencies or instrumentalities of non-state agencies or instrumentalities misinterpreted the plain language of TRIA?  Have the Second Circuit, Eleventh Circuit, this Court, and others erred by rejecting the FSIA's definition of "agency or instrumentality" for non-state actors – which of course establishes that TRIA applies to non-state agencies or instrumentalities? Of course not. Yet, that is what the PDVSA Parties posit to this Court.

Because it has no precedent to cite, the PDVSA Parties immediately delve into their view of TRIA's legislative history.  At the outset, its bears noting that courts do not review legislative history when a statute is clear, and the Second Circuit has found TRIA to be unambiguous. *Weinstein*, 609 F.3d at 50 ("But even if, contrary to fact, there were an ambiguity here, it would be resolved in plaintiff's favor by the legislative history."); *Kirschenbaum*, 830 F.3d at 133 ("Thus,

32

the text of the TRIA unambiguously reaches more broadly to permit the attachment of property in circumstances not covered by the FSIA or FSIA immunity.").

Moreover, even if one were to consider the legislative history, it is clear that Congress intended TRIA to be a terrorist victim collection maximization statute – not a statute providing half a remedy that merely limits circumstances that miraculously overlook (or even somehow spare) non-state terrorist agencies and instrumentalities. Senator Harkin's remarks, quoted on page 12 *supra*, establish that Congress was dealing "comprehensively" "on behalf of victims of terrorism" to satisfy their judgments from the "blocked assets of terrorist parties." H.R. Conf. Rep. 107-779 at p. 27.  Nary a word supporting the PDVSA Parties' theory in his statements.  The PDVSA Parties have written true fiction for this Court.

Returning from the fictional world to the actual language of TRIA, it is apparent that TRIA's plain language does not provide, as the PDVSA Parties posit, that the reference to "agencies or instrumentalities" is a reference "***only***" to agencies or instrumentalities of state actors. To accept the PDVSA Parties' argument, the Court would improperly render entire sections of TRIA superfluous, including the definition of "terrorist party" which expressly includes both state and non-state actors.  The Second Circuit in *Weinstein* disposed of any argument that TRIA should be narrowly construed. *Weinstein*, 609 F.3d at 49 (rejecting narrow construction of the agency or instrumentality language).

Dispositively, the Second Circuit has expressly rejected the PDVSA Parties' position when holding that Section 201(a) plainly permits collection from the blocked assets of "that terrorist party" ***without any limitation*** as to the terrorist party being only one of the two defined types of terrorist parties.  The Second Circuit noted that the "plain language of the TRIA refers only to 'the blocked assets of any agency or instrumentality of that terrorist party,' and does ***not***

*differentiate* among the variety of entities that might qualify as a 'terrorist party.'" *See* TRIA §§ 201(a), 201(d)(4)." *Kirschenbaum*, 830 F.3d at 134 (emphasis added). The Second Circuit reasoned:

> Although both the FSIA and the TRIA permit property in the United States held by certain 'agencies or instrumentalities' to be attached, under the FSIA the entity must be an 'agency or instrumentality of a *foreign state*,' 28 U.S.C. § 1603(b) (emphasis added), whereas, under the TRIA, the entity must be an 'agency or instrumentality of th[e] *terrorist party*.' TRIA § 201(a) (emphasis added). Thus, **the text of the TRIA unambiguously reaches more broadly to permit the attachment of property in circumstances not covered by the FSIA** or FSIA immunity. *See Weinstein*, 609 F.3d at 50; *see also Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 54 (1st Cir. 2013). Specifically, unlike the FSIA, the TRIA permits attachment and execution against individual 'terrorist[s]' and 'terrorist organization[s]' (and *their* agencies and instrumentalities). TRIA § 201(d)(4). *Kirschenbaum*, 830 F.3d at 133. (emphasis added)

As this Court has already noted [D.E. 15 at p. 4], the Second Circuit in *Kirschenbaum* expressly rejected applying the traditional FSIA definition of agency or instrumentality to non-state actors. *Kirschenbaum*, 830 F.3d at 133 ("Precisely because TRIA § 201 encompasses non-state actors and, thus, reaches more broadly than the FSIA, it would contravene a plain reading of the TRIA to cabin its reach by applying the FSIA's definition of agency or instrumentality—which requires a foreign state principal."). The Eleventh Circuit has reached the same conclusion. *Stansell*, 771 F.3d 731 ("applying the FSIA's definition of agencies or instrumentalities to TRIA would leave only terrorist states as potential sponsors of agencies or instrumentalities under TRIA § 201, eviscerating TRIA's effectiveness vis-à-vis non-state terrorist organizations. This cannot stand, as TRIA's definition clearly contemplates non-state judgment debtors being subjected to TRIA execution. *See* TRIA § 201(d)(4) (defining 'terrorist party' to include both state actors and non-state terrorist organizations)."

In one paragraph with no analysis, the PDVSA Parties invite this Court to reject the Second Circuit's opinion in *Kirschenbaum*. [D.E. 85-1 at p. 39]. The PDVSA Parties claim that

*Kirschenbaum* was "wrongly decided" and that the Supreme Court's decision in *Rubin* called "the remainder of the decision into question."   The Supreme Court did no such thing.  It addressed an entirely separate issue – whether Section 1610(g) created a freestanding exception to immunity or depended on immunity being found somewhere else within Section 1610).  *Rubin*, 138 S. Ct. at 827.[20]

## 2.  The PDVSA' Parties Factual Arguments Fail

Even though it was invited by the Court in (i) its December 18, 2020 Decision & Order ("PDVSA is nonetheless entitled to notice and an opportunity to be heard to rebut the allegations that it is an agency or instrumentality of FARC") [D.E. 15 at 5]; (ii) its May 11, 2021 Decision & Order (". . . "PDVSA and the subsidiaries shall brief the factual and legal issues, including whether PDVSA and the subsidiaries are agencies or instrumentalities of FARC . . . .") [D.E. 78 at p. 18]; and its June 10, 2021 Text Order (". . . .PDVSA and the subsidiaries shall brief the legal and factual issues by 6/25/2021 . . . ."), in complete disregard of the Court's admonition during the hearing of April 28, 2021, the PDVSA Parties have filed ***no evidence***.   Instead, they challenge the admissibility (alleging hearsay and double hearsay) and the sufficiency of Caballero's submissions, ignoring that this Court has already found the evidence, admissible, credible, and sufficient.  The Court should not entertain any invitation to re-weigh the evidence when, based on the express language in the Court's Orders, the burden shifted to the PDVSA Parties to put forth

---

[20] Indeed, following the *Rubin* decision, Courts (including this Court and the Second Circuit) have continued to cite to *Kirschenbaum*'s agency or instrumentality analysis and noted that the opinion was "abrogated on other grounds" or "abrogated in part"  [D.E. 15 at p. 4]; *Kirschenbam v. 650 Fifth Ave & Related Props.*, 934 F.3d 191, 194 (2d Cir. 2019); *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, n.1 (2d Cir. 2019); *Levin v. Bank of N.Y. Mellon*, Case No. 09-cv-5900, 2019 U.S. Dist. LEXIS 22788 at *90-91 (S.D.N.Y. Feb 12, 2019) (applying, as this Court did, the agency or instrumentality factors set forth in *Kirschenbaum*).

evidence.[21]  Put another way, this case is way past whether Caballero has proven the agency or instrumentality status of the PDVSA Parties.

By ignoring this Court's instructions, PDVSA has also failed to meet its burden under Rule 60(b) of establishing that this Court should reverse its determination that PDVSA is an agency or instrumentality of the FARC, and the Subsidiaries have failed to submit the evidence that the Court has invited them to submit on their agency and instrumentality status.  Instead, they again retreat to a faulty legal premise.

The PDVSA Parties argue that Caballero failed to establish their status as agencies or instrumentalities on or around the date he filed this collections proceeding.[22] Ignoring the evidence showing that at all times material to this case (in other words from the filing of Caballero's original ATS lawsuit to the present), the PDVSA Parties have been agencies or instrumentalities of the FARC, the PDVSA Parties cherry pick older examples (omitting all recent and concurrent examples, such as those found in the Declaration of Mr. Reich [66-1] and the March 3, 2021

---

[21] The other courts that have found the PDVSA Parties to be agencies or instrumentalities of the FARC have relied on the same or similar declarations submitted by Caballero or other plaintiffs pursuing satisfaction of their judgments.  *See* Decl. of Leon N. Patricios at ¶ 8.  Moreover, experts are permitted to rely upon hearsay, double hearsay, or inadmissible evidence.  *See, e.g.,* in *Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 479 (N.D.N.Y. 2004).

[22] Although unimportant given Chavez's, Maduro's, and PDVSA's continuous support of the FARC, it is not entirely clear, as the PDVSA Parties argue, that the agency or instrumentality determination must be measured on any static date -- the date a party commences the action seeking a writ is one such date as argued by the PDVSA Parties.  D.E. 85-1 at 39 (citing *Harrison v. Republic of Sudan*, No 13-cv-3127, 2017 U.S. Dist. LEXIS 25675 (S.D.N.Y. Feb. 10, 2017).  In *Calderon-Cardona v. Bank of N.Y Mellon*, 770 F.3d 993, 999-1000 (2d Cir. 2014), the Second Circuit set the date of the underlying final judgment as the date to measure whether a defendant was a terrorist party --  a different date than the one proposed by the PDVSA Parties.  Because TRIA is a victim recovery maximization statute, it does not follow that upon entry of the final judgment against a terrorist party, the agency or instrumentality determination must be made as of fixed date. For example, pursuant to the "Look Back Rule" [D.E. 86 at n.2], the same is not true in collection proceedings because the de-listing of an SDN after a writ has been served does not affect the collection proceedings.

Declaration of Mr. McBrien, Ex. 5. in Caballero's evidence from the PDVSA Parties' *decades* of support for the FARC.

To be certain, the record before this Court is clear.  PDVSA and its Subsidiaries are, and at all times material hereto have been, agencies or instrumentalities of the FARC.  As recited above, Caballero has presented the declarations of Mr. McBrien and Mr. Reich explaining that, at all times material hereto: (i) Maduro has been a close partner of the FARC's narco-terrorism operations; and (ii) Maduro has used the apparatus of Venezuela, including PDVSA and the Subsidiaries, supporting FARC's narco-terrorism activities. Thus, because the PDVSA Parties have supported the FARC, in the numerous ways outlined by Mr. McBrien and Mr. Reich, the PDVSA Parties are and have been agencies or instrumentalities of the FARC.

Mr. McBrien's and Mr. Reich's conclusions are shared by the United States government. Its indictment of Maduro references the FARC more than 50 times and could not have been clearer. From at least 1990 through 2020 when the Maduro Indictment was filed,[23] Maduro (and before him Chavez) has been a ***partner*** of the FARC's narco-terrorism activities.  Glaringly omitted by the PDVSA Parties is that this proceeding was filed concurrent to the pending proceedings against Maduro (see **Ex. 2**) which pending proceedings not only describe Maduro's activities with, on, or behalf, of FARC international cocaine trafficking, but also parallel the evidence submitted by Caballero herein. While the Maduro Indictment does not attempt to recite every occasion wherein Maduro or Chavez used a Venezuelan institution as part of the narco-terrorism conspiracy, the Maduro Indictment, in paragraphs 15(a) through (s) provides examples of such use, including the agreement, reached as far back as 2008, to "use funds from the Venezuelan state-owned oil

---

[23] There is no indication *anywhere* that every allegation made in the Maduro Indictment has not remained true since its filing in March 2020 through the date of this filing in July 2021.

producer, Petroleos de Venezuela (PDVSA), to support the FARC's drug-trafficking and terrorist operations." *Id.* at p. 11.

Both Mr. McBrien and Mr. Reich have explained that Maduro has continued to use and control the apparatus of the country of Venezuela for illicit purposes. Indeed, instead of denying it, the Ad Hoc Board has confirmed that through this day, that Maduro controls PDVSA.  In paragraph 8 of her declaration, Ms. DeLelle confirms that Maduro remains in control of PDVSA, noting: "Maduro's unwillingness to relinquish power has prevented the Interim Government from restoring democracy and normal operations at Venezuela's state-owned companies, such as PDVSA. *See* **Ex. 7** (discussing, among other items, "Maduro's history of exploiting the assets of PDVSA for personal gain").  D.E 58-3 at p. 4.

With regard to the Subsidiaries, the PDVSA Parties accuse Caballero of conflating blocking determinations and agency instrumentality determinations. D.E. 85-1 at 43-45. Nonsense. Caballero does not dispute that each determination requires a separate inquiry, nor does he (nor this Court) inappropriately rely on the Subsidiaries' blocked status to reach the conclusion that the Subsidiaries are agents and instrumentality of the FARC.  According to their attorney's own declaration, the subsidiaries are "wholly-owned subsidiaries of PDVSA."[24]  D.E. 58-2, at 1. It is PDVSA's ownership of the Subsidiaries and evidence that PDVSA has used certain of its subsidiaries to further its money laundering operations in the past that serves as the agency and instrumentality linchpin.

---

[24] Notably, even were one to reject the above rationale and conclude that the Subsidiaries are not agencies and instrumentalities of the FARC (which they are), Caballero would still be able to execute against the subject blocked assets because PDVSA is an agency and instrumentality of the FARC and because PDVSA effectively owns the blocked assets in the putative names of the Subsidiaries by virtue of its full ownership of such Subsidiaries.

Contrary to the PDVSA Parties' arguments [D.E. 85-1 at 43-45], the agency and instrumentality determination relating to PDVSA's wholly-owned Subsidiaries is well-founded. Per OFAC's Revised Guidance, "any entity owned in the aggregate, directly or indirectly, 50 percent or more by one or more blocked persons is itself considered to be a blocked person." (hereafter, the "50% Rule").[25] And, in *Stansell  v. Revolutionary Armed Forces of Colombia (FARC)*, No. 09-cv-2308-RAL-MAP, 2013 U.S. Dist. LEXIS 189867, at *14 (M.D. Fla. Feb. 17, 2015), the court held that Hezbollah, "including its individual members, divisions, front companies and networks, predecessor, subordinates, derivatives, and/or successor organizations are all agencies or instrumentalities of the FARC."  Relying on the 50% Rule and the logic of *Stansell,* this Court appropriately held that "[i]f PDVSA is an agency and instrumentality of the FARC—which this Court has already determined it is, *see* Docket Item 15—it follows that its majority-owned subsidiaries are as well." D.E. 33 at 5 (emphasis added).

### 3.  M&T Bank is Holding Assets in the name of, or for the benefit of PDVSA

The PDVSA Parties complain that Caballero did not prove that PDVSA owns the Blocked Assets held by M&T Bank or that the Subsidiaries own the assets held by Citibank.  Once again, the PDVSA Parties have failed to file any evidence to rebut Caballero's submissions and this Court's findings or even to provide a sworn statement denying PDVSA's ownership of the blocked funds held at M&T Bank.

Because it has no contrary evidence (and such evidence does not exist), the PDVSA Parties resort to their parlor tricks and attempts to mislead this Court with regard to the law.  In doing so, the PDVSA Parties ask this Court to commit plain legal error.  The PDVSA Parties argue that the

---

[25] U.S. TREASURY DEP'T, *Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property are Blocked* (Aug. 13, 2014), available at: https://home.treasury.gov/system/files/126/licensing_guidance.pdf

broad language of TRIA must be narrowed to allow a victim of terrorism to collect blocked assets *only* from assets blocked under the same OFAC sanctions program.  [D.E. 85-1 at pp. 46-47].  The PDVSA Parties cite dicta from *Hausler v. JPMorgan Chase Bank, N.A.,* 845 F. Supp. 2d 553, 567 (S.D.N.Y. 2012) and then misrepresent to the Court that *Hausler* was reversed on other grounds.  The PDVSA Parties are wrong.

*Hausler* was one of several cases[26] considering whether certain electronic funds transfers ("EFTs") that had been blocked midstream were the blocked assets of a terrorist party attachable under TRIA.  The conflicting decisions reached by the district courts were eventually resolved by the Second Circuit's opinion in *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 770 F.3d 993 (2d Cir. 2014).  The very premise of the language cited by PDVSA in *Hausler*—that TRIA preempts state law definitions of property ownership—was specifically reversed by the Second Circuit.  Put another way, **the very premise** upon which the words "of that terrorist party", *Hausler,* 845 F. Supp. 2d at 576, would be interpreted to mean that a TRIA judgment creditor could only collect against an agency and instrumentality that happens to be designated under the same sanctions regulation as the terrorist party itself, rests on the erroneous assumption that federal law is determinative of both: i) the blocked status of an asset; <u>and</u>, ii) defining which parties are deemed to have an ownership interest in that blocked asset. Nonsense. That erroneous premise and assumption were specifically reversed by the Second Circuit: "When Congress leaves a gap in a statute that 'has not created any new property rights, but merely 'attaches consequences, federally defined, to rights created under state law,' we must look to state law to define the 'rights the judgment debtor has in the property the [creditor] seeks to reach." 770 F.3d at 1001.

---

[26]  The others were *Levin v. Bank of New York*, Case No. 09 CV 5900 (S.D.N.Y.) and *Calderon-Cardona v. JPMorgan Chase Bank N.A.*, Case No. 11 CV 3283 -3292 (S.D.N.Y.)

Thus, in upholding the New York state law principles regarding EFT ownership in *Calderon-Cardona*, the Second Circuit squarely rebuffed using the words the "particular regulation or administrative action" to determine ownership. *Hausler,* 845 F. Supp. 2d at 567. Put another way, the very premise of the PDVSA Parties' argument (that TRIA preempts state law definition of property ownership) is squarely dead. The phrase "of that terrorist party" is not to be construed to use federal regulations or administrative action to deem only agencies and instrumentalities designated under the same sanctions regulation as the terrorist party itself to be target "owners" for collection purposes.[27] Further, such an odd interpretation would again render TRIA something other than a statute meant to "…deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism…"

### E.  Caballero's ATA Final Judgment is Correct, Final, and Not Assailable

Without establishing that they have any standing to do so, the PDVSA Parties attack Chief Judge Moore's ATA Final Judgment *arguing for the FARC* that Chief Judge Moore erred because: (i) the Southern District of Florida did not have personal jurisdiction of the FARC; (ii) Caballero lacked standing to sue the FARC or failed to state a cause of action under the ATA against the FARC because he was not a United States citizen when his father was murdered in

---

[27] Indeed, the absurdity of PDVSA's argument is belied by precedent in the *Caballero* litigation requiring turnover of assets in the putative name of an agencies and instrumentalities designated under sanctions regulations distinct from the ones used to designate Judgment Debtor FARC. *See e.g.* Judgment in Garnishment, *Caballero v. FARC*, *et al.,* No. 20-12-15428 (Tex.—Montgomery County [284th Dist.] Jan. 15, 2021), removed to S.D. Tex. under Case No. 4-21-cv-00913 (consolidated under S.D. Tex. Case No. 4:21-cv-1668) (requiring turnover of funds in the putative name FARC agent and instrumentality PdVSA—designated under the Venezuelan sanctions program—to partially satisfy Caballero's judgment against the FARC—designated under the Foreign Terrorist Organizations Sanctions Regulations (FTO), Specially Designated Global Terrorist Sanctions Regulations (SDGT), and Foreign Narcotics Kingpin Sanctions Regulation (SDNTK) programs).

Colombia; and (iii) Caballero's prior Florida state court action judgment was void, prohibiting Chief Judge Moore from using the damages calculations and findings from such court.

The Supreme Court has long recognized that collateral attacks are disfavored. *See, e.g. Chicot City Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 378 (1940); *United Student Aid Funds, Inc. Espinosa*, 559 U.S. 260, 271 (2010) ("[A] judgment is void because of a jurisdictional defect [only in the] exceptional case in which the court that rendered the judgment lacked even an 'arguable basis' for jurisdiction."). Courts disfavor collateral attacks because they disturb a judgment's "finality." *See, e.g., Nemaizer v. Baker,* 793 F.2d 58, 64-66 (2d Cir. 1986); *Hoffman v. Pulido*, 928 F.3d 1147, 1151 (9th Cir. 2019). The PDVSA Parties have no standing to make any of the above arguments as they are personal to the FARC and cannot, as a matter of law, be challenged through a collateral attack by a third party. Even if the PDVSA Parties had standing to raise the issues, the doctrine of finality would bar them from re-raising the issues collaterally. Moreover, PDVSA is just plain wrong as to each issue that it raises.

The PDVSA Parties' first argument is that the Southern District of Florida did not have personal jurisdiction over the FARC. A lack of personal jurisdiction defense is an ***individual*** right that can be waived by an individual. *Ins. Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 703 (1982) Just as a third party cannot waive the defense for an individual, a third party cannot raise it for an individual in a collateral attack. The PDVSA Parties fail to cite one case to this Court where a third party collaterally attacked a final judgment on the basis that the original court lacked personal jurisdiction over the defendant. The two cases cited by the PDVSA Parties do not stand for that proposition[28] because the opposite is true. *See, e.g., Sayles v. PAC Eng'rs &*

---

[28] *Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 732 (2d Cir. 1980) involved a defaulted defendant in a Georgia action raising its own personal defense of lack of personal jurisdiction

*Constructors, Ltd.*, Case No. 08-cv-676S, 2009 U.S. Dist. LEXIS 124819 at *15 - *18 (W.D.N.Y. Jan. 16, 2009) (noting that "the appearing defendants lack standing to raise this objection to exercising personal jurisdiction over codefendants . . . ."); *Jenkins v. Smead Mfg. Co.,* Case No. 09-cv-0261, 2009 U.S. Dist. LEXIS 101545 at *8-9 (S.D. Ca. Oct. 28, 2009) (holding that defendants lack standing to raise a lack of personal jurisdiction defense for proposed defendants).

Whether Caballero had standing to or stated a claim under the ATA and whether his damages were properly determined through reliance on the Florida State court findings are rulings that are not subject to collateral attack. Without citation to any legal authority, PDVSA boldly asks this Court to sit as an appellate court over Chief Judge Moore when the time for appeal has long since passed.  PDVSA has no standing (or legal support cited) to challenge Chief Judge Moore's interpretation of the ATA, his decision on damages, his reliance upon the Florida state court judgment, or any other act. *See, e.g., Rouse v. Conner*, Case No. 12-2121, 2012 U.S. Dist. LEXIS 86446 at *5 (N.D. Ca. June 21, 2012) (noting that non-jurisdictional errors "such as failure to state a cause of action, insufficiency of evidence, abuse of discretion, and mistake of law – are 'not appropriate procedural targets' for collateral attack . . . .").[29]

The PDVSA Parties are simply wrong.  Before the Florida state court, Caballero fully briefed the issue of personal jurisdiction over the Defendants and, at the trial court's request, fully briefed whether *Kiobel v. Royal Dutch Petrol Co.*, 569 U.S. 108 (2012), had any impact on the trial court's jurisdiction.  The Florida state court fully analyzed these issues in its Partial Summary Judgment Order making specific findings as to personal jurisdiction and the contacts of Defendants

_____

before the court enforcing the judgment.  *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) involved the subject matter jurisdiction of the rendering court under the FSIA.
[29] Even if another court were to later disagree with Chief Judge Moore, such ruling does not support a collateral attack. *See, e.g., Chicot Cty. Drainage Dist.*, 308 U.S. at 376; *Jones v. Giles*, 741 F.2d 245, 248 (9th Cir. 1984). Any such argument needed to have been made on direct appeal.

with the State of Florida sufficient to satisfy *Kiobel*. *See* **Ex. 4** Memorandum Opinion and Order

on Plaintiff's Motion and Incorporated Memorandum of Law for Partial Summary Judgment as to

Liability on All Counts (the "Partial Summary Judgment Order") at pp. 21-23 (personal

jurisdiction) and 33-34 (*Kiobel*).  The Florida state court then incorporated the Partial Summary

Judgment Order into its ATS Final Judgment.  *See* ATA Action at D.E. 1-1 at p.2.

Thereafter, during collection proceedings on his ATS Final Judgment, a third party agency

or instrumentality challenged subject matter jurisdiction, the trial court's application of *Kiobel*,

and other issues.  The trial court rejected the arguments, and the arguments were briefed again[30]

to Florida's Third District Court of Appeal, which held an oral argument and then issued a per

curiam affirmance.  Thus, even if the PDVSA Parties had standing to raise these arguments (and

they do not), because all these issues were fully and fairly litigated, they are entitled to finality.

Upon becoming a U.S. Citizen, Caballero filed his ATA action in federal court, attached

his Florida Final Judgment, and followed the same procedures for serving the FARC. *See* ATA

Action, at D.E. 1, 15, 25.  With regard to personal jurisdiction over FARC, Caballero's ATA

Complaint made specific allegations about the FARC's criminal activities and drug trafficking

operations transporting illicit drugs into Florida.  ATA Action, D.E. 1 at pp. 2-5.  While the case

was pending, a competitor case (the "Stansell Plaintiffs") filed a motion to intervene and argued

to Chief Judge Moore the very same arguments that PDVSA makes to this Court regarding

remedies under the ATA being limited temporally by when a plaintiff became a U.S. citizen.  ATA

Action at D.E. 8; 8-1; 11; 13. Chief Judge Moore denied the motion to intervene [ATA Action,

---

[30] The state court appellate briefs were already field with a federal court and are available on
PACER.  As such, Caballero provides the citations to the appellate briefs' appearance in a federal
record.  Appellant's Initial Brief, filed in *Caballero v. FARC et al.*, Case No. 4:19-cv-04011-KES
(D. S.D.), D.E. 15-2, Answer Brief at D.E. 15-3 and Reply Brief at D.E, 15-4, the appellate court's
affirmance, D.E. 15-8.

D.E. 43] and squarely addressed and rejected their arguments (the same arguments PDVSA makes here that Caballero could not bring an ATA action because he was not a U.S. citizen when living in Colombia.) *See* Order on Mot. For Default Final Judgment, ATA Action, D.E. 62.   Moreover, Chief Judge Moore's Order on Motion for Default Final Judgment was based, in part, on the ATS Action record which included the Partial Summary Judgment Order and the state court rulings on personal jurisdiction. ATA Action D.E. 62 at pp. 1-3, 7.  Thus, PDVSA's presumption that Chief Judge Moore did not consider the issue of personal jurisdiction over PDVSA is unsupportable.

## CONCLUSION

A criminal enterprise (the FARC) and a criminal (Maduro) use Venezuela's national institutions, including PDVSA, to further their narco-terrorism operations. Specifically, PDVSA has provided material assistance to the FARC, including money laundering. The United States, thankfully, operates under the rule of law.  And, in this case, that law and the relevant facts are clear: (i) Caballero is a victim of the FARC's terrorism, who has received a final judgment arising out of such terrorist acts; (ii) the United States government has blocked the assets of PDVSA; (iii) PDVSA is, and at all times material hereto, has been an agency or instrumentality of the FARC; and (iv) TRIA allows Caballero to satisfy his compensatory damages from the blocked assets of PDVSA.

It is time for this Court's Turnover Judgment to be enforced.   Caballero respectfully requests that this Court deny PDVSA's Motion [D.E. 85] and lift its stay [D.E. 39] with instructions to M&T Bank to immediately comply with the Turnover Judgment.

Dated: July 26, 2021.

Respectfully submitted,

*/s/ Joseph I. Zumpano*
Joseph I. Zumpano (Florida Bar Number: 0056091)
Admitted *Pro Hac Vice*
E-mail address: jzumpano@zplaw.com
Leon N. Patricios (Florida Bar Number: 0012777)
Admitted *Pro Hac Vice*
E-mail address: lpatricios@zplaw.com
ZUMPANO PATRICIOS, P.A.
312 Minorca Avenue
Coral Gables, FL 33134
Telephone: (305) 444-5565

Mitchell G. Mandell
E-mail address: mmandell@zplaw.com
ZUMPANO, PATRICIOS & POPOK, PLLC
417 Fifth Avenue, Suite 826
Telephone: (212) 542-8125

*Attorneys for Plaintiff Antonio Caballero*

## CERTIFICATE OF SERVICE

We hereby certify that the foregoing document was filed this 26th day of July 2021 via

CM/ECF.

*/s/ Leon N. Patricios*
Leon N. Patricios