**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

Antonio Caballero,

                     *Plaintiff*,

    v.

Fuerzas Armadas Revolucionarias de Colombia, et al.,

                     *Defendants*.

Civil Case No. 20-MC-00040-LJV

<u>**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**</u>

# TABLE OF CONTENTS

INTRODUCTION......................................................................................................1

BACKGROUND.......................................................................................................4

    A.     STATUTORY BACKGROUND......................................................4

          1.    The Foreign Sovereign Immunities Act. ..................................4

          2.    The Terrorism Risk Insurance Act of 2002. ............................6

    B.     FACTUAL AND PROCEDURAL BACKGROUND.........................7

ANALYSIS...............................................................................................................9

I.     BECAUSE TRIA DOES NOT PROVIDE AN INDEPENDENT BASIS FOR SUBJECT-MATTER JURISDICTION AGAINST AN AGENCY OR INSTRUMENTALITY OF A FOREIGN STATE THAT IS NOT A STATE SPONSOR OF TERRORISM, ANY GRANT OF JURISDICTION MUST BE PROVIDED IN THE FSIA............................................................................9

    A.     The FSIA is the exclusive basis for subject-matter jurisdiction over foreign states, including their assets or instrumentalities, and such states are immune from court jurisdiction unless a specific exception to jurisdictional immunity applies.........................................................10

    B.     TRIA—which eliminates attachment immunity in situations to which it applies—does not displace the requirement for an exception to jurisdictional immunity in this case.................................................11

    C.     Caballero's argument that an attachment action is an in rem or quasi-in-rem proceeding to which the FSIA does not apply is not consistent with the FSIA...................................................................................23

II.    FSIA'S SERVICE PROVISIONS APPLY TO POST-JUDGMENT EXECUTION ACTIONS AGAINST A FOREIGN STATE'S ASSETS WHERE THE FOREIGN STATE IS NOT THE JUDGMENT DEBTOR..................................24

    A.     FSIA sets out the process by which foreign states, including their agencies or instrumentalities, are served with judicial process. .......................24

    B.     Post-judgment execution actions require service to third parties whose assets are subject to attachment.........................................................25

    C.     Requiring service of process pursuant to section 1608 accords with principles of international comity that ultimately benefit the people of the United States......................................................................................28

III.    WHILE THE UNITED STATES DOES NOT TAKE A POSITION AS TO
        WHETHER TRIA REQUIRES THAT A TERRORIST PARTY ITSELF HAVE
        AN OWNERSHIP INTEREST IN THE BLOCKED PROPERTY SUBJECT TO
        ATTACHMENT, IT DOES TAKE THE POSITION THAT TRIA DOES NOT
        APPLY TO AGENCIES OR INSTRUMENTALITIES OF STATES THAT ARE
        NOT STATE SPONSORS OF TERRORISM. ............................................................ 29

        A.    TRIA requires an ownership interest in the property to be executed upon .......... 29

        B.    The Second Circuit's interpretation of the "agency or instrumentality" in
              Kirschenbaum should not extend to the agencies or instrumentalities of
              foreign states that have not been designated as state sponsors of terrorism ........ 31

CONCLUSIONS .................................................................................................................... 36

# TABLE OF AUTHORITIES

## CASES

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003)..................................................................................22

*Aquamar, S.A. v. Del Monte Fresh Produce, N.A., Inc.*,
   179 F.3d 1279 (11th Cir. 1999).................................................................28

*Argentine Repub. v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989).............................................................................4, 10

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
   501 U.S. 104 (1991)..................................................................................31

*Bennett v. Islamic Repub. of Iran*,
   618 F.3d 19 (D.C. Cir. 2010), *abrogated on other grounds by*
   *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ...................6, 7

*Bennett v. Islamic Republic of Iran*,
   825 F.3d 949 (9th Cir. 2016) ...................................................................30

*Billiouri v. Wells Fargo Bank N.A.*,
   No. 3:15-cv-2664-L, 2022 WL 2992880 (N.D. Tex. July 28, 2022).......23

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
   563 U.S. 776 (2011)..................................................................................30

*C.G. Holdings, Inc. v. Rum Jungle, Inc.*,
   852 F. Supp. 2d 582 (E.D.N.Y. 2008).....................................................17

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
   562 F. Supp. 3d 867 (C.D. Cal. 2021)......................................................23

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
   No. 18-cv-25337-KMM, 2020 WL 7481302 (S.D. Fla. May 20, 2020)....7

*Calderon-Cardona v. Bank of N.Y. Mellon*,
   770 F.3d 993 (2d Cir. 2014) .....................................................................30

*Clodfelter v. Rep. of Sudan*,
   720 F.3d 199 (4th Cir. 2013) ...................................................................21

*Colonial Press Int'l, Inc. v. United States*,
   788 F.3d 1350 (Fed. Cir. 2015).................................................................35

*Crystallex International Corp. v. Bolivarian Rep. of Venezuela*,
   932 F.3d 126 (3d Cir. 2019) ...............................................................15, 16

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
  879 F.3d 462 (2d Cir. 2018) ......................................................................... 27

*Dupuch-Carron v. Sec'y of Health & Human Servs.*,
  969 F.3d 1318 (Fed. Cir. 2020) .................................................................... 35

*Ellis v. United States*,
  206 U.S. 246 (1907) ...................................................................................... 30

*Epperson v. Ent. Express, Inc.*,
  242 F.3d 100 (2d Cir. 2001) ......................................................................... 17

*FG Hemisphere Assocs., LLC v. Dem. Rep. of Congo*,
  447 F.3d 835 (D.C. Cir. 2006) ...................................................................... 26

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) ...................................................................................... 16

*Flores-Figueroa v. United States*,
  556 U.S. 646 (2009) ...................................................................................... 30

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ...................................................................................... 34

*Hausler v. J.P. Morgan Chase Bank, N.A.*,
  740 F. Supp. 2d 525 (S.D.N.Y. 2010) .......................................................... 19

*Hausler v. JP Morgan Chase, NA*,
  770 F.3d 207 (2d Cir. 2014) ..................................................................... 6, 30

*Heiser v. Islamic Republic of Iran*,
  735 F.3d 934 (D.C. Cir. 2013) ................................................................ 29, 31

*Islamic Am. Relief Agency v. Unidentified FBI Agents*,
  394 F. Supp. 2d 34 (D.D.C. 2005) ............................................................... 22

*Kirschenbaum v. 650 Fifth Ave. & Related Properties*,
  830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds by*
  *Rubin v. Islamic Rep. of Iran*, 138 S. Ct. 816 (2018) ........................... *passim*

*Kirschenbaum v. Assa Corp.*,
  934 F.3d 191 (2d Cir. 2019) .................................................................... 32, 35

*Levin v. Bank of N.Y. Mellon*,
  No. 09-cv-5900 (JPO), 2019 WL 564341 (S.D.N.Y. Feb. 12, 2019) ........... 32

*Levinson v. Kuwait Fin. House (Malaysia) Berhard*,
  ---F.4th --, No. 21-2043, 2022 WL 3269083 (2d Cir. July 21, 2022) ...... 13, 15

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*,
    556 U.S. 366 (2009) ............................................................................................... 19

*Omni Cap. Int'l Ltd. v. Rudolf Wolff & Co.*,
    484 U.S. 97 (1987) ................................................................................................. 27

*Peacock v. Thomas*,
    516 U.S. 349 (1996) ........................................................................................ 16, 17

*Pere v. Nuovo Pignone, Inc.*,
    150 F.3d 477 (5th Cir. 1998) ................................................................................ 28

*Persinger v. Islamic Rep. of Iran*,
    729 F.2d 835 (D.C. Cir. 1984) ............................................................................. 21

*Peterson v. Royal Kingdom of Saudi Arabia*,
    416 F.3d 83 (D.C. Cir. 2005) ............................................................................... 10

*Poe v. Seaborn*,
    282 U.S. 101 (1930) .............................................................................................. 30

*Rep. of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014) ................................................................................................ 5

*Rep. of Mex. v. Hoffman*,
    324 U.S. 30 (1945) ................................................................................................ 28

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008) .............................................................................................. 28

*Rubin v. Islamic Rep. of Iran*,
    709 F.3d 49 (1st Cir. 2013) .................................................................................. 13

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018) ....................................................................................... 8, 30

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) .............................................................................................. 10

*Stansell v. Revolutionary Armed Forces of Colombia*,
    771 F.3d 713 (11th Cir. 2014) .................................................................... 8, 32, 34

*Stansell v. Revolutionary Armed Forces of Columbia*,
    No. 8:09-cv-2308-T-26MAP, 2013 WL 12133661 (M.D. Fla. May 2, 2013),
    *aff'd in part & rev'd in part*, 771 F.3d 713 (11th Cir. 2014) ................................ 33

*Staples v. United States*,
    511 U.S. 600 (1994) .............................................................................................. 31

*United States v. Assa Co.*,
  934 F.3d 185 (2d Cir. 2019) ............................................................ 24

*United States v. Holy Land Found. for Relief & Dev.*,
  445 F.3d 771 (5th Cir. 2006) ........................................................... 13

*United States v. Holy Land Found. for Relief & Dev.*,
  722 F.3d 677 (5th Cir. 2013) ...................................................... 18, 19

*United States v. Rodgers*,
  461 U.S. 677 (1983) .................................................................. 30, 31

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
  946 F.3d 120 (2d Cir. 2019) ................................................. 12, 13, 15

*Walters v. Indus. & Com. Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011) ............................................................ 10

*Weininger v. Castro*,
  462 F. Supp. 2d 457 (S.D.N.Y. 2006) ........................................... 7, 12

*Weinstein v. Islamic Republic of Iran*,
  609 F.3d 43 (2d Cir. 2010) ......................................................... 14, 15

**STATUTES**

18 U.S.C. § 2333 ........................................................................... 1, 7

26 U.S.C. § 7403 ............................................................................. 31

28 U.S.C. § 517 ................................................................................. 1

28 U.S.C. § 1330 ....................................................................... *passim*

28 U.S.C. § 1603 ......................................................................... 4, 10

28 U.S.C. § 1604 ......................................................................... 4, 10

28 U.S.C. § 1605 ............................................................................... 4

28 U.S.C. § 1605A .................................................................... *passim*

28 U.S.C. § 1605B ............................................................................. 4

28 U.S.C. § 1608 ..................................................................... *passim*

28 U.S.C. § 1609 ............................................................................... 5

28 U.S.C. §§ 1609-1611 .................................................................... 24

vi

28 U.S.C. § 1610 ..................................................................................................... *passim*

28 U.S.C. § 1611 ............................................................................................................. 5

28 U.S.C. § 1963 ....................................................................................................... 7, 16

Terrorism Risk Insurance Act of 2002,
    Pub. L. No. 107–297, 116 Stat. 2322 (2002) ....................................................... *passim*

Iran Threat Reduction and Syria Human Rights Act of 2012,
    Pub. L. No. 112–158, 126 Stat. 1214 (2012) .............................................................. 6

**RULES**

Fed. R. Civ. P. 4 ........................................................................................................... 26

Fed. R. Civ. P. 5 ........................................................................................................... 26

Fed. R. Civ. P. 69 ......................................................................................................... 27

N.Y. C.P.L.R. § 105 ...................................................................................................... 27

N.Y. C.P.L.R. § 5225 .................................................................................................... 27

**OTHER AUTHORITIES**

50 C.J.S. Judgments § 787 (2013) ............................................................................... 31

H.R. Rep. No. 94-1487 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604 ......................... 25, 26

H.R. Rep. No. 107-779 (2002), *as reprinted in* 2002 U.S.C.C.A.N. 1430 ............................... 13

*State Sponsors of Terrorism*,
    https://www.state.gov/state-sponsors-of-terrorism .................................................. 4

# INTRODUCTION

Pursuant to the invitation of this Court, ECF No. 106, the United States respectfully submits a Statement of Interest in this matter to address the three questions posed by the Court in its Order.[1]

The Plaintiff in this litigation, Antonio Caballero, holds a default judgment against the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), under the Anti-Terrorism Act, 18 U.S.C. § 2333, that was predicated upon the kidnapping, torture, and murder of his father. He now seeks to enforce that judgment by executing upon the assets of Venezuela's state-owned oil company, Petroleos de Venezuela, S.A. ("PDVSA"). The United States emphatically condemns the acts of terrorism against Mr. Caballero's father, and has deep sympathy for his suffering and for that of all victims of terrorist attacks who continue to seek accountability and compensation for their losses.

In seeking to execute upon the assets of PDVSA, however, Mr. Caballero implicates important questions about the immunities provided to foreign states and their agencies and instrumentalities, as well as the property of foreign states and foreign state agencies and instrumentalities, under the Foreign Sovereign Immunities Act ("FSIA"), as modified by the Terrorism Risk Insurance Act of 2002 ("TRIA"), when applied to attempts to hold foreign states, including their agencies or instrumentalities, that have not been designated as state sponsors of terrorism financially responsible for the actions of non-state entities or individuals. The United States therefore files this Statement of Interest because of its significant interest in ensuring that

---

[1] The United States' submission is pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to send any officer of the Department of Justice "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

Unless otherwise noted, all docket citations are identified by ECF number, with citation to the pdf pagination provided by the ECF system.

courts correctly construe the laws relating to foreign sovereign immunity, including the enforcement of judgments against the property of foreign states. Issues such as these, which could affect a broad subset of litigation against foreign sovereigns in U.S. courts, can have significant, detrimental impact on our foreign relations, as well as on the reciprocal treatment of the United States and its extensive overseas property holdings. In order to protect its vital interests, the United States submits this Statement of Interest, which addresses the three questions this Court posed.

*First*, the Court asked whether TRIA itself provides subject-matter jurisdiction in an action where a plaintiff has a liability judgment against a non-state terrorist party and seeks to execute that judgment against the assets of a foreign state that is also alleged to be an agency or instrumentality of that non-state terrorist party. It is the view of the United States that TRIA—which expands exceptions to the attachment immunity normally afforded foreign states—does not provide an independent basis for subject-matter jurisdiction against a foreign state that is not a state sponsor of terrorism, as designated by the Executive. Here, for example, although the plaintiff is seeking to invoke this Court's ancillary jurisdiction over PDVSA, nonetheless he must satisfy one of the exceptions to foreign state jurisdictional immunity provided in 28 U.S.C. §§ 1605 to 1607 in order to execute against PDVSA's assets. This conclusion accords with the long-established principle that foreign states are immune from U.S. court jurisdiction except as specifically provided in the FSIA; the fact that TRIA applies exclusively to post-judgment attachment proceedings; and, at least as applied to foreign states, the fact that TRIA is predicated on the foreign state not being immune under the FSIA's state sponsor of terrorism exception to immunity. That conclusion also accounts for the significant foreign policy consequences that could inure if the assets of foreign states could be attached without a predicate finding by the Executive that those states are state sponsors of terrorism—an action that would strip foreign states

of their immunities in unpredictable ways and in a manner that could have significant negative reciprocal consequences for the United States.

*Second*, the Court asked if the FSIA's service provisions apply in TRIA post-judgment execution actions. In the view of the United States, they do: the FSIA specifically sets out the procedures for service of process on foreign states and their agencies or instrumentalities. Proper service under the FSIA is required to establish personal jurisdiction over foreign states and, as established under state procedural law that applies here pursuant to Federal Rule of Civil Procedure 69, this Court must have personal jurisdiction over the non-party garnishee. Personal jurisdiction against a foreign state agency or instrumentality cannot be established absent service under the FSIA, which also accords with principles of international comity that ultimately benefit the United States in reciprocal actions abroad.

*Third*, the Court asked whether TRIA requires that the terrorist party itself have an ownership interest in the assets to be executed upon, or whether it is sufficient for the purported agency or instrumentality of the terrorist party, in this case, as alleged, PDVSA, to own the assets. TRIA has long been held to require, at a minimum, that the plaintiff establish that the entity whose assets are being attached has an ownership interest in the assets, rather than a lesser type of property interest that might be sufficient to justify those assets being blocked by U.S. sanctions. While the United States does not take a position on whether ownership by the agency or instrumentality suffices for an asset to be subject to execution under TRIA, it does take the position that the term "agency or instrumentality" in TRIA must be appropriately and narrowly defined, particularly when applied to foreign state entities that are not state sponsors of terrorism, in order to recognize the Executive's prerogative in making such a critical determination and to minimize international friction that could occur if TRIA's exception to attachment immunity were broadly applied.

# BACKGROUND

## A. STATUTORY BACKGROUND

### 1. The Foreign Sovereign Immunities Act.

The Foreign Sovereign Immunities Act ("FSIA") establishes the comprehensive and exclusive framework for obtaining and enforcing judgments against a foreign state in civil suits in U.S. courts. *See, e.g.*, *Argentine Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989). For the purposes of the FSIA, a foreign state includes an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The FSIA provides that a "foreign state" is "immune from the jurisdiction" of federal and state courts except as provided by the exceptions to immunity in 28 U.S.C. §§ 1605 through 1607. *Id.* § 1604; *see also id.* § 1330(a).

In addition to the original exceptions to jurisdictional immunity contained in 28 U.S.C. § 1605, which mainly focus on the commercial activities or explicit waiver of the foreign state, Congress has subsequently amended the FSIA to provide for two exceptions to jurisdictional immunity to specifically address international terrorism impacting the United States. The first exception, 28 U.S.C. § 1605A, provides for jurisdiction over certain terrorism-related claims against designated "state sponsor[s] of terrorism." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Claims may be heard under this "state sponsor of terrorism exception" only if the state was designated at the time the act of terrorism occurred or was designated as a result of the act.[2] Further, at the time that the act of terrorism occurred, the victim must have been a U.S. national, a member of the armed forces, or a U.S. Government employee or contractor acting within the scope of employment. The second exception, 28 U.S.C. § 1605B, enacted in 2016 as part of the Justice Against Sponsors of

---

[2] Venezuela is not (and has never been) designated by the United States as a state sponsor of terrorism. *See State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism. (last visited Sept. 2, 2022).

Terrorism Act ("JASTA"), provides jurisdiction over certain terrorism-related claims against any foreign state.   While this "JASTA exception" to jurisdictional immunity is not limited to designated state sponsors of terrorism, it does contain key limitations.  First, it is limited to cases involving death or injury caused by "an act of terrorism in the United States."  Second, the injury or death must be caused by a tortious act of the foreign state or its officials, employees, or agents acting within the scope of their employment.

The FSIA also addresses the kinds of foreign sovereign property that are and are not immune from attachment by judgment creditors.  The general rule is that "the property in the United States of a foreign state shall be immune from attachment."  *See* 28 U.S.C. § 1609.  Section 1610 and 1611 set out various exceptions and qualifications to the general immunity from attachment of foreign state property.[3]  *See id.* §§ 1610, 1611.

Foreign states, including their agencies or instrumentalities, must be served according to specific service rules.  *See* 28 U.S.C. § 1608.  In order to establish personal jurisdiction over a foreign state, the court must have subject-matter jurisdiction (*i.e.*, an exception to jurisdictional immunity applies) and the foreign state must have been served pursuant to section 1608.  *See id.* § 1330(b).  As a general matter, after a default judgment has been entered against a foreign state, a party cannot attach or execute upon the property of a foreign state pursuant to section 1610 until the state has been served with the default judgment in accordance with section 1608.  *See id.* §§ 1608(e), 1610(c).

---

[3] Traditionally, under the FSIA, the exceptions to attachment immunity are "narrower" than the exceptions to jurisdictional immunity.  *Rep. of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014).  As discussed *infra*, jurisdictional immunity and attachment immunity are distinct and independent requirements.

2.  **The Terrorism Risk Insurance Act of 2002.**

Section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") represents an extension of Congress' earlier efforts to facilitate the execution of terrorism-related judgments against a state sponsor of terrorism.  The text of TRIA § 201 exclusively pertains to making certain assets available for execution to satisfy terrorism-related judgments.  In pertinent part, and as currently amended, TRIA § 201 provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), Pub. L. No. 107–297, title II, §201(a), (b), (d) (as codified at 28 U.S.C. § 1610 note); 116 Stat. 2322, 2337-39 (2002), as amended (to add reference to  section 1605A) by Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112–158, title V, §502(e)(2), 126 Stat. 1214, 1260 (2012).

TRIA defines "terrorist party" to include "a terrorist, a terrorist organization . . . or a foreign state designated as a state sponsor of terrorism."  *Id.* § 201(d)(4).  As set forth above, a judgment holder seeking to attach assets under TRIA must establish that the assets are: (1) blocked, and (2) assets "of" that terrorist party (including those of an agency or instrumentality of the terrorist party).  *Id.* § 201(a); *see also*, *e.g.*, *Hausler v. JP Morgan Chase, NA*, 770 F.3d 207, 211 (2d Cir. 2014).

When its conditions are satisfied, TRIA section 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.  *See, e.g., Bennett v. Islamic Repub. of*

*Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010); *Weininger v. Castro*, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006) (TRIA "overrides the immunity conferred in [28 U.S.C.] § 1611").

### B.  FACTUAL AND PROCEDURAL BACKGROUND

As this Court is aware, this case involves the Plaintiff's attempt to enforce a liability judgment originally entered against the FARC.  In 2020, Antonio Caballero secured a liability judgment in the Southern District of Florida under the Anti-Terrorism Act, 18 U.S.C. § 2333.[4]  *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 18-cv-25337-KMM, 2020 WL 7481302, at *1 (S.D. Fla. May 20, 2020).  He alleged, among other things, that the FARC had kidnapped, tortured, and murdered his father, a "former Ambassador to the United Nations, a leading politician, and an outspoken critic of narcotics traffickers in Colombia." *Id.*  These events did not occur within the United States. *Id.* at *3 (stating that the kidnapping occurred in Colombia). The FARC did not appear and defaulted. *Id.* at *1.  The Southern District of Florida court found that the FARC was liable to Caballero under the Anti-Terrorism Act, *id.* at *3-4, and thereafter entered final judgment against the FARC [hereinafter the "Liability Judgment"]. *Id.* at *7.

Having secured his liability judgment, Caballero began working to satisfy it.  In September 2020, pursuant to 28 U.S.C. § 1963, he registered the Liability Judgment in the Western District of New York.[5]  *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 20-mc-40

---

[4] The relevant provision of the Anti-Terrorism Act is entirely distinct from the FSIA, and does not necessarily involve foreign states.  *See* 18 U.S.C. § 2333.

[5] Caballero has also registered the Liability Judgment in a number of other jurisdictions in order to seek turnover orders against various assets and parties in an attempt to satisfy his judgment.  *See, e.g.*, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 3:20-cv-1939 (RNC) (D. Conn.); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 21-cv-11393-IT (D. Mass.); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 20-cv-7602-JWH (C.D. Cal.); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 20-mc-80416-JST (N.D. Cal.).

(W.D.N.Y.), at ECF No. 1.   Shortly thereafter, he moved for an *ex parte* post-judgment writ of execution pursuant to TRIA § 201(a) against the assets of Venezuela's state-owned oil company, Petroleos de Venezuela, S.A. ("PDVSA"), that were located within the district.   *See generally* Pl.'s Mot for Issuance of Court Ordered Post-Judgment Writ of Execution, ECF No. 10.

The Court granted that motion in December 2020.   *See generally* Decision & Order, ECF No. 15.   The Court concluded that the definition of "agency and instrumentality" for purposes of TRIA was governed by the Second Circuit's decision in *Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 133-34 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Rep. of Iran*, 138 S. Ct. 816 (2018).   *See* Decision & Order, ECF No. 15, at 4-5.   Applying that standard, the Court held that "PDVSA is an agency or instrumentality of FARC."   *Id.* at 5.   The Court further held that "[b]ecause 'an agency or instrumentality determination carries drastic results—the attachment and execution of property—it undeniably implicates due process concerns."   *Id.* at 5 n.3 (quoting *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 726 (11th Cir. 2014)).   The Court thus ordered that "before its assets are executed on, PDVSA is nonetheless entitled to notice and an opportunity to be heard to rebut the allegations that it is an agency or instrumentality of FARC."   *Id.*

Caballero served PDVSA by mailing a copy of the writ of execution to PDVSA's offices in Venezuela.   *See* Ex. 4, ECF No. 23-4.   Caballero then moved for a turnover judgment, which the Court granted in January 2021, for essentially the same reasons as in its order granting the writ of execution. *See* Turnover J., ECF No. 35.   PDVSA did not appear, despite the fact that, according to the Court, Caballero had "provided adequate notice of the writ of execution to PDVSA and the defendants."   *Id.* at 3.

8

A few days later, PDVSA moved to intervene.  *See* PDVSA's Limited Mot. to Intervene, ECF No. 37.  PDVSA then moved to quash the writs of execution and vacate the turnover judgment.  *See* PDVSA's Mot. to Quash Writs of Executions & Vacate Turnover J., ECF No. 85-1.  After PDVSA's motion was fully briefed, the Court issued an order inviting the United States to file a brief addressing the following questions "and any other issues raised by this litigation that the United States deems of interest."  Order, ECF No. 106, at 4.

1. Whether, and if so, how, FSIA's jurisdictional and attachment immunity provisions apply in this post-judgment execution action; in particular, whether section 201(a) of TRIA provides subject matter jurisdiction in an action where a party obtained a judgment against a non-state terrorist party and seeks to execute that judgment against a foreign state also alleged to be an agency or instrumentality of the non-state terrorist party.

2. Whether FSIA's service provision, 28 U.S.C. § 1608, applies in a post-judgment execution action under section 201(a) of TRIA; and

3. Whether section 201(a)'s language regarding the "blocked assets of any agency or instrumentality of that terrorist party" requires that the terrorist party have an ownership interest in the assets at issue for attachment under section 201(a) of TRIA.

*Id.* at 4-5.

## ANALYSIS

**I.     BECAUSE TRIA DOES NOT PROVIDE AN INDEPENDENT BASIS FOR SUBJECT-MATTER JURISDICTION AGAINST AN AGENCY OR INSTRUMENTALITY OF A FOREIGN STATE THAT IS NOT A STATE SPONSOR OF TERRORISM, ANY GRANT OF JURISDICTION MUST BE PROVIDED IN THE FSIA.**

It is the view of the United States that TRIA does not provide an independent basis for subject-matter jurisdiction in a claim against a foreign state, or its agencies and instrumentalities, that is not designated as a state sponsor of terrorism.  Instead, the FSIA's jurisdictional requirements—which are the exclusive basis for jurisdiction against foreign states or their agencies or instrumentalities—must first be satisfied.

9

**A. The FSIA is the exclusive basis for subject-matter jurisdiction over foreign states, including their assets or instrumentalities, and such states are immune from court jurisdiction unless a specific exception to jurisdictional immunity applies.**

It is a foundational principle that the "FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." *Argentine Rep.*, 488 U.S. at 434; *see also Samantar v. Yousuf*, 560 U.S. 305, 313-14 (2010) ("The FSIA provides that 'a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States' except as provided in the Act. Thus, if a defendant is a 'foreign state' within the meaning from the Act, then the defendant is immune from jurisdiction unless one of the exceptions in the Act applies.") (internal citation omitted); *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005) ("In the United States, there is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one—the FSIA."). Such exclusive jurisdiction is defined by two statutes: "[28 U.S.C.] § 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and [28 U.S.C.] § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity." *Argentine Rep.*, 488 U.S. at 434. The FSIA draws a further distinction between jurisdictional immunity, which provides the state immunity from suit, and execution immunity, which protects the state's property from attachment and execution. *See, e.g.*, *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 286 (2d Cir. 2011) (summarizing differences). "[T]he FSIA's provisions governing jurisdictional immunity, on one hand, and execution immunity, on the other, operate independently." *Id.* at 288.

For the purposes of the FSIA, including section 1604, a foreign state includes "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). This Court recognizes that PDVSA is "the national oil company of Venezuela," Decision & Order, ECF No. 78, at 3, which is owned by

Venezuela, and whose board is appointed by the President of Venezuela, *id.* at 10.  Accordingly, it appears to be undisputed that PDVSA is an agency or instrumentality of Venezuela.

As such, Caballero must establish an exception to jurisdictional immunity as set out in 28 U.S.C. §§ 1605 to 1607 that would be applicable to PDVSA.  While the United States does not take a position as to whether Caballero could make such a showing, absent a determination that there is an applicable exception to the FSIA that provides subject-matter jurisdiction over PDVSA, there would be no basis to exercise jurisdiction over PDVSA in this case.

### B.  TRIA—which eliminates attachment immunity in situations to which it applies— does not displace the requirement for an exception to jurisdictional immunity in this case.

TRIA does not provide an explicit exception to jurisdictional immunity.  TRIA section 201(a) provides that:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) [(as such section was in effect on January 27, 2008)] of title 28, United States Code, the blocked assets of the terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment.

TRIA § 201(a).

It is clear that TRIA expands the category of assets that may be executed upon in service of a terrorism judgment.  *Compare* TRIA § 201(a), *with* 28 U.S.C. § 1610 (limited exceptions to foreign state execution immunity).  The dispositive question is whether TRIA also waives *jurisdictional immunity* for foreign states.  For multiple independent reasons, it is the position of the United States that TRIA does *not* provide an independent grant of subject-matter jurisdiction over foreign states where jurisdiction has not already been established under the FSIA's exception to immunity for state sponsors of terrorism.  Rather, in such cases TRIA simply—albeit

significantly—expands the exceptions for *attachment* immunity for entities that fall within its scope.

      **i.**      TRIA's text exclusively pertains to *post-judgment* attachment proceedings.  TRIA thus takes as a given that there must have been jurisdiction to allow the imposition of a judgment earlier in the proceedings, rather than providing an independent grant of subject-matter jurisdiction.

      Indeed, with respect to foreign states, TRIA only expands exceptions to execution immunity where the FSIA's jurisdictional requirements have already been satisfied.  TRIA clarifies that it applies to judgments "based upon an act of terrorism" as specifically defined or claims "for which a terrorist party is not immune under [28 U.S.C. § 1605A]."  TRIA § 201(a).  As courts have explained, if TRIA were an independent source of subject-matter jurisdiction, then that clause—which presumes that the FSIA's terrorism exception to jurisdictional immunity has already been satisfied—would be superfluous. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 480 (S.D.N.Y. 2006) ("However, if a foreign sovereign was immune from judgment under § 1605(a)(7), reading a 'claim based on an act of terrorism' to include those foreign sovereigns would defeat that very immunity and create a whole new category of jurisdiction over otherwise immune sovereigns.  The Court has before it no indication that this application reflects Congress's intent in passing TRIA, an execution statute.").  Moreover, the Second Circuit is explicit that TRIA only waives the *attachment* immunity over foreign states: "TRIA section 201(a) provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign, however, only where a *valid* judgment has been entered against the sovereign.  In other words, section 201 provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA." *Vera v. Banco Bilbao*

*Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019) (internal citations and quotation marks omitted).

Moreover, the legislative history and case law also recognize TRIA as expanding exceptions to attachment immunity, rather than expanding the subject-matter jurisdiction of the federal courts over foreign states. As discussed above, attachment and jurisdiction immunity are independent requirements, so expanding attachment immunity should render no change to jurisdictional immunity. *See* H.R. Rep. 107-779, at 27 (2002), *as reprinted in* 2002 U.S.C.C.A.N. 1430, 1434 ("Section 201 builds upon and extends the principles in section 1610(f)(1) of the Foreign Sovereign Immunities Act [applying to attachment immunity], authorizes the enforcement of judgments against terrorist organizations . . . ."); *United States v. Holy Land Found. for Relief & Dev.*, 445 F.3d 771, 787 (5th Cir. 2006) ("The TRIA amended § 1610 of the FSIA, which is titled 'Exceptions to the immunity from attachment or execution' to make available assets that might otherwise be immune from execution."); *id.* ("We conclude that the 'notwithstanding' language [in TRIA] . . . appears to target statutory immunities to execution."); *Rubin v. Islamic Rep. of Iran*, 709 F.3d 49, 54 (1st Cir. 2013) ("[Under certain circumstances, TRIA permits the attachment of property that might otherwise be immune under the FSIA."); *see also Levinson v. Kuwait Fin. House (Malaysia) Berhard*, -- F.4th --, No. 21-2043, 2022 WL 3269083, at *3 (2d Cir. July 21, 2022) ("The FSIA provides that foreign states, as well as their agencies or instrumentalities, enjoy absolute immunity from suit and from the attachment and execution of their assets, and these immunities fall away only under 'certain express exceptions.' . . . . [one] such exception, TRIA, allows FSIA judgment holders to enforce their judgments using attachment or execution . . . .") (internal citation omitted).

ii.      The Second Circuit's decision in *Weinstein v. Islamic Republic of Iran*, 609 F.3d

43 (2d Cir. 2010), which concerned jurisdiction over agencies and instrumentalities of designated

state sponsors of terrorism, does not suggest that TRIA could serve as an independent grant of

subject-matter jurisdiction over agencies and instrumentalities of a foreign state not designated as

a state sponsor of terrorism.   In *Weinstein*, the Second Circuit considered a claim where there was

an FSIA terrorism judgment against Iran and the plaintiffs were attempting to execute against the

assets of Bank Melli, an agency or instrumentality of Iran that had not been a defendant in the

initial suit.   The bank argued that TRIA "does not provide jurisdiction for a court to permit

attachment against a party that was not itself the subject of the underlying judgment."  *Id.* at 48-

49.   The Second Circuit disagreed.   It reasoned that, because TRIA specifically stated that the

"blocked assets of any agency or instrumentality of th[e] terrorist party" are subject to attachment

in cases in which the plaintiff had a judgment against the terrorist party, the court must *also* have

"an independent grant of jurisdiction over the agencies and instrumentalities." *Id.* at 49.  Otherwise

the language in TRIA allowing plaintiffs to execute upon the assets of those entities would be

rendered a "nullity."  *Id.*   Accordingly, it held that "Section 201(a) of the TRIA provides courts

with subject-matter jurisdiction over post-judgment execution and attachment proceedings against

property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality

is not itself named in the judgment."  *Id.* at 50.

*Weinstein*, however, does not address this kind of case, where the plaintiff is seeking to

attach the assets of a state instrumentality or agency based on a judgment that was entered against

a *non-state* party.   Although *Weinstein* refers to TRIA as providing an "independent grant of

jurisdiction over the agencies and instrumentalities" of terrorist parties, *id.* at 49, that broad

language is read best to refer only to the situation that was presented in that case—in which "TRIA

provides jurisdiction for execution and attachment proceedings to satisfy *a judgment for which there was original jurisdiction under the FSIA* ….."  *Id.* at 52 (emphasis added).  In such cases, there was already a FSIA exception to subject-matter jurisdiction over the foreign state, as required for the primary terrorism judgment.  *See, e.g.*, *Levinson*, 2022 WL 3269083, at *3 (noting that TRIA is an exception to attachment immunity for "FSIA judgment holders").  Here, where the terrorism judgment was based on a *non-state entity*, there is no judgment for which there was subject-matter jurisdiction under the FSIA.  Accordingly, *Weinstein* need not and should not be read to address attachment proceedings against a foreign state (or agency or instrumentality) *absent* a predicate FSIA judgment against the foreign state in question.  Under those circumstances, the requirement of an exception to the FSIA's jurisdictional immunity found in the FSIA itself continues to apply.  This reading is consistent with how the Second Circuit has construed *Weinstein*:

> TRIA section 201(a) provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign, however, only where "a *valid* judgment has been entered" against the sovereign.  In other words, section 201 "provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA . . . if certain statutory elements are satisfied."  Whether the District Court here had jurisdiction under TRIA to attach and execute on Cuba's assets, therefore, turns on whether Petitioners held judgments that were based on an exception to immunity from jurisdiction established by the FSIA

*Vera*, 946 F.3d at 133 (quoting *Weinstein*, 609 F.3d at 52; first citation omitted); *see also Levinson*, 2022 WL 3269083, at *3 (noting that TRIA, as applied against foreign states, "allows FSIA judgment holders to enforce their judgments using attachment or execution").

Similarly, in *Crystallex International Corp. v. Bolivarian Rep. of Venezuela*, 932 F.3d 126, 136-38 (3d Cir. 2019), the Third Circuit considered the related question of whether the plaintiffs— who had secured jurisdiction over Venezuela via an applicable FSIA exception to jurisdictional

immunity under section 1605—could also have jurisdiction over PDVSA, its conceded agency or instrumentality, for purpose of enforcing the judgment. The Third Circuit reasoned that it did. It concluded that "when a party establishes that an exception to sovereign immunity applies in a merits action that results in a federal judgment . . . that party does not need to establish yet another exception when it registers the judgment in another district court under 28 U.S.C. § 1963 and seeks enforcement in that court." *Id.* at 137. The Third Circuit reasoned that "the jurisdictional basis from the action resulting in the judgment carries over to the post-judgment enforcement proceeding in a manner akin to the ordinary operation of a district court's enforcement jurisdiction over post-judgment proceedings." *Id.* The Third Circuit further concluded that if the plaintiff could establish that PDVSA was the alter ego of Venezuela under *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), then the plaintiff could attach the company's assets to satisfy the judgment against Venezuela.

When read together with *Weinstein*, *Crystallex* indicates that under certain circumstances, such as where an agency or instrumentality is operating as an alter ego of the state, there does not necessarily need to be a separate jurisdictional exception for the agency or instrumentality in order for the court to have subject-matter jurisdiction and be able to attach assets of the agency or instrumentality to satisfy a judgment against a foreign state. *Crystallex*, 932 F.3d at 139. But even in those limited situations, the FSIA still has to provide an exception to jurisdictional immunity for the parent state. That is not the situation here.

TRIA also does not provide ancillary jurisdiction to enforce judgments against a foreign state's assets that would overcome the jurisdictional immunities provided by the FSIA. PDVSA, in its district court briefing, relies upon the Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349 (1996). *See* PDVSA's Mot. to Quash, at 14; PDVSA's Reply in Supp. of Mot. to Quash

Writs of Executions & Turnover J., ECF No. 91, at 1.   In that decision, the Supreme Court considered the line between a court's ancillary jurisdiction to enforce upon an existing judgment and a new proceeding that imposed liability on a new party.  The Court noted that "[w]e have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."  *Peacock*, 516 U.S. at 357.  It affirmed, however, the "exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, [and] garnishment."  *Id.* at 356.  Key to the court's decision appeared to be "the shifting of liability for payment of the judgment from the judgment debtor to the [new party]."  *Id.* at 358.  Indeed,

> Since *Peacock*, most courts have continued to draw a distinction between post-judgment proceedings to collect an existing judgment and proceedings, such as claims of alter ego liability and veil-piercing, that raise an independent controversy with a new party in an effort to shift liability.  Where the post-judgment proceeding is an effort to collect a federal court judgment, the courts have permitted judgment creditors to pursue, under the ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even those the assets are found in the hands of a third party.

*Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001); *see also C.G. Holdings, Inc. v. Rum Jungle, Inc.*, 852 F. Supp. 2d 582, 388 (E.D.N.Y. 2008) ("courts in this circuit have found that enforcement of a judgment against a third party that is predicated on alter-ego and veil-piercing theories falls outside the ancillary jurisdiction of the court.").

In the view of the United States, the best way to harmonize *Peacock*, *Crystallex*, and *Weinstein* is as follows: As long as there is an applicable FSIA exception under which the district court has subject-matter jurisdiction over a foreign state against which a judgment has been entered, a court may attach the assets of that state's agency or instrumentality to enforce the judgment, at least if that agency or instrumentality is the alter ego of the foreign state (*Crystallex*)

or, in the TRIA context, is the agency or instrumentality of a foreign state subject to a judgment under 28 U.S.C. § 1605A (*Weinstein*).   If the FSIA was not utilized for the subject-matter jurisdiction of the underlying judgment, then *Peacock* teaches that the court may not attach the assets, because the plaintiff is trying to extend liability for the judgment to a new party, the foreign state (or its agency or instrumentality), rather than to collect the defendant's own assets that are being held by a foreign state agency or instrumentality.   That reading is faithful to the fundamental principle that the FSIA is the exclusive authorization of jurisdiction over foreign states and that the courts lack jurisdiction over a foreign state *unless* an exception to the FSIA applies.

 **iii.** The Plaintiff's argument to the contrary would effectively limit not only the execution immunity of designated state sponsors of terrorism, but also the jurisdictional immunity of *all* foreign states.   That reading would fundamentally alter the immunity regime enacted by Congress in the FSIA.   Whereas TRIA explicitly abrogates the execution immunity regime for a very small number of foreign states designated by the Executive as state sponsors of terrorism, Plaintiff's proposed interpretation would make the blocked assets of *any* foreign state potentially vulnerable to attachment to enforce terrorism judgments against non-state actors.   It would do so without any requirement that the courts first address the jurisdictional immunity, much less the liability, of the foreign state or its agency.

 TRIA itself does not require such a reading.   Although Plaintiff points to the "notwithstanding" clause of Section 201(a) of TRIA, that "'notwithstanding' clause only applies when another provision of law conflicts with the TRIA."   *United States. v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 687 (5th Cir. 2013) (collecting cases).   In determining whether there is an actual conflict, courts have rejected the argument that "the 'notwithstanding' clause trumps any other law that has the incidental effect of removing funds from the reach of judgment

creditors." *Id.* at 688; *see also id.* at 689 ("The language of TRIA § 201 is not ambiguous; it allows a plaintiff with a judgment against a terrorist organization to execute against that organization's assets. . . . The 'notwithstanding' clause should not be read to override the operation of other statutory provisions that do not interfere with the TRIA's stated purpose.") (internal citation omitted). Moreover, even to the extent that this provision could be read as preempting conflicting laws, *e.g.*, *Hausler v. J.P. Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 531 (S.D.N.Y. 2010), the United States is not aware of authority holding that a "notwithstanding" clause would *create* subject-matter jurisdiction that would not otherwise exist. This would be a broad expansion of a provision that is focused on attachment immunity only. As the Supreme Court observed "the [legislative] history suggests that Congress placed the 'notwithstanding' clause in § 201(a) for totally different reasons, namely, to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009) (citing H. R. Rep. No. 107-779, at 27 (Conf. Rep.), 2002 U.S.C.C.A.N. at 1434).

Caballero's proposed interpretation is not only inconsistent with the comprehensive regime of immunity established by the FSIA; it would also undermine the specific and targeted measures under the FSIA to address sovereign immunity as it relates to terrorism claims. Congress has enacted two specific FSIA provisions for addressing jurisdictional immunity in the terrorism context, sections 1605A and 1605B, with one of those provisions being enacted over a decade after TRIA's enactment. But Caballero's proposed interpretation of TRIA would allow plaintiffs to avoid those carefully delineated exceptions enacted by Congress, as well as the judgment of the Executive Branch in designating state sponsors of terrorism, in effect opening a back door through TRIA. Plaintiffs' inability to obtain jurisdiction over Venezuela or PDVSA based on the FSIA's

terrorism exceptions to immunity would no longer be an obstacle to plaintiffs, for there would be a far easier route to have Venezuela or PDVSA satisfy a terrorism-related judgment through TRIA.[6]  Courts should be wary of interpreting TRIA to fundamentally alter the sovereign immunity framework established by Congress, particularly in the absence of any support in the text or legislative history of TRIA for such an interpretation.

 **iv.** Caballero's proposed interpretation also would invite significant, negative foreign policy consequences, which would significantly limit the discretion of the Executive and cause unnecessary conflict with foreign countries at the expense of U.S. litigants.

 *First*, interpreting TRIA to potentially abrogate attachment immunity for all foreign states—not just those designated state sponsors of terrorism—would undermine the effectiveness of the Executive Branch's authority to designate which particular foreign governments should be subject to suit and attachment under the FSIA based on their support of terrorism.  Designating a foreign state as a state sponsor of terrorism carries serious consequences and occurs only after national security, foreign policy, and intelligence professionals carefully review all available information to determine whether a country meets the criteria that the Congress established.  In contrast, plaintiff's interpretation of TRIA could strip any foreign government of immunity from judicial process in the United States based solely upon allegations by private litigants that a foreign government or its agency or instrumentality acted as an agent of a private terrorist party subject to

---

[6] In fact, under Caballero's interpretation, plaintiffs pursuing execution against the assets of non-state sponsors of terrorism under TRIA may be more favorably positioned than those seeking to hold a foreign state directly liable for its tortious acts connected to a terrorist attack in the United States under JASTA.  Plaintiffs under JASTA have to meet certain jurisdictional requirements and, if successful, prevail on the merits.  And even then, they would not be able to execute any resulting judgments based on the provisions of TRIA (which is limited to 1605A or 1605(a)(7) claims), but would have to rely on the narrower exceptions to execution immunity provided by the FSIA.

a terrorism-related judgment. This would place consequential decisions concerning whether foreign governments support terrorism in the hands of private litigants and courts, to be made post-judgment, based upon incomplete information or upon a mere showing of broad connections between a foreign government and terrorist groups. In addition, this approach would risk having different courts reaching different conclusions about the degree of connection necessary to execute against a foreign state's assets based on alleged terrorist connections.

*Second*, Caballero's interpretation would upset longstanding international principles regarding sovereign immunity, putting in place rules that, if applied globally, could have serious implications for U.S. national interests. The United States has a larger international presence, by far, than any other country, and sovereign immunity principles protect our Nation and its Armed Forces, officials, and assistance professionals from foreign court proceedings. These principles also protect U.S. Government assets from attempted seizure by private litigants abroad. Removing sovereign immunity in U.S. courts for foreign governments that are not designated as state sponsors of terrorism, based solely on allegations of that foreign government's support for a terrorist group, threatens to undermine these longstanding principles that protect the United States, our forces, and our personnel. *See, e.g.*, *Clodfelter v. Rep. of Sudan*, 720 F.3d 199, 209 (4th Cir. 2013) (noting the "reciprocal foreign litigation interests of the United States" when construing statutes against foreign states); *Persinger v. Islamic Rep. of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984) (recognizing that because "some foreign states base their sovereign immunity decisions on reciprocity," a U.S. court's decision to exercise jurisdiction over a foreign state can "subject the United States to suits abroad" in like circumstances).

*Third*, Caballero's interpretation threatens to create complications in our relationships with foreign states and our use of sanctions as a foreign policy tool. If a plaintiff obtained a judgment

against a terrorist party, that judgment could be satisfied with blocked assets of a foreign state on a mere showing that the foreign state had provided "material services to, on behalf of, or in support of the terrorist party." *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d at 135. While it is true that TRIA would allow for attachment only of blocked assets, assets can be blocked for a wide variety of reasons, not necessarily related to terrorism or the specific terrorist attack for which plaintiffs have obtained a judgment. Subjecting a foreign state's blocked assets to execution under TRIA, where the Executive branch has not designated the foreign state as a state sponsor of terrorism, significantly complicates the use of sanctions as a tool of foreign policy by subjecting a potentially broad range of blocked assets belonging to foreign states to the choices of private litigants seeking to enforce their judgments.

Economic sanctions have long been used by the United States as an important tool of foreign policy. *See, e.g.*, *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 41 (D.D.C. 2005). Moreover, the United States often blocks assets for reasons that are broader or different than a foreign state's connection to terrorism. Under the plaintiff's theory, however, litigants could collect foreign state assets under TRIA provisions that (as relevant here) were intended to be limited to the blocked assets of designated state sponsors of terrorism (or their agencies and instrumentalities). This would greatly expand the pool of available assets, and thus reduce the leverage of sanctions in contexts not involving a state sponsor of terrorism. This would frustrate the important national security and foreign policy prerogatives of the Executive, including its leverage in applying such sanctions. *Cf. Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (discussing executive's central role in carrying out foreign policy and blocking conflicting state efforts which interfere with those responsibilities). In light of this important background principle,

TRIA § 201 should not be interpreted to create subject-matter jurisdiction absent a clear indication of Congressional intent, which is not present here.

### C. Caballero's argument that an attachment action is an *in rem or quasi-in-rem* proceeding to which the FSIA does not apply is not consistent with the FSIA.

Caballero's primary response to the foregoing analysis is to claim that the limitations of the FSIA do not apply in this action because the FSIA only applies to *in personam* actions, as opposed to actions that are *in rem* or *quasi-in-rem*. *See* Pl.'s Mem. of Law in Opp'n to PDVSA's & Subsidiaries Mot. to Quash Writs of Execution & Vacate Turnover J. ("Opp'n to Mot. to Quash"),. There is no basis for this conclusion, which could have the effect of largely vitiating the FSIA's carefully constructed immunity provisions.

i.     Post-judgment attachment actions are sometimes described as *quasi-in-rem* proceedings, particularly when applied against the property in the possession of a third-party based upon a relationship between that party and the judgment debtor. *See, e.g.*, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 562 F. Supp. 3d 867, 882-85 (C.D. Cal. 2021) (concluding that TRIA provided for *quasi-in-rem* jurisdiction for post-judgment attachment actions); *Billiouri v. Wells Fargo Bank N.A.*, No. 3:15-cv-2664-L, 2022 WL 2992880, at *3 (N.D. Tex. July 28, 2022) ("A postjudgment garnishment proceeding is a *quasi in rem* action brought by a judgment creditor (the garnishor) against another party (the garnishee) who holds property or funds belonging to the judgment debtor.").

But the FSIA makes clear that foreign property is immune from post-judgment attachment *unless* a specific exception to that attachment immunity applies. *See* 28 U.S.C. §§ 1609-1611.[7]

---

[7] There is a limited exception to the FSIA's immunity from pre-judgment attachment, which only applies if the foreign state has, among other things, "explicitly waived its immunity from attachment prior to judgment." 28 U.S.C. § 1610(d)(1).

Given that Congress enacted several sections of the FSIA to protect foreign states from attachment proceedings except under narrow circumstances, it is difficult to see how the FSIA does not apply to attachment proceedings, however denominated, involving the property of a foreign state.

  **ii.**  The Second Circuit's decision in *United States v. Assa Co.* 934 F.3d 185 (2d Cir. 2019), is not to the contrary. *See* Opp'n to Mot. To Quash, at 6-8. There, the Second Circuit concluded that FSIA does not preclude *in rem* asset forfeiture actions brought by the United States against the property of foreign states. *See Assa*, 934 F.3d at 189. The Second Circuit's decision specifically distinguished civil forfeiture *in rem* actions brought by the United States from "*quasi in rem* suits meant to enforce *in personam* judgments against a foreign state." *Id.* The Second Circuit agreed that the FSIA governs attachment proceedings of the type at issue here, which are brought by private litigants to enforce *in personam* judgments. *Id*.

## II. FSIA'S SERVICE PROVISIONS APPLY TO POST-JUDGMENT EXECUTION ACTIONS AGAINST A FOREIGN STATE'S ASSETS WHERE THE FOREIGN STATE IS NOT THE JUDGMENT DEBTOR.

  The United States takes the position that FISA's service provisions, 28 U.S.C. § 1608, apply to post-judgment execution actions under section 201(a) of TRIA, at least where the foreign state was not the judgment debtor, as here.

### A. FSIA sets out the process by which foreign states, including their agencies or instrumentalities, are served with judicial process.

  The FSIA establishes the process by which "service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign states." 28 U.S.C. § 1608(b). "Section 1608 sets forth the exclusive procedures with respect to service on, the filing of an answer or other responsive pleadings by, and obtaining a default judgment against a foreign state or its political subdivisions, agencies or instrumentalities." H.R. Rep. No. 94-1487, at 24 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6622. The purpose of these procedures is to ensure

that the foreign state has proper notice of litigation in the United States brought against a foreign state, or against foreign states assets, so that the foreign state has an adequate opportunity to appear before U.S. courts to assert its defenses, including sovereign immunity.

Befitting the importance of notice and an opportunity to appear, proper service is a consequential act in litigation against foreign states. Service pursuant to section 1608 is necessary to establishing personal jurisdiction over a foreign state. *See* 28 U.S.C. § 1330(b). Service pursuant to section 1608 is also required before a default judgment can be enforced against a foreign state via the execution or attachment of state assets. *See* 28 U.S.C. §§ 1608(e), 1610(c).

## B. Post-judgment execution actions require service to third parties whose assets are subject to attachment.

The United States is not aware of authority directly addressing whether section 1608 requires service with respect to attempts to attach the assets of foreign states who were *not* party to the underlying liability judgment. Indeed, no provision of the FSIA specifically addresses what form of notice must be provided to a foreign state where execution is sought against foreign state property. However, there are several independent reasons why service as set out in the FSIA is required under such circumstances.

**i.** Service of the attachment action is consistent with the structure of the FSIA, which provides foreign states (and their agencies and instrumentalities) with significant protections, including against attachment proceedings. Under the FSIA, service under section 1608 is required to commence a liability suit against a foreign state, *see* 28 U.S.C. § 1330(b), and is required again before attachment or execution against a foreign state's assets can be effectuated after a default judgment against that state has been entered, *see* 28 U.S.C. § 1610(c). (In a situation where a non-default judgment was entered, the foreign state must have appeared, and thus was on notice of the suit.) The purpose of this provision is to "afford sufficient protection to a foreign state." H.R.

Rep. 94-1487, at 30. By preventing execution except by court order, and by requiring the passage of a reasonable time following entry of default judgment, which must be separately served on the foreign state, Congress clearly envisioned that there would be a meaningful opportunity for a foreign sovereign to be heard at the enforcement stage to assert immunity.

In the situation here, the foreign state—by definition—would not have been served with the underlying liability judgment, because it was not named in that suit. It would be highly anomalous for Congress to have provided service of process as a prerequisite to execution to a situation where a foreign state was *named* as a defendant in the underlying lawsuit, and then defaulted (*i.e.*, affirmatively chose not to appear even after being provided notice), but to have provided no protection when a foreign state's assets are being attached in a situation where the foreign state was not even named as a defendant in the underlying action or provided any notice of that action.

The Federal Rules also are best understood to require service in a post-judgment execution motion consistent with the FSIA. Any pleading "asserting new or additional claims" against a foreign state must be served in conformance with 28 U.S.C. § 1608. *See* Fed. R. Civ. P. 5(a), 4(j)(1). In light of the distinct rights and interests implicated for the first time when a judgment is sought to be enforced—particularly against a new party—a motion seeking an order of enforcement against foreign state property can be viewed as analogous to a pleading asserting a new claim for relief.

Courts have "stressed a foreign sovereign's interest—and our interest in protecting that interest—in being able to assert defenses based on its sovereign status." *FG Hemisphere Assocs., LLC v. Dem. Rep. of Congo*, 447 F.3d 835, 838 (D.C. Cir. 2006). Service of process pursuant to

the FSIA is the best way of ensuring that foreign states have notice that their property is subject to enforcement efforts and an opportunity to appear to assert immunity from execution.

      **ii.**     Service of process under section 1608 is also required under applicable federal and state procedural law.  Federal Rule of Civil Procedure 69 states that writs of execution "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a)(1).  Here, the relevant New York state statute appears to be N.Y. C.P.L.R. § 5225(b), which allows the judgment creditor to bring an execution action "against a person in possession or custody of money or other personal property in which the judgment debtor has an interest."  N.Y. C.P.L.R. § 5225(b).

      Importantly, in order to proceed against a non-party garnishee,[8] as here, the court must "ha[ve] personal jurisdiction over the garnishee."  *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018).  To establish personal jurisdiction over a foreign state agency or instrumentality, that entity must, among other requirements, be served pursuant to section 1608. *See* 28 U.S.C. § 1330(b).  Indeed, even if section 1330(b) does not apply here—and it does— before a court may exercise personal jurisdiction over a party "the procedural requirement of service of summons must be satisfied."  *Omni Cap. Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  Because section 1608 sets out the procedures by which "service in the courts of the United States . . . shall be made," 28 U.S.C. § 1608(b), and because Rule 69 dictates that applicable federal statutes govern with respect to post-judgment execution writs, as is involved here, service under 1608 is required.

---

[8] Under applicable New York State law, "[a] 'garnishee' is a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest."  N.Y. C.P.L.R. § 105(i).  Plaintiff appears to presume that PDVSA falls into the latter category.

**C. Requiring service of process pursuant to section 1608 accords with principles of international comity that ultimately benefit the people of the United States.**

Requiring service of process pursuant to section 1608 also accords with the underlying principles of comity and predictable and friendly international relationships that are a core purpose of the FSIA. "[T]he FSIA's purposes include 'promoting harmonious international relations,' and according foreign sovereigns treatment in U.S. courts that is similar to the treatment the United States would prefer to receive in foreign courts." *Aquamar, S.A. v. Del Monte Fresh Produce, N.A., Inc.*, 179 F.3d 1279, 1295 (11th Cir. 1999) (quoting *Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477, 480 (5th Cir. 1998)). Moreover, as the Supreme Court stated in *Republic of Philippines v. Pimentel*, "'judicial seizure' of the property of a friendly state may be regarded as 'an affront to its dignity and may . . . affect our relations with it.'" 553 U.S. 851, 866 (2008) (quoting *Rep. of Mex. v. Hoffman*, 324 U.S. 30, 35-36 (1945)).

The United States has an interest in ensuring that the procedures provided under the FSIA are followed. The United States will not appear in foreign litigation unless proper service of process was provided consistent with principles of customary international law concerning service on foreign states. The Department of Justice and the Department of State are unaware of any instance similar to this one, where an execution proceeding has been successfully initiated against assets of the United States in the absence of an underlying judgment against the United States. In such an unusual scenario, the United States would insist on proper service of process. Thus, it is in the interests of the United States to ensure that the FSIA is interpreted in a manner that not only furthers U.S. reciprocal interests but is consistent with what the United States considers a rule of customary international law concerning service of process on foreign states.

Indeed, that is particularly true in a case like this, where a foreign state is accused of being an "agency or instrumentality" of terrorists. Were the situation reversed, the United States would

28

expect service of process to be made in such a way that it would have notice of such a claim so that it could respond accordingly, lest the United States be held to be a supporter of terrorism in a foreign court without an ability to respond, and its assets subject to execution without an ability to defend.  Providing service of process consistent with the requirements of the FSIA is the best way to ensure those foreign countries provide the United States the same protections it would expect in those foreign courts.

III.   **WHILE THE UNITED STATES DOES NOT TAKE A POSITION AS TO WHETHER TRIA REQUIRES THAT A TERRORIST PARTY ITSELF HAVE AN OWNERSHIP INTEREST IN THE BLOCKED PROPERTY SUBJECT TO ATTACHMENT, IT DOES TAKE THE POSITION THAT TRIA DOES NOT APPLY TO AGENCIES OR INSTRUMENTALITIES OF STATES THAT ARE NOT STATE SPONSORS OF TERRORISM.**

TRIA states that "the blocked assets of th[e] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution."  TRIA § 201(a).  The United States does not take a position at this time as to whether TRIA requires that the terrorist party itself have an ownership interest in blocked property in question, or whether it is sufficient for the agency or instrumentality of that terrorist party to have such an ownership interest.  The United States does, however, note several factors that must be considered in this analysis.

A.   **TRIA requires an ownership interest in the property to be executed upon.**

As a starting premise, TRIA has consistently been read to authorize attachment execution only of blocked assets that are owned by the party against whom attachment is sought, as opposed to authorizing attachment based on some lesser degree of connection.  *See Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 937-40 (D.C. Cir. 2013) (interpreting TRIA § 201 to require ownership); *Hausler*, 770 F.3d at 212 (acknowledging that a party must have property interests in a blocked asset before attachment would be proper, though defining the nature of those property

interests under state law) (citing *Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014)); *Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 963 (9th Cir. 2016) (court must "determine the ownership of the assets in this context"), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).[9]

The courts of appeals have properly construed TRIA to include this ownership requirement. The assets "of" an entity are not naturally understood to include all assets in which it has any interest of any nature whatsoever.  Rather, the Supreme Court has repeatedly observed that the "use of the word 'of' denotes ownership." *BoBd.ard of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011) (quoting *Poe v. Seaborn*, 282 U.S. 101, 109 (1930); *see also id.* (describing *Flores-Figueroa v. United States*, 556 U.S. 646, 648, 657 (2009), as treating the phrase "identification [papers] of another person" as meaning such items belonging to another person); *Ellis v. United States*, 206 U.S. 246, 259 (1907) (interpreting the phrase "works of the United States" to mean "works belonging to the United States").

Applying that understanding of "of" to a disputed provision of patent law, the Court in *Stanford* concluded that "invention owned by the contractor" or "invention belonging to the contractor" are natural readings of the phrase "'invention of the contractor.'" 563 U.S. at 788.  In contrast, in *United States v. Rodgers*, 461 U.S. 677, 692 n.18 (1983), the Court held that the IRS could execute against property in which a tax delinquent had only a partial interest when the relevant statute permitted execution with respect to "any property, of whatever nature, *of* the

---

[9] The United States has repeatedly filed briefs supporting this position.  *See, e.g.*, Br. for the United States as Amicus Curiae Supporting Neither Party, *Bennett v. Islamic Republic of Iran*, Nos. 13-15442, 13-16100, Dkt. No. 82, at 10-14 (9th Cir. Oct. 23, 2015); Br. for the United States as Amicus Curiae, on Pet. For Writ of Certiorari, *Bank Melli v. Bennett*, No. 16-334, at 19-23 (S. Ct. May 23, 2017).

delinquent, *or in which* he has any right, title, or interest." 26 U.S.C. § 7403(a) (emphasis added); *see also Rodgers*, 461 U.S. at 692-94. The Court found it important that the statute not only explicitly applied to the property "of the delinquent," but also specifically referred to property in which the delinquent "has any right, title, or interest." *See Rodgers*, 461 U.S. at 692 (emphasis removed). TRIA omits the additional phrase; it applies to the blocked assets "of" a terrorist party," *see* TRIA § 201(a).

Moreover, while "the word ['of'] may carry a different meaning in other[] [statutes]," *Heiser*, 735 F.3d at 938, TRIA's context supports the government's reading. Extending this statute beyond ownership would expand these statutes well beyond common law execution principles. It is "basic in the common law that a lienholder enjoys rights in property no greater than those of the debtor himself; . . . the lienholder does no more than step into the debtor's shoes." *Rogers*, 461 U.S. at 713 (Blackmun, J., concurring in part and dissenting in part); *see also id.* at 702 (majority op.) (implicitly agreeing with this description of the traditional common law rule); *Heiser*, 735 F.3d at 938 ("a judgment creditor cannot acquire more property rights in a property than those already held by the judgment debtor.") (quoting 50 C.J.S. Judgments § 787 (2013)). Congress enacted TRIA against the background of these principles, and the statute should be interpreted consistent with those common-law precepts. *See Staples v. United States*, 511 U.S. 600, 605 (1994); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107-10 (1991).

**B. The Second Circuit's interpretation of the "agency or instrumentality" in *Kirschenbaum* should not extend to the agencies or instrumentalities of foreign states that have not been designated as state sponsors of terrorism.**

Courts have held that the meaning of "agency or instrumentality" in TRIA cannot be fully coextensive with the FSIA's definition because TRIA's definition of "terrorist party" encompasses non-state actors, whereas the FSIA applies only to foreign sovereigns. For example, the Second

Circuit has cautioned that TRIA's definition of an "agency or instrumentality" should not be read to "require[] a foreign state principal." *Kirschenbaum.*, 830 F.3d at 133.  In a case concerning whether an entity holding blocked assets was the agency or instrumentality of a foreign state that had been designated as a state sponsor of terrorism, the *Kirschenbaum* court granted the terms "agency or instrumentality" their "ordinary meanings." *Id.* at 135.  In evaluating whether the non-state entity acted as the "agency or instrumentality" of the designated state sponsor of terrorism, the Second Circuit held that a plaintiff must establish that a defendant "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party." *Id.* (citing *Stansell*, 771 F.3d at 723); *see also, e.g.*, *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 198-99 (2d Cir. 2019) (concluding that a corporation was an "agency or instrumentality" of a designated state sponsor of terrorism because it was undisputed that the corporation was an alter ego of the state and was "owned, controlled, and directed" by the state); *Levin v. Bank of N.Y. Mellon*, No. 09-cv-5900 (JPO), 2019 WL 564341, at *4 (S.D.N.Y. Feb. 12, 2019) (holding that a genuine issue of material fact existed as to whether a private individual was an agent or instrumentality of Iran).

*Kirschenbaum* arose in a different posture than is presented here.  The Second Circuit had no occasion in that case to consider whether, and under what circumstances (if any), an agency or instrumentality of a foreign state can simultaneously be an agency or instrumentality of a non-state terrorist entity.  As discussed below, the relevant legal considerations may differ when a court is asked to assess whether a foreign state, including its agency or instrumentality, can also act as an agency or instrumentality of a non-state entity.

*First*, applying *Kirschenbaum*'s broad definition of "agency or instrumentality" to foreign state agencies or instrumentalities would eliminate Congress's careful application of TRIA to state sponsors of terrorism. In defining which kinds of "terrorist party" assets could be attached under TRIA, Congress provided distinct categories for non-state actors ("terrorist" and "terrorist organization") and state actors ("a foreign state designated as a state sponsor of terrorism"). TRIA § 201(d)(4). Where a state is not designated as a state sponsor of terrorism, TRIA does not authorize the attachment of a foreign state's assets to satisfy a judgment against the foreign state.

*Second*, the application of the *Kirschenbaum* test to foreign state agencies or instrumentalities would cause significant international friction, because it would allow attachment of the property of foreign states that the Executive has *not* determined are state sponsors of terrorism, and would do so based on determinations about the degree of terrorism support that are made solely by the judiciary, without consideration of the foreign policy consequences of such determinations. Applying TRIA to the agencies or instrumentalities of foreign states based on their having "provided material services" in support of a terrorist party or having served as "a means through which a material function of the terrorist party is accomplished," *Kirschenbaum*, 830 F.3d at 135, involves vague terms that would potentially cover a wide range of behaviors, and thus open a broad range of state property to attachment.[10] The United States could expect reciprocal actions in foreign countries. Given the range of U.S. activities in foreign countries and

---

[10] Moreover, *Kirschenbaum* did not clearly explain from where it defined its TRIA "agency or instrumentality" standard. While it stated that it applied the "ordinary meanings" of "agency or instrumentality," *Kirschenbaum*, 830 F.3d at 135, the specific test it articulated was based on a *cf.* citation to the Eleventh Circuit's decision in *Stansell*. *See Kirschenbaum*, 830 F.3d at 135 n.19. *Stansell*, in turn, merely cited the district court's definition. *See Stansell*, 771 F.3d at 724 n.6. And the district court, in turn, did not explain where it drew its definition of agency or instrumentality, rather it simply articulated it, without any explanation. *See Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 8:09-cv-2308-T-26MAP, 2013 WL 12133661, at *2 (M.D. Fla. May 2, 2013)*, aff'd in part and rev'd in part*, 771 F.3d 713 (11th Cir. 2014).

the potential for U.S. entities to be accused of providing support, in some form, to groups those countries may not support, this could significantly expand U.S. liability abroad.  Indeed, the requirement that a foreign state be designated a state sponsor of terrorism avoids this problem, because in such a circumstance the Executive will have affirmatively decided to subject that foreign state to potential adverse consequences, including that the foreign state's property will be subject to attachment under the FSIA.  The Executive can consider the reciprocal implications of such an act.  But absent that determination, the expansion of *Kirschenbaum* could cause serious foreign policy issues.

*Third*, to the extent that this Court determines that TRIA requires only that the agency or instrumentality of a terrorist party have an ownership interest in the assets for those assets to be subject to execution, as opposed to the terrorist party itself having that ownership interest, it is all the more important for *Kirschenbaum*'s definition of agency or instrumentality to not apply to agencies or instrumentalities of foreign states that have not been designated as state sponsors of terrorism.  *Kirschenbaum*'s standard for agency or instrumentality status is relatively permissive, requiring only the provision of "material support" to terrorists or serving as "a means through which a material function of the terrorist party is accomplished".  *Kirschenbaum*, 830 F.3d at 135. If this is applied to foreign states (including entities that meet the narrower definition of "agency or instrumentality" under the FSIA), it would allow state assets to be attached under a broad range of circumstances, as discussed above, without any state sponsor of terrorism requirement, in contravention of FSIA's targeted approach and the specific language of TRIA that references that targeted approach (*i.e.*, the specific reference to 28 U.S.C. § 1605A).  This counsels, at a minimum, for applying a narrow application of "agency or instrumentality" to foreign states as defined under the FSIA.  *See, e.g.*, *Griffin v. Oceanic Contractors, Inc.* 458 U.S. 564, 575 (1982) ("It is true that

interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Dupuch-Carron v. Sec'y of Health & Human Servs.*, 969 F.3d 1318, 1330 (Fed. Cir. 2020) ("When construing a statutory term or phrase to avoid an absurd result, or when the term or phrase is 'ambiguous', it 'must be read in its context and with a view to its place in the overall statutory scheme.'") (quoting *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1357 (Fed. Cir. 2015) (brackets omitted).

The United States is aware that a district court in the Second Circuit cannot overturn or ignore *Kirschenbaum*.  However, it believes that a narrow construction is appropriate, as the Second Circuit did not address the question of when a foreign state, as defined under the FSIA, could be considered an agency or instrumentality of a non-state terrorist party under TRIA.  For the reasons discussed above, the broad *Kirschenbaum* standard for "agencies and instrumentalities" under TRIA, which the Second Circuit determined necessary given that TRIA extends to non-state terrorist parties, would be problematic to extend to foreign states under the FSIA that are not designated as a state sponsor of terrorism.  Indeed, the Second Circuit itself later recognized that an overly broad construction of *Kirschenbaum* was not advisable.  *See Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 199 (2d Cir. 2019) (recognizing that "it is possible that, if broadly construed, *Kirschenbaum*'s reading of TRIA could invite lawsuits against a third-party institution, such as a bank, that had only incidental and perhaps unintentional involvement with a terrorist party," but declining to "balance[] these concerns" because "a terrorist party's alter ego cannot argue that it lacks a nexus to its principal's wrongdoing.").

## CONCLUSIONS

The United States respectfully suggests that this Court adopt the constructions of the FSIA and TRIA set out above.  The United States appreciates the opportunity to submit its views and describe its interests in this matter.

Dated: September 20, 2022                    Respectfully submitted,

 

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director

DIANE KELLEHER
Assistant Branch Director

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va. Bar No. 85519)
Trial Attorney
U. S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, D.C. 20005
Tel.     (202) 514-1944
Email:  joseph.borson@usdoj.gov

*Counsel for the United States of America*